JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CIV 2163

Organic Seed Growers and Trade Association; Organic
Crop Improvement Association International, Inc.; OCIA
Research and Education Inc.; The Cornucopia Institute;
Demeter Association, Inc.; Navdanya International;
Maine Organic Farmers and Gardeners Association;
Northeast Organic Farming Association/Massachusetts
Chapter, Inc.; Northeast Organic Farming Association of
Vermont; Rural Vermont; Ohio Ecological Food & Farm
Association; Southeast Iowa Organic Association;
Northern Plains Sustainable Agriculture Society;
Mendocino Organic Network; Northeast Organic Dairy
Producers Alliance; Canadian Organic Growers; Family
Farmer Seed Cooperative; Sustainable Living Systems;
Global Organic Alliance; Food Democracy Now!; Family
Farm Defenders Inc.; Farm-to-Consumer Legal Defense
Fund; FEDCO Seeds Inc.; Adaptive Seeds, LLC; Sow
True Seed; Southern Exposure Seed Exchange; Mumm's
Sprouting Seeds; Baker Creek Heirloom Seed Co., LLC;
Comstock, Ferre & Co., LLC; Seedkeepers, LLC;
Siskiyou Seeds; Countryside Organics; Cuatro Puertas;
Interlake Forage Seeds Ltd.; Alba Ranch; Wild Plum
Farm; Gratitude Gardens; Richard Everett Farm, LLC;
Philadelphia Community Farm, Inc; Genesis Farm;
Chispas Farms LLC; Kirschenmann Family Farms Inc.;
Midheaven Farms; Koskan Farms; California Cloverleaf
Farms; North Outback Farm; Taylor Farms, Inc.; Jardin
del Alma; Ron Gargasz Organic Farms; Abundant Acres;
T & D Willey Farms; Quinella Ranch; Nature's Way Farm
Ltd.; Levke and Peter Eggers Farm; Frey Vineyards, Ltd.;
Bryce Stephens; Chuck Noble; LaRhea Pepper; Paul
Romero; and, Donald Wright Patterson, Jr.,

        Plaintiffs,

    v.

Monsanto Company and Monsanto Technology LLC,

        Defendants.

ECF CASE



Case No. _____

COMPLAINT

Jury Demanded

1

## INTRODUCTION

1.     Society stands on the precipice of forever being bound to transgenic agriculture and transgenic food.[1]  Coexistence between transgenic seed and organic seed is impossible because transgenic seed contaminates and eventually overcomes organic seed.  History has already shown this, as soon after transgenic seed for canola was introduced, organic canola became virtually extinct as a result of transgenic seed contamination.  Organic corn, soybean, cotton, sugar beet and alfalfa now face the same fate, as transgenic seed has been released for each of those crops, too.  And transgenic seed is being developed for many other crops, thus putting the future of all food, and indeed all agriculture, at stake.

2.     Plaintiffs in this matter represent farmers and seed businesses who do not want to use or sell transgenic seed.  Plaintiffs are largely organic farmers and organic seed businesses, but also include non-organic farmers who nonetheless wish to farm without transgenic seed. Plaintiffs are increasingly being threatened by transgenic seed contamination despite using their best efforts to avoid it.  This causes Plaintiffs to fear that, if they do indeed become contaminated by transgenic seed, which may very well be inevitable given the proliferation of transgenic seed today, they could quite perversely also be accused of patent infringement by the company responsible for the transgenic seed that contaminates them.  Thus, Plaintiffs bring this action to protect themselves from ever being accused of infringing patents on transgenic seed.

3.     Monsanto is a chemical company that was previously responsible for introducing to the world Agent Orange, DDT, PCB's and other toxins.  Monsanto is now the world's leading

---

1  Transgenic means to introduce the genetic code of one species into another.  Transgenic plants are sometimes referred to as "genetically modified (GM)" or "genetically engineered (GE)," however those terms are imprecise and, therefore, not used herein.

proponent of transgenic seed and holds many patents relating thereto that it has aggressively asserted against literally hundreds of farmers, including those farmers who became contaminated by Monsanto's transgenic seed through no fault of their own.  Public awareness of Monsanto's patent assertion activities is high and it contributes mightily to Plaintiffs' fears that they, too, could most assuredly be accused of patent infringement in the near future if and when they become contaminated by Monsanto's transgenic seed.

4.    Through this action, Plaintiffs ask the Court to declare that, should they ever be contaminated by Monsanto's transgenic seed, they need not fear being sued for patent infringement.  As set forth below, there are several legal bases for this declaration, the principal one of which is that patents on transgenic seed fail to satisfy the requirement of both the Constitution and the Patent Act that only technology with a beneficial societal use may be patented.  U. S. Const., Art. I, § 8, cl. 8 ("To promote the Progress of Science and *useful* Arts") (emphasis added); 35 U.S.C. § 101 ("Whoever invents or discovers any new and *useful* process, machine, manufacture, or composition of matter, or any new and *useful* improvement thereof, may obtain a patent therefor") (emphasis added).  As Justice Story wrote in 1817, to be patentable, an invention must not be "injurious to the well-being, good policy, or sound morals of society," and "a new invention to poison people ... is not a patentable invention."  *Lowell v. Lewis*, 15 F. Cas. 1018 (C.C.D. Mass. 1817).  Because transgenic seed, and in particular Monsanto's transgenic seed, is "injurious to the well-being, good policy, or sound morals of society" and threatens to "poison people," Monsanto's transgenic seed patents are all invalid.

5.    Monsanto's patents are   additionally   invalid   for   other   failures   to   meet   the

requirements of patent law, including that each violates the prohibition against double patenting, each is anticipated or rendered obvious by prior art, and each fails to satisfy the requirements of written description, enablement and best mode.  Monsanto's patents would also not be infringed by Plaintiffs because, amongst other things, Plaintiffs do not intend to use Monsanto's transgenic seed, any seed possessed by Plaintiffs that may be contaminated by Monsanto's transgenic seed is not covered by any valid and properly construed claim of any patent in suit, and Monsanto's patents rights in transgenic seed exhaust upon the authorized distribution by Monsanto to its customers.  Monsanto's patents are also unenforceable because, among other things, Monsanto has committed misuse, Monsanto is equitably estopped from enforcing them, and Monsanto commits trespass when its transgenic seed contaminates another.  Lastly, Monsanto would not be entitled to any remedy under law or equity even if its patents were held to be valid, infringed and enforceable against Plaintiffs, as no economic injury happens to Monsanto and the public interest would not support granting Monsanto an injunction when its patented seed contaminates another.

6.    As non-transgenic seed farmers and seed sellers, Plaintiffs already have to deal with the constant threat of transgenic seed contamination that could destroy their chosen livelihood. They should not also have to live with the threat of being sued for patent infringement should that travesty come to pass.  They now ask this court to provide them the declaratory relief to which they are entitled.

## JURISDICTION AND VENUE

7.    This Court has original jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §§ 1331 and 1338(a), in that it involves substantial claims arising under the United States Patent Act, 35 U.S.C. § 1 *et seq*.

8.    This Court may declare the rights and other legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because this is a case of actual controversy within the Court's jurisdiction seeking relief under the Federal Declaratory Judgment Act.

9.    This Court has personal jurisdiction over Defendants pursuant to Rule 4(K)(1)(a) of the Federal Rules of Civil Procedure and §§ 301 and 302 of the New York Civil Practice Law and Rules, because they have sufficient contacts with this District.

10.    Venue in this Judicial District is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400.


PARTIES

11.    Plaintiffs in this action represent a broad array of the organic and conventional agriculture community.   In total, Plaintiffs represent twenty-two agriculture membership organizations, twelve seed businesses and twenty-six farms and farmers.   Plaintiffs are largely, but not exclusively, organic.   Plaintiffs span the entire United States, from Maine to California, Ohio to Oregon, and everywhere in between.   They work hard to ensure Americans have the opportunity to select organic and non-transgenic food and other agricultural products.   They are constantly under siege from the threat of transgenic seed contaminating their property and, thus, jeopardizing their ability to maintain organic certification.

Plaintiff Agriculture Membership Organizations

12.     Plaintiff ORGANIC SEED GROWERS AND TRADE ASSOCIATION is a not-
for-profit agricultural organization that develops, protects and promotes the organic seed trade
and its growers, and assures that the organic community has access to excellent quality organic
seed, free of contaminants and adapted to the diverse needs of local organic agriculture.  See
http://www.osgata.org/.  Organic farmers require quality organic seed in order to maximize the
overall integrity and success of their organic system.  Organic seed systems face risks from
transgenic contamination.  The growth and development of a vibrant organic seed trade will
result in seed systems suited to the ecological, economic, local, and sustainable challenges and
needs of organic farming.  OSGATA policy states that transgenic contamination of organic seed
constitutes irreparable harm to the organic seed industry and that it undermines the integrity of
organic seed and that any detectable level is unacceptable.  OSGATA's membership is comprised
of organic farmers who produce seed crops, organic seed breeders, organic seed companies, and
affiliate organizations.  OSGATA brings this action on behalf of its forty members, some of
whom are at risk of being contaminated by Defendants' transgenic seed and consequently being
sued by Defendants for patent infringement.

13.     Plaintiff     ORGANIC     CROP     IMPROVEMENT     ASSOCIATION
INTERNATIONAL, INC. is one of the world's oldest, and most trusted leaders in the organic
certification industry.  See  http://www.ocia.org/.  OCIA International is a not-for-profit
agricultural organization dedicated to providing the highest quality organic certification services
and access to global organic markets.  As producers of certified organic crops, OCIA

6

International is committed to environmentally sound stewardship.  OCIA International brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

14.   Plaintiff OCIA RESEARCH AND EDUCATION INC. is a not-for-profit agricultural organization that supports farmer driven research, both on-farm and at research institutions, including exploratory and demonstration projects.   See http://www.ocia.org/RE/. OCIA R&E facilitates connections between farmers, researchers, consumers and decision-makers, and educates organic producers and local and global communities regarding organic farming and foods.  OCIA R&E brings this action on behalf of its approximately 900 members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

15.   Plaintiff THE CORNUCOPIA INSTITUTE is a not-for-profit public interest organization that engages in research and educational activities supporting the ecological principles and economic wisdom underlying sustainable and organic agriculture.   See http://www.cornucopia.org/.   Through research and investigations on agricultural issues, The Cornucopia Institute provides needed information to family farmers, consumers and the media. The Cornucopia Institute brings this action on behalf of its 4000+ members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

16.   Plaintiff DEMETER ASSOCIATION, INC. is the non-profit American chapter of Demeter International, the world's only certifier of Biodynamic® farms and products.   See

7

http://www.demeter-usa.org/.  The Demeter Association currently works with 275 members.  The Demeter® Farm Standard utilizes the National Organic Program as a base and from there envisions the farm as a self-contained and self-sustaining ecosystem.  It provides a base definition for Biodynamic products in the USA marketplace.  Seed, as well as other farm inputs, are encouraged to be generated from within the farming system rather than being imported from the outside, thus many Biodynamic farmers save their own seed.  The entire farm, versus a particular crop, must be certified, and farms are inspected annually.  In order for a  processed product to bear the Demeter logo it must be made with certified Biodynamic ingredients and meet strict processing standards to ensure the purest possible product.  The Demeter Association brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

17.  Plaintiff  NAVDANYA  INTERNATIONAL,  founded  by  physicist  and internationally renowned activist Dr. Vandana Shiva, was born out of a vision of peace and non-violence.  See http://www.navdanya.org/.  Navdanya's aim is to defend and protect nature and the rights of people to access to food and water and dignified jobs and livelihoods.  Promoting local and ecological food models is critical to alleviating poverty, hunger, and safeguarding natural resources, including water, especially in this time of climate change chaos.  Articulating rarely heard views from the global South, Navdanya believes that cultural and biological diversity is essential for ensuring creative, peaceful societies throughout the planet.  Navdanya has members throughout the world and brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by

Defendants for patent infringement.

18.    Plaintiff MAINE ORGANIC FARMERS AND GARDENERS ASSOCIATION is a not-for-profit agricultural organization. See http://www.mofga.org/.  Formed in 1971, MOFGA is the oldest and largest state organic organization in the country with over 6,300 members. MOFGA's mission is to help farmers and gardeners grow organic food, fiber and other crops, protect the environment, recycle natural resources, increase local food production, support rural communities, and illuminate for consumers the connection between healthful food and environmentally sound farming practices.   The organization includes hundreds of certified organic farmers as members, as well as farmers growing non-transgenic crops.   MOFGA brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

19.    Plaintiff            NORTHEAST            ORGANIC            FARMING ASSOCIATION/MASSACHUSETTS CHAPTER, INC. is a not-for-profit membership organization that includes farmers, gardeners, landscapers and consumers working to educate members and the general public about the benefits of local organic systems based on complete cycles, natural materials, and minimal waste for the health of individual beings, communities and the living planet.  See http://www.nofamass.org/.  NOFA/Mass encourages methods of farming and gardening that can continue for generations because they show respect for the soil, water, and air which support us all.  NOFA/Mass promotes political and economic changes necessary to build a sustainable local agriculture that benefits rural, suburban and urban Massachusetts. NOFA/Mass is concerned about the dangers posed by pesticides, herbicides and chemical

fertilizers along with the growing destruction of topsoil caused by erosion and loss of humus. NOFA/Mass advocates sustainable growing practices which not only conserve but actually renew and improve our environment. NOFA/Mass is looking at improved access for all to organic food and organic land and farming; with a consciousness of reaching low-income and marginalized people. NOFA/Mass brings this action on behalf of its approximately 1200 members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

20.    Plaintiff NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT is a nonprofit association of farmers, gardeners and consumers working to promote an economically viable and ecologically sound Vermont food system for the benefit of current and future generations. See http://nofavt.org/. NOFA Vermont was founded in Putney in 1971, making it one of the oldest organic farming associations in the United States. Today, NOFA Vermont is proud to have over 1,500 members throughout the state and to certify over 580 farms and processors to the USDA National Organic Program Standards. NOFA Vermont is passionate about increasing the acreage of certified organic land in Vermont while also increasing the access of local organic food to all Vermonters. All of NOFA Vermont's programs strive to meet these goals, whether it involves working with schools to bring local foods into the cafeteria or providing business planning services to farmers to ensure their businesses stay viable. NOFA Vermont brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

10

21.     Plaintiff RURAL VERMONT is a not-for-profit membership organization that envisions a Vermont local food system which is self-reliant and based on reverence for the earth. Rural Vermont's members agree that sustainable agriculture should be the foundation of our communities and that all people have the right to healthy, locally produced food.  For the past twenty years, Rural Vermont has been at the forefront of fighting corporate control of agriculture, representing family farmers and amplifying their voices in the struggle to achieve food sovereignty.  Rural Vermont brings this action on behalf of its approximately 800 members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

22.     Plaintiff OHIO ECOLOGICAL FOOD & FARM ASSOCIATION was formed in 1979 and is a membership-based, grassroots organization, dedicated to promoting and supporting sustainable, ecological, and healthful food systems.  See http://www.oeffa.org/.  OEFFA's membership includes over 2,800 farmers, consumers, gardeners, chefs, teachers, researchers, retailers, and students.  Together, OEFFA's members work to recreate a regionally-scaled farming, processing, and distribution system that moves food from farm to local fork using the highest standards of environmental stewardship.  OEFFA brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

23.     Plaintiff SOUTHEAST IOWA ORGANIC ASSOCIATION is Iowa Chapter 3 of OCIA International and is comprised of organic farmers in Southeast Iowa.  SEIOA brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants'

transgenic seed and consequently being sued by Defendants for patent infringement.

24.    Plaintiff NORTHERN PLAINS SUSTAINABLE AGRICULTURE SOCIETY is a nonprofit membership organization that is committed to the development of a more sustainable society through the promotion of ecologically sound, socially just, and economically viable food systems.  See http://www.npsas.org/.  NPSAS, a 32-year-old grassroots educational organization, has worked to advocate land stewardship and organic farming, bring together farmers for education and advancement of sustainable practices, help Northern Plains farmers convert their farms to organic systems, increase the region's land grant research in organic and sustainable agriculture, protect the integrity of the organic label, promote healthy trade relationships in the organic industry, and develop local food systems.  NPSAS's constituency is farm families and others interested in sustainable agriculture.  Members are located primarily in North Dakota, South Dakota, Minnesota, and Montana, as well as neighboring states of Iowa, Wyoming, and Nebraska.  NPSAS brings this action on behalf of its approximately 320 members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

25.    Plaintiff MENDOCINO ORGANIC NETWORK is a project of the Cloud Forest Institute, a not-for-profit scientific and educational organization formed in 1996.  Founded in 2001 by a small group of residents of Mendocino County, California, Mendocino Organic Network exists to promote sustainable organic agriculture and businesses in its bioregion and supports and promotes local organic and biodynamic farms and businesses.  See http://www.mendocinorenegade.com/.  Mendocino Organic Network brings this action on behalf

of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

26.     Plaintiff NORTHEAST ORGANIC DAIRY PRODUCERS ALLIANCE is a ten-year old 501(c)(5) nonprofit organization based in Deerfield, MA.  See http://www.nodpa.com. Open to any organic dairy producers in the eastern United States, NODPA is currently made up of 782 member organic farmers, organic dairies, and organic businesses.  Members are based throughout the Northeast including New England, New York, Pennsylvania, West Virginia, Virginian, North Carolina, South Carolina, Massachusetts, Ohio and Michigan.  NODPA brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

27.     Plaintiff CANADIAN ORGANIC GROWERS is a Canadian national charitable organization with members in all regions of Canada that exists to lead local and national communities towards sustainable organic stewardship of land, food and fiber while respecting nature, upholding social justice and protecting natural resources.  See http://www.cog.ca/.  COG's membership is diverse and includes farmers, gardeners, processors, retailers, educators, policy-makers, and consumers.  COG's 2000 members believe that organic food production is the best choice for the health of consumers and producers, for the protection and enhancement of the environment, and for the sustainability of the food production system.  COG brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement when they seek to export that seed into the United States.

28.     Plaintiff FAMILY FARMER SEED COOPERATIVE is a farmer-owned marketing cooperative with members in Colorado, New Mexico, Oregon, Washington, and North Dakota. See http://organicseedcoop.com/.  FFSC believes that the decreasing number of cultivars and gene traits in the commercial seed market makes it imperative that open-pollinated seeds are preserved and quality maintenance and breeding programs are undertaken.  FFSC's purpose is to strengthen seed sovereignty and seed security.  It's mission is to foster the development and improvement of open-pollinated varieties suitable to organic production systems and produce and distribute high quality, open-pollinated, organic seed.  FFSC brings this action on behalf of itself and its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

29.     Plaintiff SUSTAINABLE LIVING SYSTEMS is a non-profit citizen's organization that was formed to demonstrate and teach a way of living where its impact (or footprint) on the Earth's ecosystems is minimized.   See http://www.sustainablelivingsystems.org/.   Sustainable Living Systems' primary focus is to build a local food system.  Sustainable Living Systems brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

30.     Plaintiff GLOBAL ORGANIC ALLIANCE is an organic certifying membership organization established in 1997.  See http://www.goa-online.org/.   Global Organic Alliance brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

31.     Plaintiff FOOD DEMOCRACY NOW! is a grassroots not-for-profit membership

organization dedicated to building a sustainable food system that protects our natural environment, sustains farmers and nourishes families. See http://www.fooddemocracynow.org/. Food Democracy Now! has over 250,00 members, including thousands of farmers, and brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

32.    Plaintiff FAMILY FARM DEFENDERS INC. is a not-for-profit grassroots organization made up of farmers, consumers and others concerned about sustainable agriculture, farm workers rights, consumer safety, rural justice, animal welfare, fair trade, and food sovereignty. See http://familyfarmers.org/. FFD has approximately 5,000 members in all fifty states, though most are concentrated in the Midwest. FFD exists to create a farmer-controlled and consumer-oriented food and fiber system, based upon democratically controlled institutions that empower farmers to speak for and respect themselves in their quest for social and economic justice. FFD has worked to create opportunities for farmers to join together in new cooperative endeavors, form a mutual marketing agency, and forge alliances with consumers through providing high quality food products while returning a fair price to farmers. FFD brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

33.    Plaintiff FARM-TO-CONSUMER LEGAL DEFENSE FUND ("FTCLDF") is a 501(c)(4) nonprofit membership organization that promotes sustainable farming and direct farm-to-consumer transactions, because they further the common good and general welfare of all Americans. FTCLDF protects and defends the constitutional rights of family farms and

consumers to engage in direct sales of processed and unprocessed farm food. See http://www.farmtoconsumer.org. FTCLDF has over 1,700 members. Its membership consists of U.S. based farmers using non-toxic farming practices as well as consumers and affiliate organizations. FTCLDF brings this action on behalf of its members, some of whom are at risk of being contaminated by Defendants' transgenic seed and consequently being sued by Defendants for patent infringement.

Plaintiff Seed Businesses

34.    Plaintiff FEDCO SEEDS INC. is a cooperative seed company located in Waterville and Clinton, Maine. See http://www.fedcoseeds.com/. Fedco sells only conventional and organic seed and has a strict no-transgenic seed policy. Fedco sells seeds for a wide variety of crops, including corn, soy beans, beets and alfalfa.

35.    Plaintiff ADAPTIVE SEEDS, LLC is a seed company located in Sweet Home, Oregon. See http://www.adaptiveseeds.com/. Adaptive Seeds strictly sells only public domain, open-pollinated seed, and some diverse genepool mixes. None of Adaptive Seeds' seeds are proprietary hybrids, patented or transgenic and all of Adaptive Seeds' seed is grown without the use of chemical fertilizers, herbicides or pesticides. Adaptive Seeds sells seeds for a wide variety of crops, including corn and beets.

36.    Plaintiff SOW TRUE SEED is an independently owned open-pollinated/non-hybrid vegetable, herb and flower seed company specializing in heirloom, certified organic, and traditional Southern varieties based in Asheville, North Carolina. See http://sowtrueseed.com/.

Sow True Seed sells seeds for a wide variety of crops, including corn and soybeans.

37.    Plaintiff SOUTHERN EXPOSURE SEED EXCHANGE is a seed company located in Mineral, Virginia.  See http://www.southernexposure.com/.  SESE sells only conventional and organic seed and has a strict no-transgenic seed policy.  SESE sells seeds for a wide variety of crops, including corn, soybeans and cotton.

38.    Plaintiff MUMM'S SPROUTING SEEDS is a certified organic sprouting seed company based in Canada that sells seed in the United States.  See http://www.sprouting.com/usastore/enter.html.  Mumm's sells seeds for a wide variety of crops, including alfalfa, canola, legumes, and grains.

39.    Plaintiff BAKER CREEK HEIRLOOM SEED CO., LLC is an heirloom seed company based in Mansfield, Missouri that sells only open-pollinated and non-transgenic seeds.  See http://rareseeds.com/.  Baker Creek Heirloom Seed Co., LLC sells seeds for a wide variety of crops, including corn and soybeans.

40.    Plaintiff COMSTOCK, FERRE & CO., LLC is an heirloom seed company based in Wethersfield, Connecticut that sells only open-pollinated and non-transgenic seeds.  See http://comstockferre.com/.  Comstock, Ferre & Co., LLC sells seeds for a wide variety of crops, including corn.

41.    Plaintiff SEEDKEEPERS, LLC is based in Santa Barbara, California, and operates Edible Gardens, an heirloom-seed company and biodiversity farm that is part of a growing movement to preserve the natural seeds of the world by sharing the wonder of growing good healthy food.  See http://ediblegardens.com/.  Edible Gardens sells seeds for a wide variety of

17

food crops, including corn, beets, soybeans and over 50 other varieties.

42.   Plaintiff SISKIYOU SEEDS is a certified organic seed company based in Williams, Oregon.  See. http://www.siskiyouseeds.com/.  Siskiyou Seeds sells seeds for a wide variety of crops, including corn.  Siskiyou Seeds feels that transgenic seed technology is being used in a way that is immoral and undermines food sovereignty.  The private ownership of our genetic commons transgresses natural laws and is undermining our shared planetary wealth.

43.   Plaintiff COUNTRYSIDE ORGANICS is an organic seed and feed store located in Waynesboro, Virginia, that sells, amongst other things, organic corn.   See http://www.countrysidenatural.com/.

44.   Plaintiff CUATRO PUERTAS is a New Mexico community development corporation founded in 2002 through grassroots efforts.  Cuatro Puertas' mission is to connect New Mexico's urban economies with rural agricultural economies.  It's methodology is a framework that assists low- and moderate-income households to build local assets and wealth through preservation of natural capital and biodiversity.  One of Cuatro Puertas' projects is the Arid Crop Seed Cache, a seed collection established to rescue and reintroduce native, heirloom and forgotten crops.  As the largest collection in New Mexico, the survival of this seed diversity is crucial for historical, cultural, and biodiversity reasons.  The ACSC works directly with farmers and growers to revive these crops through seed saving and breeding workshops, so these crops can attain a place at our tables once again.  The ACSC maintains over a thousand accessions, with the goal of ensuring the availability of the seed.  ACSC's seeds include seed for popcorn and corn.

18

45.    Plaintiff INTERLAKE FORAGE SEEDS LTD. is a sustainable seed company based in Canada that sells seed in the United States.  See http://www.interlakeforageseeds.com/. Interlake Forage sells alfalfa seed.

46.    Each of the seed business Plaintiffs is fearful that they could become contaminated by Defendants' transgenic seed and then be accused by Defendants of patent infringement.  This fear arises from the wide spread knowledge of the contaminating character of transgenic seed and of Defendants' aggressive patent assertion tactics.

Plaintiff Farms and Farmers

47.    Plaintiff ALBA RANCH is a diversified organic certified family farm/ranch in the Wolf River Valley, which is a tributary of the Missouri River in the old corn belt in northeastern Kansas.  Predecessors have been agrarians there since 1858.  Alfalfa is among the many crops grown at Alba Ranch.

48.    Plaintiff WILD PLUM FARM is an organically certified farm in Dixon, Montana, that grows non-transgenic sweet corn for seed and vegetables/herbs for the regional market.

49.    Plaintiff GRATITUDE GARDENS is a certified organic seed grower in Concrete, Washington that grows seed for many vegetables and could grow corn.

50.    Plaintiff RICHARD EVERETT FARM, LLC located in Scottsbluff, Nebraska is a USDA certified organic farm growing alfalfa, grains, grass, and in the past field corn, as well as Demeter® certified Biodynamic®  and USDA certified organic vegetable seed including Cucurbit pepo and sweet corn.

51.   Plaintiff PHILADELPHIA COMMUNITY FARM, INC, located near Osceola, Wisconsin has been a community supported (CSA) farm for twenty-two years and intends to expand its vegetable seed production to include corn.  It conducts education and conservation activities by hosting visiting children, providing care for adults with special needs, and fostering farmland and natural area preservation along the St. Croix National Scenic Riverway.

52.   Plaintiff GENESIS FARM is located in Blairstown, New Jersey and hosts a community-supported garden that grows a variety of Biodynamic® cultivated vegetables, herbs and fruits on 30 acres.  It also conducts a variety of programs focusing on ecological restoration and all aspects of sustainability.  It is very clear in its opposition to transgenic seed.

53.   Plaintiff CHISPAS FARMS LLC is an organic farm in Albuquerque, New Mexico that currently grows alfalfa, although the prospect of dealing with transgenic seed while attempting to earn and maintain organic certification is rather off-putting and could potentially make the operation unavailable.

54.   Plaintiff KIRSCHENMANN FAMILY FARMS INC. is a certified organic farm in South Central, North Dakota that grows alfalfa and used to grow canola.  It has been certified organic since 1980.

55.   Plaintiff MIDHEAVEN FARMS is a Biodynamic® farm in Park Rapids, Minnesota that grows alfalfa, wheat, and vegetables.

56.   Plaintiff KOSKAN FARMS is a certified organic farm in Wood, South Dakota that grows corn and alfalfa.

57.   Plaintiff CALIFORNIA CLOVERLEAF FARMS is an organic dairy farm in

Merced County, California that feeds organic alfalfa hay, organic corn grain and organic corn silage.

58.    Plaintiff NORTH OUTBACK FARM is an organic farm in Wales, North Dakota owned and operated by Janet and Terry Jacobson.  It is a grain and livestock farm on which the Jacobsons grow alfalfa, wheat, oats and flax.  The farm is located in an area ideally suited for growing canola, but they can not grow canola because of the widespread use of transgenic canola seed in their area posing a contamination threat for any organic canola crop they may wish to grow.

59.    Plaintiff TAYLOR FARMS, INC. is an organic seed farm located in Tremonton, Utah, that grows amongst other things, organic alfalfa.

60.    Plaintiff JARDIN DEL ALMA is a certified organic seed producer in Monticello, New Mexico that grows seeds for various crops, including corn.

61.    Plaintiff RON GARGASZ ORGANIC FARMS is an organic farm in Volant, Pennsylvania that does agricultural research, including on issues relating to grass fed to cattle, and grows soybeans.  Ron Gargasz is a Biologist, Adjunct Professor, Researcher and full-time Certified Organic Farmer.  From 1976 to 1980 he served as the Conservation Director for the state of Pennsylvania.  He has operated Ron Gargasz Organic Farm in Volant, PA for 31 years. Ron was involved in the early organizational work for the creation of the Organic Crop Improvement Association International.  He served as the organization's International President in 1989. In 1990 he authored and taught the first Sustainable Agriculture Curriculum in the nation.  Gargasz Farms produces a myriad of crops including open pollinated heritage variety

corn, soy, spelt, buckwheat, barley, and edible beans.  His most recent study with Penn State University reveals his organic grass-fed beef to be 1041% healthier in Omega 6 to 3 fatty acid ratio, higher in CLAs, and higher in Vitamin E, quantifying the healthfulness of Forage Fed Beef.

62.    Plaintiff ABUNDANT ACRES is a farm in Laclede County, Missouri. They sell plants in the spring. Their field crops are primarily grown for seed production. They have in the past grown corn and soybeans but stopped for fear of transgenic contamination, and possible resultant litigation.

63.    Plaintiff T & D WILLEY FARMS is a certified organic farm in Madera, California that grows almost 50 varieties of vegetables from artichoke to zucchini.

64.    Plaintiff QUINELLA RANCH is a certified organic farm in Saskatchwan, Canada that grows a variety of crops, including alfalfa and used to grow canola, and would like to sell into the United States.

65.    Plaintiff NATURE'S WAY FARM LTD. is an organic farm in Alberta, Canada that grows alfalfa seed and could sell such seed into the United States.

66.    Plaintiff LEVKE AND PETER EGGERS FARM is a strongly anti-transgenic seed farm in Alberta, Canada that grows certified organic seed, including alfalfa, and would like to sell such seed into the United States.

67.    Plaintiff FREY VINEYARDS, LTD. makers of certified Biodynamic and Organic wine.  Wheat and other crops are grown in the certified Biodynamic and Organic vineyards, and they would like to grow alfalfa and canola, but are concerned about transgenic seed

22

contamination.

68.   Plaintiff BRYCE STEPHENS is a certified organic farmer in Jennings, Kansas, where he grows organic alfalfa along with wheat, clover, cane, milo, millett and also raises, bison, beef, poultry and swine.   Certified organic since 1994, Mr. Stephens previously grew organic corn and soybeans, but discontinued those crops due to the threat of transgenic seed contamination.

69.   Plaintiff CHUCK NOBLE is a conventional farmer who farms in South Dakota. Mr. Noble grows alfalfa forage and seed without transgenic traits.   He intends to keep his farm free of genetically engineered traits.   In addition, there are feed and food safety issues which are unacceptable.   He expects the cattle feed industry to reject the presence of genetically engineered herbicide in their feed.   Dairy customers are already rejecting the presence of herbicide in their feed.

70.   Plaintiff LARHEA PEPPER is an organic farmer in O'Donnell, Texas, where she grows, or could grow, organic cotton.

71.   Plaintiff PAUL ROMERO is an organic farmer in Espanola, New Mexico, where he grows, amongst other crops, sweet corn.

72.   Plaintiff DONALD WRIGHT PATTERSON, JR. has been involved with organic agriculture since before chemical agriculture gained a foothold in the years following World War II.   In his view, organic has been the convention since the dawn of human agriculture, and he considers it intolerable that a half-century old chemical usurpation of agricultural and environmental wisdom is now called "conventional."   He has resided in Fauquier County,

Virginia for many years and his farming ancestors settled in Frederick County, Virginia in 1730 where the family farmstead and barns still exist. Prior to that the family farmed in Chester County, Pennsylvania. Mr. Patterson has the capacity and desire to farm organic alfalfa.

73. Each of the farm and farmer Plaintiffs is fearful that they could become contaminated by Defendants' transgenic seed and then be accused by Defendants of patent infringement. This fear arises from the wide spread knowledge of the contaminating character of transgenic seed and of Defendants' aggressive patent assertion tactics. This fear causes some of the farming Plaintiffs to forgo growing certain crops, including specifically corn, cotton, canola, sugar beets, soybeans and alfalfa, since it is widely known that those crops are currently under severe threat of transgenic seed contamination.

74. Each farm and farmer Plaintiff could, if they desired, purchase Defendant's transgenic seed as such seed is widely available to the public. In doing so, they expect they would be required to enter into a license agreement for Defendants' transgenic seed patents.

Defendants

75. Defendant MONSANTO COMPANY is a company organized and existing under the laws of the State of Delaware publicly traded on the New York Stock Exchange. It is authorized to do and is doing business in New York and this judicial district.

76. Defendant MONSANTO TECHNOLOGY LLC is a company organized and existing under the laws of the state of Delaware. It is authorized to do and is doing business in New York and this judicial district.

24

77.   Since they are, upon information and belief, commonly owned and managed, Defendants are collectively referred to herein as Monsanto.

THE PERILS OF TRANSGENIC SEED

78.   Genetic modification, also known as genetic engineering, is the purposeful alteration of an organism's genetic material.  The first genetically engineered organisms were bacteria created in 1973.  In the 1980's, many companies, including principally Monsanto, sought to utilize genetic engineering in agriculture with transgenic plants.

79.   Transgenic seeds are genetically engineered through the introduction of foreign genes and regulatory sequences into the seeds' genome.  The genes of one species are put into the DNA of another.   The process of incorporating exogenous DNA into a cell is called transformation.  The foreign genetic material, when expressed in transformed organisms, can, for example, immunize the plant against glyphosate-based herbicides, such as RoundUp, a highly toxic glyphosate-based product developed and sold by Monsanto.

80.   Transformation permanently alters plant DNA.  During the life cycle of a transgenic plant, human-engineered genetic material is replicated and transferred through natural life cycle processes.   Thus the transformed genes persist in all of the seeds that crop bears.   The transformed genetic material also spreads through natural pollination to other transgenic crops, non-transgenic crops, and even native plants.

81.   Monsanto widely markets transgenic seed to the public under the trade name Roundup Ready.  Monsanto sells Roundup Ready seed for corn, canola, soybean, sugar beet,

alfalfa and cotton.  Monsanto dominates the market for transgenic seeds and traits.  Monsanto currently holds the largest percentage of the global proprietary seed market of any company.  In the United States, Monsanto's control of the seed market is so high that over 85-90% of all soybeans, corn, cotton, sugar beets and canola grown in the U.S. contains Monsanto's patented genes.

82.     Monsanto's most predominant transgenic trait is glyphosate tolerance.  This trait makes crops tolerant of Monsanto's non-selective, glyphosate-based herbicide, called Roundup.  Roundup causes severe injury or destruction when applied to crops that are not glyphosate tolerant.  While Monsanto's patent on glyphosate expired in 2000, Monsanto continues to hold many patents covering the technology for glyphosate-tolerant transgenic crops.

83.     Although Monsanto has come to dominate various crops within the agricultural industry with its transgenic technology, many farmers, including the farming plaintiffs here, continue to grow crops from seed that is not transgenic.  There are many reasons to grow non-transgenic crops.  A growing number of consumers prefer to eat non-transgenic foods based on health and environmental concerns, taste preferences, and the desire to support local farmers.  Additionally, non-transgenic crops certified as organic often provide a price premium because consumers prefer them.  Finally, some farmers may choose to grow non-transgenic crops because the seed is less expensive and/or because they wish to avoid the potential risks transgenic crops pose to humans, animals, and the environment.

84.     Farmers who grow non-transgenic crops have strong incentives to ensure their crops are free of transgenic genes such as Monsanto's trait for glyphosate resistance.  Transgenic

contamination can result in a lower price for the crop and, for certified organic farmers, loss of USDA NOP Organic Certification. Domestically and internationally, it can result in rejected shipments and import bans. Even farmers who have not experienced contamination can suffer its effects, as the perception of contamination affects consumer demand. Additionally, contaminated farmers risk potential legal liability for alleged patent infringement.

85.  To minimize the risks, farmers of non-transgenic crops expend effort and expense to ensure that their products are free of contamination. Certified organic farmers must follow strict standards to avoid transgenic contamination. Additionally, testing for transgenic contamination may also be part of any non-transgenic farmer's risk management system. The cost of such testing can be expensive. Another cost caused by the threat of transgenic seed contamination that organic farmers must absorb is that of devoting part of their own land to be a buffer between themselves and neighboring farms that use transgenic seed. This is a substantial cost in terms of removing land from their organic production.

86.  In the January 27, 2011 Record of Decision by the USDA Animal and Plant Health Inspection Service, USDA Secretary Vilsack acknowledged the economic harm non-transgenic farmers suffer at the hands of transgenic crops: "[A]lfalfa growers who cater to [transgenic] sensitive markets might incur additional costs to produce their product. These additional costs may come in the form of additional testing for the [transgenic] trait or its changes in management practices to avoid low level presence of [glyphosate-tolerant] alfalfa in their product. Some alfalfa seed producers may lose market share to alfalfa seed produced outside the US, where [glyphosate-tolerant] alfalfa is not grown."

87.     There is extensive hard evidence of the harm farmers can suffer as a result of contamination of their crop with transgenic genes.  One of the most public examples is the case of Liberty Link rice.  Liberty Link 601 ("LL601") was a rice variety genetically engineered to tolerate Liberty herbicide. It was field-tested on a small number of sites between 1999 and 2001 but had not been approved for human consumption.  In 2006, extensive LL601 contamination of the commercial rice supply was discovered.  The contamination led to multiple countries banning the importation of U.S. rice, implementation of strict testing requirements, and removal from the market of entire rice varieties.  Economic loss in the 2006/2007 crop years was estimated at $254 million.  The worldwide total economic loss due to the LL601 contamination event was estimated at $741 million to $1.285 billion.

88.     Non-transgenic crops are vulnerable to contamination by transgenic seed at almost every step of the production process: before seed is purchased; through seed drift or scatter; through cross-pollination; through commingling via tainted equipment during harvest or post-harvest activities; during processing; during transportation; and during storage.

89.     The contamination problem is compounded because contamination cannot be easily ascertained.  For example, genetic modification cannot be detected by visually examining the seed or crop.  Instead, if an organic farmer wants to determine whether Monsanto's patented gene is present in her crop, she must conduct genetic testing, which can be extremely expensive.  Additionally, if and when an organic farmer determines that transgenic material is present in her crop, it is extremely difficult to eradicate the contamination, as the contaminated seed must be destroyed and the organic farmer will lose all use of that field for several years in order to ensure

that it is completely purged of the transgenic seed contamination.

90.    In addition to the economic harm caused by transgenic seed, it also has potentially severe negative health effects.  For one, the design of Monsanto's transgenic seed is purely so that it will be resistant to the herbicide glyphosate.  This means that as Monsanto's transgenic seed becomes more widely used, then so too will glyphosate.  As such, the existence of Monsanto's transgenic seed is directly responsible for the increased use of glyphosate, and in particular Monsanto's brand of glyphosate, Roundup, which studies have shown is harmful to human health. Sophie Richard, et al., *Differential Effects of Glyphosate and Roundup on Human Placental Cells and Aromatase*, Environ Health Perspect 113:716-72 (2005) ("We conclude that endocrine and toxic effects of Roundup, not just glyphosate, can be observed in mammals").

91.    Studies suggest an association between glyphosate use and the risk of non-Hodgkin lymphoma.  A.J. De Roos, et al., *Integrative Assessment of Multiple Pesticides as Risk Factors for Non-Hodgkin's Lymphoma Among Men,* Occup. Environ. Med., 60:E11 (2003); and, L. Hardell, et al., *Exposure to Pesticides as Risk Factor for Non-Hodgkin's Lymphoma and Hairy Cell Leukemia: Pooled Analysis of Two Swedish Case-Control Studies*. Leuk Lymphoma, 43:1043–1049 (2002).    Another study that included more than fifty-thousand pesticide applicators suggested a link between glyphosate use and multiple myeoloma.  A.J. De Roos, et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study* , Environ Health Perspect, 113: 49-54 (2005).  Myeloma has been associated with agents that cause either DNA damage or immune suppression.   A recent 2009 article demonstrated the DNA damage caused by glyphosate based herbicides.  C. Gasnier, et al.,

*Glyphosate-Based Herbicides are Toxic and Endocrine Disruptors in Human Cell Lines* , Toxicology 262:184-191 (2009).

92.    Others have suggested an association between Monsanto's transgenic seed, its inherent increase in glyphosate use and animal miscarriages.  J. Zelman, *Monsanto's Roundup Ready Crops Contain Organism Causing Animal Miscarriages, Scientist Says*, Huffington Post, (February 23, 2011) (http://www.huffingtonpost.com/2011/02/23/monsanto-roundup-ready-miscarriages_n_827135.html) ("Recent research claims that Monsanto's Roundup Ready transgenic crops contain an organism, previously unknown to science, that can cause miscarriages in farm animals").

93.    But transgenic seed is not only a threat to human health due to its inherent increase in the use of glyphosate. There are also serious questions about whether transgenic seed itself has an effect on human health.  Joël Spiroux de Vendômois, et al., *A Comparison of the Effects of Three GM Corn Varieties on Mammalian Health* , International Journal of Biological Sciences , 5(7):706-726 (2009) ("Our analysis clearly reveals for the 3 GMOs new side effects linked with GM maize consumption "); SW Ewen, et al., *Effect of Diets Containing Genetically Modified Potatoes Expressing Galanthus Nivalis Lectin on Rat Small Intestine*, Lancet 354 (1987): 1353–4 (October 1999).

94.    While transgenic seed poses many dangers for society, its purported benefits have not been achieved.  While Monsanto makes many bold promises for its transgenic seed, those promises have universally been proven false.  For example, Monsanto's propaganda surrounding transgenic seed expresses a promise that its use will increase the quantity of production that can

be achieved with the same amount of land.  Greater "yield" is the promise, but studies have shown that there is actually no meaningful improvement in yield from using transgenic seed.  D. Gurian-Sherman, *Failure to Yield: Evaluating the Performance of Genetically Engineered Crops* , Union of Concerned Scientists (April 2009) ("This report is the first to evaluate in detail the overall, or aggregate, yield effect of GE after more than 20 years of research and 13 years of commercialization in the United States.  Based on that record, we conclude that GE has done little to increase overall crop yields.").

95.     To be sure, the Attorney General of West Virginia filed suit against Monsanto just last fall after his office determined that several published tests contradicted the yield results claimed by Monsanto in its advertising.  See   https://www.wvago.gov/press.cfm?ID=541&fx=more.

96.     Another failed promise of transgenic seed is that it will result in less pesticide and herbicide use.  However, that, too, has been disproven by studies.  C. Benbrook, Ph.D, *Impacts of Genetically Engineered Crops on Pesticide Use: The First Thirteen Years*, The Organic Center (November 2009) ("compared to pesticide use in the absence of GE crops, farmers applied 318 million more pounds of pesticides over the last 13 years as a result of planting GE seeds.  This difference represents an average increase of about 0.25 pound for each acre planted to a GE trait.")

97.     In fact, evidence shows that the increased use of glyphosate caused by Monsanto's transgenic seed has in turn caused weeds to become resistant to the herbicide.  W. Neuman et al., *Farmers Cope With Roundup-Resistant Weeds*, New York Times (May 3, 2010) (available at

http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html).  ("[j]ust as the heavy use of antibiotics contributed to the rise of drug-resistant supergerms, American farmers' near-ubiquitous use of the weedkiller Roundup has led to the rapid growth of tenacious new superweeds.  To fight them, Mr. Anderson and farmers throughout the East, Midwest and South are being forced to spray fields with more toxic herbicides, pull weeds by hand and return to more labor-intensive methods like regular plowing.  ...  Farm experts say that such efforts could lead to higher food prices, lower crop yields, rising farm costs and more pollution of land and water.")  Thus, despite all of the hype, using transgenic seed actually increases costs, reduces production, and exacerbates environmental harms.

98.   If there is a lack of sufficient research on the issue of whether transgenic seed is safe, that is solely the fault of Monsanto, as its transgenic seed patents allow it to prevent any third-party from performing research on its transgenic seed without Monsanto's permission.  T. Sappington, et al., *Conducting Public-Sector Research on Commercialized Transgenic Seed : In Search of a Paradigm That Works* , Gm Crops 1:2, 1-4 (April 2010).  As a group of leading corn insect scientists from public research institutions told the Environmental Protection Agency: "Technology/stewardship agreements required for the purchase of transgenic seed explicitly prohibit research. These agreements inhibit public scientists from pursuing their mandated role on behalf of the public good unless the research is approved by industry. As a result of restricted access, no truly independent research can be legally conducted on many critical questions regarding the technology, its performance, its management implications, IRM, and its interactions with insect biology." *Id*.

32

99.   To be sure, this is why many countries througout the world, including Japan, Germany and France, and many municipalities here in the United States, including several in Vermont and California, have bans or severe limitations on transgenic crops.

100.   To be sure, even those jurisdictions that do not outright ban transgenic food, such as the European Union, at least require clear labeling so that consumers can make educated purchasing decisions.  Monsanto has fought vigorously to defeat any proposal for labeling of transgenic food in the United States, despite evidence that the vast majority of Americans want transgenic food to be labeled.  In a recent MSNBC poll that asked, "Do you believe genetically modified foods should be labeled?" over 96% of respondents said, "Yes. It's an ethical issue -- consumers should be informed so they can make a choice."   See http://health.newsvine.com/_question/2011/02/25/6131050-do-you-believe-genetically-modified-foods-should-be-labeled (last visited March 29, 2011).

101.   Even Prince Charles of England has long warned against the adoption of transgenic crops.  The Prince of Whales said it quite clearly, "And if they think its somehow going to work because they are going to have one form of clever genetic engineering after another then again count me out, because that will be guaranteed to cause the biggest disaster environmentally of all time."  J. Randall, *Prince Charles Warns GM Crops Risk Causing The Biggest-ever Environmental Disaster*, The Telegraph (August 12, 2008) (http://www.telegraph.co.uk/earth/earthnews/3349308/Prince-Charles-warns-GM-crops-risk-causing-the-biggest-ever-environmental-disaster.html).

102.   Thus, since the harm of transgenic seed is known, and the promises of transgenic

seed's benefits are false, transgenic seed is not useful for society.


## MONSANTO'S PATENTS ON GENETICALLY MODIFIED SEED

Monsanto's Transgenic Seed Patent Portfolio

103.    Upon information and belief, Monsanto owns or is the exclusive licensee of each of the following patents on transgenic seed:

A.    U.S. Patent No. 5,322,938, entitled "DNA sequence for enhancing the efficiency of transcription";

B.    U.S. Patent No. 5,352,605, entitled "Chimeric genes for transforming plant cells using viral promoters";

C.    U.S. Patent No. 5,362,865, entitled "Enhanced expression in plants using non-translated leader sequences";

D.    U.S. Patent No. 5,378,619, entitled "Promoter for transgenic plants";

E.    U.S. Patent No. 5,424,412, entitled "Enhanced expression in plants";

F.    U.S. Patent No. 5,463,175, entitled "Glyphosate tolerant plants";

G.    U.S. Patent No. 5,530,196, entitled "Chimeric genes for transforming plant cells using viral promoters";

H.    U.S. Patent No. 5,554,798, entitled "Fertile glyphosate-resistant transgenic corn plants";

I.    U.S. Patent No. 5,593,874, entitled "Enhanced expression in plants";

J.    U.S. Patent No. 5,641,876, entitled "Rice actin gene and promoter";

K.   U.S. Patent No. 5,659,122, entitled "Enhanced expression in plants using non-translated leader sequences";

L.   U.S. Patent No. 5,717,084, entitled "Chimaeric gene coding for a transit peptide and a heterologous peptide";

M.   U.S. Patent No. 5,728,925, entitled "Chimaeric gene coding for a transit peptide and a heterologous polypeptide";

N.   U.S. Patent No. 5,750,871, entitled "Transformation and foreign gene expression in Brassica species";

O.   U.S. Patent No. 5,859,347, entitled "Enhanced expression in plants";

P.   U.S. Patent No. 6,025,545, entitled "Methods and compositions for the production of stably transformed, fertile monocot plants and cells thereof";

Q.   U.S. Patent No. 6,040,497, entitled "Glyphosate resistant maize lines";

R.   U.S. Patent No. 6,051,753, entitled "Figwort mosaic virus promoter and uses";

S.   U.S. Patent No. 6,083,878, entitled  "Use of N-(phosphonomethyl) glycine and derivatives thereof";

T.   U.S. Patent No. 6,753,463, entitled "Transformed cotton plants";

U.   U.S. Patent No. 6,825,400, entitled  "Corn plants comprising event PV-ZMGT32(nk603)";

V.   U.S. Reissue Patent No. RE38825, entitled "Glyphosate tolerant plants"; and,

W.   U.S. Reissue Patent No. RE39247, entitled "Glyphosate-tolerant 5-

enolpyruvylshikimate-3-phosphate synthases".

104.    Monsanto licenses these patents in connection with the sale of its transgenic seed. This licensing occurs through prominent license statements contained on the bags of seed themselves and also through Technology/Stewardship Agreements that purchasers of Monsanto's transgenic seed are required to sign.  The 2010 Monsanto Technology/Stewardship Agreement is attached hereto as Exhibit 1.  The agreement is a mass market license available to the general public.  In the Agreement, Monsanto offers a license to its transgenic seed patents.  Ex. 1, ¶ 14. Each of the patents identified above is listed in the Agreement.  *Id.*

105.    Plaintiffs are well aware of Monsanto's licensing of its transgenic seed patents and have no reason to believe that they could not enter into such an Agreement.

Monsanto's Aggressive Assertion of its Transgenic Seed Patents

106.    Monsanto zealously enforces its transgenic seed patents.  Published reports and Monsanto's own statements suggest that roughly 500 farmers are investigated for patent infringement each year.  Between 1997 and April 2010, Monsanto filed 144 lawsuits against farmers in at least 27 different states for alleged infringement of its transgenic seed patents and/or breach of its license to those patents.

107.    Monsanto's aggressive patent assertion behavior is widely known and has been the subject of substantial media coverage, including being mentioned in countless press articles and the subject of several television news stories and films.  *See*, *e.g.*, Donald L. Barlett and James B. Steele, *Monsanto's Harvest of Fear*, Vanity Fair (May 2008) (http://www.vanityfair.com/politics/features/2008/05/monsanto200805).    The documentaries

*Food Inc.* and *The Future of Food*, for example, discuss at great length Monsanto's aggressive assertion of its transgenic seed patents.

108.    Monsanto has made accusations of patent infringement against those who never wished to possess its transgenic seed.  This behavior has been widely reported and is well known by Plaintiffs.  For example, on April 26, 2008, the nationally broadcast CBS Evening News included a segment entitled, "Agricultural Giant Battles Small Farmers: Monsanto Goes To Great Lengths To Protect Its Patents On Genetically Modified Crops."    See http://www.cbsnews.com/stories/2008/04/26/eveningnews/main4048288.shtml.    The segment described the threats Monsanto made against Mr. and Mrs. David and Dawn Runyon, who never intended to use transgenic seed, "Monsanto sent investigators to their home unannounced, demanded years of farming records, and later threatened to sue them for patent infringement." Further the news segment continued, "In Feb. 2005 the Runyons received a letter from Monsanto, citing 'an agreement' with the Indiana Department of Agriculture giving it the right to come on their land and test for seed contamination.  Only one problem: The Indiana Department of Agriculture didn't exist until two months after that letter was sent."  *Id.*

109.    The CBS Evening News segment also described the harassment of Mr. Mo Parr, a seed cleaner who for years offered his service to farmers who wanted to save seed from one season to plant the next.  "Monsanto sued him claiming he was 'aiding and abetting' farmers, helping them to violate the patent."  *Id.*  Thus, Monsanto's willingness to assert its transgenic seed patents against anyone within the seed distribution chain is also widely known.

110.    Monsanto's investigation, accusation and litigation of patent infringement claims

against other farmers who did not want to be contaminated by transgenic seed, including Roger, Rodney and Greg Nelson, Troy Roush, Percy Schmeiser and others, are widely known and contribute to Plaintiffs' reasonable fear that they, too, could be sued for patent infringement by Monsanto if they were to become contaminated by Monsanto's transgenic seed.

## MONSANTO'S TRANSGENIC SEED PATENTS ARE INVALID

111.   The Patent Act provides that "[w]hoever invents or discovers any new and _useful_ process, machine, manufacture, or composition of matter, or any new and _useful_ improvement thereof," may obtain a patent on the invention or discovery.  35 U.S.C. § 101 (emphasis added). An invention is "useful" under section 101 if it is capable of providing some identifiable benefit. *See Brenner v. Manson*, 383 U.S. 519, 534 (1966).  To be sure, as Justice Story explained in *Lowell v. Lewis*, 15 F. Cas. 1018 (C.C.D. Mass. 1817), inventions that are "injurious to the well-being, good policy, or sound morals of society" are unpatentable.  Justice Story gave examples of unpatentable inventions, including "a new invention to poison people, or to promote debauchery, or to facilitate private assassination."  *Id*. at 1019.  For at least the reasons discussed above regarding the perils of transgenic seed, Monsanto's transgenic seed is not "useful," and, therefore, Monsanto's transgenic seed patents are all invalid.

112.   Monsanto began applying for patents on glyphosate tolerance in the mid-1980s. Its first patents on the trait were granted in 1990 and are now expired.  After pursuing its earliest patents on glyphosate resistance, Monsanto continued to seek and receive patents on Roundup Ready technology for over two decades.  Although the United States patent system allows

38

improvements on existing inventions, it does not permit a party to extend its monopoly over a field of invention by receiving a patent that expires later than and is not patentably distinct from a patent it already owns.  In acquiring the transgenic seed patents, Monsanto unjustly extended its period of patent exclusivity by duplicating its ownership of a field of invention already covered by other Monsanto patents.  Monsanto's transgenic seed patents are thus invalid for violating the prohibition against double patenting.

113.    Monsanto's patents are invalid because prior art exists that anticipates or renders obvious each of their claims.

114.    Monsanto's patents are invalid for failure to meet the written description, enablement and best mode requirements.

### MONSANTO'S TRANSGENIC SEED PATENTS CAN NOT BE INFRINGED

115.    Transgenic seed that may come to contaminate Plaintiffs cannot infringe any of Monsanto's transgenic seed patents.

116.    Plaintiffs cannot be held to have infringed any Monsanto transgenic seed patent if Plaintiffs become contaminated by Monsanto's transgenic seed through no intentional act of their own.

117.    Because Monsanto sells, licenses and distributes its transgenic seed in a manner such that contamination of Plaintiffs is reasonably foreseeable, any patent rights Monsanto may have in transgenic seed are exhausted when it makes an authorized sale to its customers.

MONSANTO'S TRANSGENIC SEED PATENTS ARE UNENFORCEABLE

Misuse

118.    Monsanto's control of the seed market is so high that over 85-90% of all soybeans, corn, cotton, sugar beets and canola grown in the U.S. contains Monsanto's patented genes.  It unquestionably has dominant market power in the markets for seeds for these crops.  Monsanto has misused its patents on transgenic seed to achieve and maintain anticompetitive benefit, including that dominant market power.

119.    Since Roundup Ready technology was introduced, the seed market has become increasingly concentrated due to Monsanto's acquisitions of competitors and independent seed companies.  Between 2005 and 2010 alone, Monsanto acquired over 30 independent seed companies, many of which also developed germplasm.  This increased concentration has diminished consumer choice and slowed innovation.

120.    Another result of the concentrated market is a dramatic rise in seed price.  According to the USDA, corn seed prices have risen 135 percent since 2001, while soybean prices went up 108 percent over that same period.  On information and belief, the royalty paid to Monsanto for the same Roundup Ready trait in soybeans has nearly tripled since 2000 – from $6.50 to over $15 per bag.  Additionally, a recent study of seed pricing over the past 35 years found that, between 1975 and 1997, soybean farmers spent between 4 percent and 8 percent of their farm income on seeds, while in 2009, farmers who planted transgenic soybeans spent 16.4 percent of their income on seeds.

121.    Since obtaining its transgenic seed patents, Monsanto has sought to protect and

enhance its dominant market power through abusive litigation practices and anticompetitive licensing agreements.

122.    Monsanto has sought to impermissibly broaden the scope of its transgenic seed patents by pursuing objectively baseless litigation to intimidate farmers and restrict competition with its transgenic seed.  Monsanto has consistently sued farmers who do not have the resources to adequately defend themselves from Monsanto's baseless claims.  Monsanto's acts have caused widespread fear and intimidation in the farming industry.  Monsanto has abused the litigation process not only by bringing and persisting in baseless lawsuits, but also by making false statements to litigants and federal judges in the enforcement of its transgenic seed patents.  By pursuing false claims and making false statements to the courts, Monsanto has created an atmosphere of fear and intimidation throughout the farming industry and stolen an illegal anti-competitive advantage.

123.    In addition to misusing its patents through abuse of the litigation process, Monsanto has misused its patents by conditioning the use of its products upon overly restrictive, anticompetitive license agreements.  As described above, Monsanto has dominant market power over herbicide tolerant transgenic seed.  Monsanto has exploited that dominant market power to unlawfully enlarge its transgenic seed patents not only to limit competition from other herbicide-tolerant trait developers but to limit competition from other seed trait developers and herbicide producers more generally.  It has also used licensing agreements to expand the geographic scope of its U.S. Roundup Ready transgenic seed patents to countries where the technology is not protected.

Prosecution Laches

124.    Monsanto's patents are unenforceable due to prosecution laches because Monsanto caused unreasonable and unexplained delay in the prosecution of the patents that would prejudice Plaintiffs.

Equitable Estoppel

125.    Monsanto publishes upon its website a page entitled, "Monsanto's Commitment: Farmers and Patents."   See   http://www.monsanto.com/newsviews/Pages/commitment-farmers-patents.aspx.   In its "Commitment," Monsanto acknowledges that its transgenic seeds can contaminate the property of non-transgenic farmers.  The Commitment states in part, "We do not exercise our patent rights where trace amounts of our patented seeds or traits are present in a farmer's fields as a result of inadvertent means."  The "Commitment" does not define what is meant by "trace amounts" or "inadvertent means."  Therefore, the clear message is that Monsanto indeed intends to assert its transgenic seed patents against certified organic and non-transgenic seed farmers who come to possess more than "trace amounts" of Monsanto's transgenic seed, even if it is not their fault.

126.    Upon information and belief, Monsanto has in fact investigated and pursued action against and/or settlements from farmers who did not want to use its transgenic seed.  Due to Monsanto's evident violation of the Commitment and the Commitment's indefinite and ambiguous language, Plaintiffs cannot reasonably rely upon the Commitment for assurance that Monsanto will not exercise its patents against them if Monsanto discovers the unintended presence of Monsanto's transgenic seed in their fields or seed supplies.  Monsanto's Commitment

and violation thereof warrant a court ruling that equitably estops Monsanto from asserting its patents against farmers who become contaminated by Monsanto's transgenic seed.

Trespass

127.   Plaintiffs have no desire to possess Monsanto's transgenic seed.  Monsanto is responsible for creating transgenic seed that threatens to contaminate Plaintiffs.  To the extent that Monsanto's transgenic seed contaminates Plaintiffs, Monsanto has wrongfully interfered with Plaintiffs' rights to possess, enjoy and exploit their property.  Monsanto has thus committed trespass upon Plaintiffs and Monsanto's transgenic seed patents are, as a consequence, unenforceable against Plaintiffs.


MONSANTO WOULD NOT BE ENTITLED TO ANY REMEDY AGAINST PLAINTIFFS

128.   Even if any claim of any Monsanto patent was found to be valid, infringed and enforceable, Monsanto would not be entitled to any award of relief against Plaintiffs.

129.   Monsanto would not be entitled to any damages because Monsanto suffers no lost profits when its transgenic seed contaminates the property of a certified organic or non-transgenic farmer or seed distributor.  Further, absolutely no royalty is reasonable because Plaintiffs would never willingly pay any license fee for Monsanto's patents.

130.   Monsanto would also not be entitled to any injunctive relief against Plaintiffs because contamination of Plaintiffs causes no irreparable harm to Monsanto.  In fact, the balance of hardships resulting from contamination of Plaintiffs by Monsanto's transgenic seed weighs completely in favor of Plaintiffs, as such contamination threatens to cause them substantial

economic harm.  Lastly, the public interest is strongly against awarding a monopolist in the agriculture industry an injunction against Plaintiffs who endeavor to make and use non-transgenic seed.

FIRST CLAIM FOR RELIEF
(DECLARATORY JUDGMENT OF PATENT INVALIDITY)

131.    Plaintiffs reallege and incorporate paragraphs 1 to 130 as if fully set forth herein.

132.    Each claim of each patent in suit is invalid for failure to comply with the requirements of Title 35 of the United States Code, including, without limitation, one or more of the requirements of §§ 101, 102, 103, and 112.

133.    Each claim of each patent in suit is invalid because, among other things, each is not useful.

134.    Each claim of each patent in suit is invalid because, among other things, each violates the prohibition against double patenting.

135.    Each claim of each patent in suit is invalid because, among other things, there is prior art that anticipates or renders obvious each claim.

136.    Each claim of each patent in suit is invalid because, among other things, each fails to satisfy the requirements of written description, enablement and best mode.

137.    Plaintiffs seek and are entitled to a declaratory judgment that each claim of each patent in suit is invalid.

## SECOND CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT OF NON-INFRINGEMENT)

138.    Plaintiffs reallege and incorporate paragraphs 1 to 137 as if fully set forth herein.

139.    Plaintiffs' making, using, offering for sale, selling and/or importing of any seed that may be contaminated by Monsanto's transgenic seed does not infringe any valid and properly construed claim of any patent in suit.

140.    Monsanto's patents rights in transgenic seed exhaust upon the authorized distribution by Monsanto to its customers.

141.    Plaintiffs seek and are entitled to a declaratory judgment that Plaintiffs cannot be held to infringe any claim of any patent in suit.


## THIRD CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT OF UNENFORCEABILITY)

142.    Plaintiffs reallege and incorporate paragraphs 1 to 141 as if fully set forth herein.

143.    Each patent in suit is unenforceable because, among other things, Monsanto has committed misuse.

144.    Each patent in suit is unenforceable because, among other things, Monsanto is equitably estopped from enforcing it.

145.    Each patent in suit is unenforceable because, among other things, Monsanto commits trespass when its transgenic seed contaminates another.

146.    Plaintiffs seek and are entitled to a declaratory judgment that each patent in suit is unenforceable.

FOURTH CLAIM FOR RELIEF
(DECLARATORY JUDGMENT OF NO ENTITLEMENT TO ANY REMEDY)

147.   Plaintiffs reallege and incorporate paragraphs 1 to 146 as if fully set forth herein.

148.   Monsanto is not entitled to any damages if any Plaintiff is held to infringe any valid and enforceable claim of any patent in suit.

149.   Monsanto is not entitled to any injunctive relief if any Plaintiff is held to infringe any valid and enforceable claim of any patent in suit.

150.   Plaintiffs seek and are entitled to a declaratory judgment that Monsanto is not entitled to any relief if any Plaintiff is held to infringe any valid and enforceable claim of any patent in suit.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask the Court to:

A.   Declare that each claim of each patent in suit is invalid;

B.   Declare that Plaintiffs cannot be held to infringe any claim of any patent in suit;

C.   Declare that each patent in suit is unenforceable;

D.   Declare that Monsanto is not entitled to any relief if any Plaintiff is held to infringe any valid and enforceable claim of any patent;

E.   Enjoin Monsanto from taking any action to enforce any patent in suit;

F.   Issue an order requiring Monsanto to pay Plaintiffs' costs and reasonable attorneys' fees incurred in connection with this action; and

G.   For such other and further relief as the Court deems just.

<u>Request for Jury Trial</u>

Pursuant to Fed. R. Civ. P. 38(b)(1), PUBPAT hereby demands a jury trial on all issues so triable.

Respectfully submitted,

PUBLIC PATENT FOUNDATION, INC.

By: _____

Dated: New York, New York
       March 29, 2011

Daniel B. Ravicher, Esq. (DR1498)
Sabrina Y. Hassan, Esq. (SH2081)
PUBLIC PATENT FOUNDATION, INC.
Benjamin N. Cardozo School of Law
55 Fifth Avenue
New York, New York 10003
Tel.: 212-545-5337
Fax.: 212-591-6038
Email: info@pubpat.org

Attorneys for Plaintiffs

47

EXHIBIT 1

# 2010 MONSANTO TECHNOLOGY/STEWARDSHIP AGREEMENT
### (Limited Use License)

**Form Number**

## PLEASE MAIL THE SIGNED 2010 MONSANTO TECHNOLOGY/STEWARDSHIP AGREEMENT TO:
Grower Licensing, Monsanto, 622 Emerson Road, Suite 150, St. Louis, MO 63141

## GROWER INFORMATION (please print)

Please complete this section with your business information. To sign this Monsanto Technology/Stewardship Agreement ("Agreement") you must be the **operator/grower** for all fields that will grow plants from Seed (as defined below). You represent that you have full authority to and do hereby bind to this Agreement yourself, all entities for which you obtain Seed, all individuals and entities having an ownership interest in any entities for which you obtain Seed, and that Monsanto Company has not barred any of those individuals or entities from obtaining this limited-use license. Your name must be filled in and must match the signature below. This Agreement becomes effective if and when Monsanto issues the Grower a license number from Monsanto's headquarters in St. Louis, Missouri. Monsanto does not authorize seed dealers or seed retailers to issue a license of any kind for Monsanto Technologies.

**Grower's Full Legal Name (First/Middle/Last)**   Dr.   Mr.   Mrs.   Ms.   Suffix (Sr, Jr, II, III)

**Grower's Mailing Address**

**Grower's City**                                                                 State        Zip

**Area Code**   **Business Phone**                   **Fax**

**Email**

**Farm Business Name**

**Farm Physical Address (as listed with the FSA)**

**Farm City**                                                                     State        Zip

**Last Four of Social Security #**        **Role**
X X X - X X -                              ☐ Operator   ☐ Owner/Operator   ☐ Farm Manager   ☐ Other

## SEED SUPPLIER

**Business Name**                                                    Area Code   Phone

**City**                                                              State        Zip

## THIS SPACE FOR MONSANTO OFFICE USE ONLY, PLEASE LEAVE THIS SECTION BLANK:

Lic. #:                              Batch #:                              Date:

---

This Monsanto Technology/Stewardship Agreement is entered into between you ("Grower") and Monsanto Company ("Monsanto") and consists of the terms on this page and on the reverse side of this page.

This Monsanto Technology/Stewardship Agreement grants Grower a limited license to use Roundup Ready® soybeans, Genuity™ Roundup Ready 2 Yield® soybeans, YieldGard® Corn Borer corn, YieldGard® Rootworm corn, YieldGard® Rootworm with Roundup Ready® Corn 2 corn, YieldGard® Plus corn, YieldGard® Plus with Roundup Ready® Corn 2 corn, Roundup Ready® Corn 2 corn, YieldGard® Corn Borer with Roundup Ready® Corn 2 corn, YieldGard VT Triple® corn, YieldGard VT Rootworm/RR2® corn, Genuity™ VT Triple PRO™ corn, Genuity™ SmartStax™ corn, Roundup Ready® cotton, Bollgard® cotton, Bollgard® with Roundup Ready® cotton, Bollgard II® cotton, Bollgard II® with Roundup Ready® cotton, Genuity™ Roundup Ready® Flex cotton, Genuity™ Bollgard II® with Roundup Ready® Flex cotton, Vistive® low linolenic soybeans, Genuity™ Roundup Ready® Sugarbeets, Genuity™ Roundup Ready® Canola, Roundup Ready® Alfalfa, Monsanto patented germplasm and Monsanto Plant Variety Protection rights ("Monsanto Technologies"). Seed containing Monsanto Technologies are referred to herein as ("Seed"). This Agreement also contains Grower's stewardship responsibilities and requirements associated with the use of Seed and Monsanto Technologies.

1. **GOVERNING LAW:** This Agreement and the parties' relationship shall be governed by the laws of the State of Missouri and the United States (without regard to the choice of law rules).

2. **BINDING ARBITRATION FOR COTTON-RELATED CLAIMS MADE BY GROWER:**
Any claim or action made or asserted by a cotton Grower (or any other person claiming an interest in the Grower's cotton crop) against Monsanto or any seller of cotton Seed containing Monsanto Technology arising out of and/or in connection with this Agreement or the sale or performance of the cotton Seed containing Monsanto Technology other than claims arising under the patent laws of the United States must be resolved by binding arbitration. The parties acknowledge that the transaction involves interstate commerce. The parties agree that arbitration shall be conducted pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. Sec 1 et seq. and administered under the Commercial Dispute Resolution Procedures established by the American Arbitration Association ("AAA"). The term "seller" as used throughout this

---

**Page 1 of 4**

*Initial here ›*

Agreement refers to all parties involved in the production, development, distribution, and/or sale of the Seed containing Monsanto Technology. In the event that a claim is not amicably resolved within

30 days of Monsanto's receipt of the Grower's notice required pursuant to this Agreement any party may initiate arbitration. The arbitration shall be heard in the capital city of the state of Grower's residence or in any other place as the parties decide by mutual agreement. When a demand for arbitration is filed by a party, the Grower and Monsanto/sellers shall each immediately pay one half of the AAA filing fee. In addition, Grower and Monsanto/sellers shall each pay one half of AAA's administrative and arbitrator fees as those fees are incurred. The arbitrator(s) shall have the power to apportion the ultimate responsibility for all AAA fees in the final award. The arbitration proceedings and results are to remain confidential and are not to be disclosed without the written agreement of all parties, except to the extent necessary to effectuate the decision or award of the arbitrator(s) or as otherwise required by law.

**3. FORUM SELECTION FOR NON-COTTON-RELATED CLAIMS MADE BY GROWER AND ALL OTHER CLAIMS:** THE PARTIES CONSENT TO THE SOLE AND EXCLUSIVE JURISDICTION AND VENUE OF THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION, AND THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS, MISSOURI, (ANY LAWSUIT MUST BE FILED IN ST. LOUIS, MO) FOR ALL CLAIMS AND DISPUTES ARISING OUT OF OR CONNECTED IN ANY WAY WITH THIS AGREEMENT AND/OR THE USE OF THE SEED OR THE MONSANTO TECHNOLOGIES, EXCEPT FOR COTTON-RELATED CLAIMS MADE BY GROWER. THE PARTIES WAIVE ANY OBJECTION TO VENUE IN THE EASTERN DIVISION OF THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI, INCLUDING THOSE BASED, IN WHOLE OR IN PART, ON THE DIVISIONAL VENUE LOCAL RULE(S) OF THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI.

THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION FOR COTTON RELATED CLAIMS PURSUANT TO THE PROVISIONS OF THE FEDERAL ARBITRATION ACT, 9 U.S.C. §1 ET SEQ., WHICH MAY BE ENFORCED BY THE PARTIES.

**4. GROWER AGREES:**

- Direct grain produced from these crops to appropriate markets as necessary. Any crop or material produced from these products can only be exported to, or used, processed or sold in countries where all necessary regulatory approvals have been granted. It is a violation of national and international law to move material containing biotech traits across boundaries into nations where import is not permitted.
- Only to lawfully plant Roundup Ready® alfalfa; and not to plant Roundup Ready® alfalfa for the production of sprouts, or of seed unless under specific contract to produce seed. If growing Roundup Ready® alfalfa, to direct any product produced from a Roundup Ready® alfalfa seed or crop, including hay and hay products, only to those countries where regulatory approvals have been granted, and to grow and manage Roundup Ready® alfalfa in accordance with the Technology Use Guide.
- To accept and continue the obligations of this Monsanto Technology/ Stewardship Agreement on any new land purchased or leased by Grower that has Seed planted on it by a previous owner or possessor of the land; and to notify in writing purchasers or lessees of land owned by Grower that has Seed planted on it that the Monsanto Technology is subject to this Monsanto Technology/Stewardship Agreement and they must have or obtain their own Monsanto Technology/Stewardship Agreement.
- To implement an Insect Resistance Management ("IRM") program as specified in the applicable Bollgard® and Genuity™ Bollgard II® cotton and YieldGard® corn sections of the most recent Technology Use Guide ("TUG") and the Grower and Insect Resistance Management Guide ("IRM/Grower Guide") and to cooperate and comply with these IRM programs.
- To use Seed containing Monsanto Technologies solely for planting a single commercial crop.
- Not to save or clean any crop produced from Seed for planting and not to supply Seed produced from Seed to anyone for planting other than to a Monsanto licensed seed company.
- Not to transfer any Seed containing patented Monsanto Technologies to any other person or entity for planting.
- To plant and/or clean Seed for Seed production, if and only if, Grower has entered into a valid, written Seed production agreement with a Seed company that is licensed by Monsanto to produce Seed. Grower must either physically deliver to that licensed Seed Company or must sell for non-seed purposes or use for non-seed purposes all of the Seed produced pursuant to a Seed production agreement.
- Grower may not plant and may not transfer to others for planting any Seed that the Grower has produced containing patented Monsanto Technologies for crop breeding, research, or generation of herbicide registration data. Grower may not conduct research on Grower's crop produced from Seed other than to make agronomic comparisons and conduct yield testing for Grower's own use.

- To use on Roundup Ready® or Genuity™ Roundup Ready® crops only a labeled Roundup® agricultural herbicide or other authorized non-selective herbicide which could not be used in the absence of the Roundup Ready® gene (see TUG for details on authorized non-selective products). Use of any selective herbicide labeled for the same crop without the Roundup Ready® gene is not restricted by this Agreement. MONSANTO DOES NOT MAKE ANY REPRESENTATIONS, WARRANTIES OR RECOMMENDATIONS CONCERNING THE USE OF PRODUCTS MANUFACTURED OR MARKETED BY OTHER COMPANIES WHICH ARE LABELED FOR USE IN ROUNDUP READY® CROP(S). MONSANTO SPECIFICALLY DISCLAIMS ALL RESPONSIBILITY FOR THE USE OF THESE PRODUCTS IN ROUNDUP READY® OR GENUITY™ ROUNDUP READY® CROP(S). ALL QUESTIONS AND COMPLAINTS ARISING FROM THE USE OF PRODUCTS MANUFACTURED OR MARKETED BY OTHER COMPANIES SHOULD BE DIRECTED TO THOSE COMPANIES.
- To read and follow the applicable sections of the TUG and the IRM/Grower Guide, which are incorporated into and is a part of this Agreement, for specific requirements relating to the terms of this Agreement, and to abide by and be bound by the terms of the TUG and the IRM/Grower Guide as it may be amended from time to time.
- To acquire Seed containing these Monsanto Technologies only from a seed company with technology license(s) from Monsanto for the applicable Monsanto Technology(ies) or from a licensed company's dealer authorized to sell such licensed Seed.
- To pay all applicable fees due to Monsanto that are a part of, associated with or collected with the Seed purchase price or that are invoiced for the seed. If Grower fails to pay Monsanto for cotton related Monsanto Technologies, Grower agrees to pay Monsanto default charges at the rate of 14% per annum (or the maximum allowed by law whichever is less) plus Monsanto's reasonable attorneys' fees, court costs and all other costs of collection.
- To provide Monsanto copies of any records, receipts, or other documents that could be relevant to Grower's performance of this Agreement, including but not limited to, Summary Acreage History Report, Form 578 (producer print), Farm and Tract Detail Listing and corresponding aerial photographs, Risk Management Agency claim documentation, and dealer/retailer invoices for seed and chemical transactions. Such records shall be produced following Monsanto's actual (or attempted) oral communication with Grower and not later than seven (7) days after the date of a written request from Monsanto.
- To identify and allow Monsanto and its representatives access to land farmed by or at the direction of Grower (including refuge areas) and bins, wagons, or seed storage containers used or under the control or direction of Grower, for purposes of examining and taking samples of crops, crop residue or seeds located therein. Such inspection, examination or sampling shall be available to Monsanto and its representatives only after Monsanto's actual (or attempted) oral communication with Grower and after at least seven (7) days prior written request by Monsanto to Grower.
- To allow Monsanto to obtain Grower's internet service provider ("ISP") records to validate Grower's electronic signature, if applicable.

**5. GROWER RECEIVES FROM MONSANTO COMPANY:**

- A limited use license to purchase and plant Seed and apply Roundup® agricultural herbicides and other authorized non-selective herbicides over the top of Roundup Ready® or Genuity™ Roundup Ready® crops. Monsanto retains ownership of the Monsanto Technologies including the genes (for example, the Roundup Ready® gene) and the gene technologies. Grower receives the right to use the Monsanto Technologies subject to the conditions specified in this Agreement.
- Monsanto Technologies are protected under U.S. patent law. Monsanto licenses the Grower under applicable U.S. patents listed below (other than the Dow AgroScience Patent Rights), to use Monsanto Technologies subject to the conditions listed in this Agreement. Dow AgroSciences LLC and Agrigenetics, Inc. (collectively "Dow AgroSciences") licenses the Grower under its applicable U.S. patents listed below (the "Dow AgroScience Patent Rights") to use Dow AgroSciences' Event TC 1507 and Event DAS 15229-7 to the extent either is present in any SmartStax Seed being obtained by Grower pursuant to this Agreement, Monsanto being authorized to act on Dow AgroSciences' behalf for this Agreement, subject to the conditions listed in this Agreement. These licenses do not authorize Grower to plant Seed in the United States that has been purchased in another country or plant Seed in another country that has been purchased in the United States. Grower is not authorized to transfer Seed to anyone outside of the U.S.
- Enrollment for participation in Roundup Rewards® program.
- A limited use license to prepare and apply on glyphosate-tolerant soybean, cotton, alfalfa, or canola crops (or have others prepare and apply) tank mixes of, or sequentially apply (or have others sequentially apply), Roundup® agricultural herbicides or other glyphosate herbicides labeled for use on those crops with quizalofop, clethodim, sethoxydim, fluazifop,

*Initial here ›*

and/or fenoxaprop to control volunteer Roundup Ready® Corn 2 corn in Grower's crops for the 2010 growing season. However, neither Grower nor a third party may utilize any type of co-pack or premix of glyphosate plus one or more of the above-identified active ingredients in the preparation of a tank mix.

### 6. GROWER UNDERSTANDS:

- **Monsanto Company is a member of Excellence Through Stewardship℠ (ETS).** These products containing Monsanto technologies have been commercialized in compliance with the ETS Product Launch Stewardship Guidance and the Monsanto Product Launch Stewardship policy, after meeting applicable regulatory requirements in key export markets with functioning regulatory systems. Any crop or material produced from these products may only be exported to, or used, processed or sold in countries where all necessary regulatory approvals have been granted. It is a violation of national and international law to move material containing biotech traits across boundaries into nations where import is not permitted. Growers should talk to their grain handler or product purchaser to confirm their buying position for these products. Excellence Through Stewardship℠ is a service mark of Biotechnology Industry Organization.

- Insect Resistance Management: When planting any YieldGard®, Bollgard®, Genuity™ Bollgard II® products, Grower must implement an IRM program according to the size and distance guidelines specified in the TUG and the IRM/Grower Guide, including any supplemental amendments. Grower may lose Grower's limited use license to use these products if Grower fails to follow the IRM program required by this Agreement.

- Crop Stewardship & Specialty Crops: Refer to the section on Coexistence and Identity Preservation in the TUG for applicable information on crop stewardship and considerations for production of identity preserved crops.

- Corn Trait Performance: All hybrids containing Monsanto corn traits (YieldGard® Corn Borer corn, YieldGard® Rootworm corn, YieldGard® Plus corn, and Roundup Ready® Corn 2 corn) have been screened for the presence of the appropriate protein and have passed that screening prior to commercial sale. YieldGard® Rootworm corn and YieldGard® Plus corn hybrids have achieved industry leading success rates in excess of 99%. A small number of these hybrids may infrequently demonstrate variable levels of performance in fields and not meet grower expectations.

### 7. SPECIAL LIMITATIONS ON PURCHASES AND USE OF BOLLGARD® COTTON:

Grower may not purchase Bollgard® cotton seed or Bollgard® with Roundup Ready® cotton seed after September 30, 2009. Monsanto has petitioned the U.S. Environmental Protection Agency (EPA) to amend its registration to allow Monsanto to distribute any of this seed purchased by a Grower before September 30, 2009 in the spring of 2010 for planting during the 2010 growing season. Monsanto will publicly announce the EPA's decision when it is received. Whether the petition is granted or not, Grower must return any unplanted Bollgard® cotton seed no later than the end of the 2010 planting season. These restrictions do not apply to any Genuity™ Bollgard II® cotton seed products.

### 8. GENERAL TERMS:

Grower's rights may not be transferred to anyone else without the written consent of Monsanto. If Grower's rights are transferred with Monsanto's consent or by operation of law, this Agreement is binding on the person or entity receiving the transferred rights. If any provision of this Agreement is determined to be void or unenforceable, the remaining provisions shall remain in full force and effect.

Grower acknowledges that Grower has received a copy of Monsanto's Technology Use Guide ("TUG") and the Grower and Insect Resistance Management Guide ("IRM/Grower Guide"). To obtain additional copies of the TUG and/or the IRM/Grower Guide, contact Monsanto at 1-800-768-6387 or go to www.monsanto.com. Once effective, this Agreement will remain in effect until either the Grower or Monsanto choose to terminate the Agreement, as provided in Section 9 below. Information regarding new and existing Monsanto Technologies, including any additions or deletions to the U.S. patents licensed under this agreement, and any new terms will be mailed to you each year. Continuing use of Monsanto Technologies after receipt of any new terms constitutes Grower's agreement to be bound by the new terms.

### 9. TERMINATION:

Grower or Monsanto may choose to terminate this Agreement effective immediately by delivering written notice to either party. Grower must deliver the notice of termination to Grower Licensing, Monsanto, 622 Emerson Road, Suite 150, St. Louis, MO 63141. If this Agreement is terminated pursuant to such a notice, Grower's responsibilities and the other terms herein shall survive (such

as but not limited to Grower's obligation to use Seed for a single commercial crop) as to Seed previously purchased by the Grower.

In the event Grower violates the terms of this Agreement, then this Agreement shall automatically terminate. However, Grower's responsibilities and the other terms herein shall survive as to all Seed purchased or used by the Grower prior to such violation (such as but not limited to Grower's obligation to use Seed for a single commercial crop, Grower's obligation to pay Monsanto for its attorneys' fees, costs and other expenses incurred in enforcing its rights under this Agreement, and Grower's agreement to the choice of law and forum selection provisions contained herein). Further, Grower shall not be entitled to obtain a future limited-use license from Monsanto unless Monsanto provides Grower with specific written notice expressly recognizing the prior breach and prior termination of the limited-use license and expressly granting and/or reissuing the limited-use license previously obtained (and terminated) pursuant to this Agreement. Grower expressly acknowledges that Grower's submission of a new Monsanto Technology Stewardship Agreement and Monsanto's issuance of a new license number shall not satisfy the specific written notice reference above and that any such action shall have no legal effect. If Grower is found by any court to have breached any term of this Agreement and/or to have infringed one or more of the U.S. patents listed below, Grower agrees that, among other things, Monsanto and Dow Agrosciences, as appropriate, shall be entitled to preliminary and permanent injunctions enjoining Grower and any individual and/or entity acting on Grower's behalf or in concert therewith from making, using, selling, or offering Seed for sale. Additionally, Grower agrees that any such finding of infringement by Grower shall entitle Monsanto and Dow Agrosciences, as appropriate, to patent infringement damages to the full extent authorized by 35 U.S.C. § 271 et. seq. Grower will also be liable for all breach of contract damages. If Grower is found by any court to have infringed one or more of the U.S. patents listed below or otherwise to have breached this Agreement, Grower agrees to pay Monsanto and the licensed Monsanto Technology provider(s) and Dow AgroSciences, as appropriate, their attorneys' fees and costs and other expenses incurred in enforcing rights under this Agreement including, but not limited to, expenses incurred in the investigation of the breach of this Agreement and/or infringement of one or more of the U.S. patents listed below.

**Grower accepts the terms of the following NOTICE REQUIREMENT, LIMITED WARRANTY AND DISCLAIMER OF WARRANTY AND EXCLUSIVE LIMITED REMEDY by signing this Agreement and/or opening a bag of Seed. If Grower does not agree to be bound by the conditions of purchase or use, Grower agrees to return the unopened bags to Grower's seed dealer.**

### 10. NOTICE REQUIREMENT:

As a condition precedent to Grower or any other person with an interest in Grower's crop asserting any claim, action, or dispute against Monsanto and/or any seller of Seed regarding performance or non-performance of Monsanto Technologies or Seed, Grower must provide Monsanto a written, prompt, and timely notice (regarding performance or non-performance of the Monsanto Technologies) and to the seller of any Seed (regarding performance or non-performance of the Seed) within sufficient time to allow an in-field inspection of the crop(s) about which any controversy, claim, action, or dispute is being asserted. The notice will be timely only if it is delivered 15 days or less after the Grower first observes the issue(s) regarding performance or non-performance of the Monsanto Technology and/or the Seed. The notice shall include a statement setting forth the nature of the claim, name of the Monsanto Technology, and Seed hybrid or variety. Grower must deliver the notice to Grower Licensing, Monsanto, 622 Emerson Road, Suite 150, St. Louis, MO 63141.

### 11. LIMITED WARRANTY AND DISCLAIMER OF WARRANTIES:

Monsanto warrants that the Monsanto Technologies licensed hereunder will perform as set forth in the TUG when used in accordance with directions. This warranty applies only to Monsanto Technologies contained in planting Seed that has been purchased from Monsanto and seed companies licensed by Monsanto or the seed company's authorized dealers or distributors. EXCEPT FOR THE EXPRESS WARRANTIES IN THE LIMITED WARRANTY SET FORTH ABOVE, MONSANTO MAKES NO OTHER WARRANTIES OF ANY KIND, AND DISCLAIMS ALL OTHER WARRANTIES, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE.

### 12. GROWER'S EXCLUSIVE LIMITED REMEDY:

THE EXCLUSIVE REMEDY OF THE GROWER AND THE LIMIT OF THE LIABILITY OF MONSANTO OR ANY SELLER FOR ANY AND ALL LOSSES, INJURY OR DAMAGES RESULTING FROM THE USE OR HANDLING OF SEED (INCLUDING CLAIMS BASED

*Initial here* ›

IN CONTRACT, NEGLIGENCE, PRODUCT LIABILITY, STRICT LIABILITY, TORT, OR OTHERWISE) SHALL BE THE PRICE PAID BY THE GROWER FOR THE QUANTITY OF THE SEED INVOLVED OR, AT THE ELECTION OF MONSANTO OR THE SEED SELLER, THE REPLACEMENT OF THE SEED. IN NO EVENT SHALL MONSANTO OR ANY SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES.

Thank you for choosing our advanced technologies. We look forward to working with you in the future. If you have any questions regarding the Monsanto Technologies or this license, please call the Monsanto Customer Relations Center at: 1-800-768-6387.

**13. PLEASE MAIL THE SIGNED 2010 MONSANTO TECHNOLOGY/STEWARDSHIP AGREEMENT TO:** Grower Licensing, Monsanto, 622 Emerson Road, Suite 150, St. Louis, MO 63141.

**14. UNITED STATES PATENTS:**

The licensed U.S. patents include: for Bollgard® cotton – 5,322,938; 5,352,605; 5,530,196; 6,943,282; for Genuity™ Bollgard II® cotton – 5,322,938; 5,338,544; 5,352,605; 5,362,865; 5,530,196; 5,659,122; 5,717,084; 5,728,925; 6,489,542; 6,943,282; 7,064,249; 7,223,907; for Genuity™ Bollgard II® with Roundup Ready® cotton – 5,322,938; 5,338,544; 5,352,605; 5,362,865; 5,378,619; 5,530,196; 5,659,122; 5,717,084; 5,728,925; 6,051,753; 6,083,878; 6,489,542; 6,753,463; 6,943,282; 7,064,249; 7,223,907; RE39247; for Genuity™ Bollgard II® with Roundup Ready® Flex Cotton – 5,322,938; 5,338,544; 5,352,605; 5,362,865; 5,530,196; 5,659,122; 5,717,084; 5,728,925; 6,051,753; 6,083,878; 6,489,542; 6,660,911; 6,753,463; 6,943,282; 6,949,696; 7,064,249; 7,112,725; 7,141,722; 7,223,907; 7,381,861; RE39247; for Bollgard® with Roundup Ready® cotton – 5,322,938; 5,352,605; 5,378,619; 5,530,196; 5,717,084; 5,728,925; 6,051,753; 6,083,878; 6,753,463; 6,943,282; RE39247; for Bollgard® with Roundup Ready® Flex Cotton – 5,322,938; 5,352,605; 5,530,196; 5,717,084; 5,728,925; 6,051,753; 6,083,878; 6,660,911; 6,753,463; 6,943,282; 6,949,696; 7,112,725; 7,141,722; 7,381,861; RE39247; for Mavera® high value corn with lysine – 7,157,281; for Genuity™ Roundup Ready 2 Yield® Soybeans – 5,717,084; 5,728,925; 5,804,425; 6,051,753; 6,660,911; 6,949,696; 7,141,722; RE39247; for Roundup Ready® Alfalfa – 5,362,865; 5,378,619; 5,659,122; 5,717,084; 5,728,925; 6,051,753; RE39247; for Genuity™ Roundup Ready® Canola – 5,378,619; 5,463,175; 5,717,084; 5,728,925; 5,750,871; 6,051,753; 6,083,878; RE38825; RE39247; for Roundup Ready® Corn – 5,554,798; 5,641,876; 5,717,084; 5,728,925; 6,025,545; 6,040,497; 6,083,878; for Roundup Ready® Corn 2 – 5,322,938; 5,352,605; 5,424,412; 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,083,878; 6,825,400; RE39247; for Roundup Ready® Corn – 5,352,605; 5,378,619; 5,530,196; 5,717,084; 5,728,925; 6,051,753; 6,083,878; 6,753,463; RE39247; for Genuity™ Roundup Ready® Flex Cotton – 5,717,084; 5,728,925; 6,051,753; 6,083,878; 6,660,911; 6,753,463; 6,949,696; 7,112,725; 7,141,722; 7,381,861; RE39247; for Roundup Ready® Soybeans – 5,352,605; 5,530,196; 5,717,084; 5,728,925; RE39247; for Genuity™ Roundup Ready® Sugarbeets – 5,322,938; 5,352,605; 5,378,619; 5,463,175; 5,530,196; 5,717,084; 5,728,925; 6,051,753; 6,083,878; RE38825; RE39247; for YieldGard® Corn Borer corn – 5,352,605; 5,424,412; 5,484,956; 5,593,874; 5,859,347; 6,180,774; for YieldGard® Corn Borer with Roundup Ready® Corn – 5,322,938; 5,352,605; 5,424,412; 5,484,956; 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,083,878; 6,180,774; RE39247; for YieldGard® Corn Borer with Roundup Ready® Corn 2 – 5,322,938; 5,352,605; 5,424,412; 5,484,956; 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,083,878; 6,180,774; 6,825,400; RE39247; for YieldGard® Corn Rootworm corn – 5,352,605; 5,484,956; 6,063,597; 6,501,009; 7,227,056; for YieldGard® Plus corn – 5,352,605; 5,424,412; 5,484,956; 5,593,874; 5,859,347; 6,063,597; 6,180,774; 6,501,009; 7,227,056; for YieldGard® Plus with Roundup Ready® Corn 2 – 5,322,938; 5,352,605; 5,424,412; 5,484,956; 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,063,597; 6,083,878; 6,180,774; 6,501,009; 6,825,400; 7,227,056; RE39247; for YieldGard® Rootworm with Roundup Ready® Corn 2 – 5,322,938; 5,352,605; 5,424,412; 5,484,956; 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,063,597; 6,083,878; 6,501,009; 6,825,400; 7,227,056; RE39247; for YieldGard® VT PRO® – 5,322,938; 5,352,605; 5,378,619; 5,424,412; 6,051,753; 6,489,542; 6,645,497; 6,962,705; 7,064,249; 7,250,501; for YieldGard VT PRO/RR2® – 5,322,938; 5,352,605; 5,378,619; 5,424,412; 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,051,753; 6,083,878; 6,489,542; 6,825,400; 6,962,705; 7,064,249; 7,250,501; RE39247; for YieldGard VT Rootworm/RR2® – 5,322,938; 5,352,605; 5,554,798; 5,641,876; 5,717,084; 5,728,925; 6,025,545; 6,051,753; 6,063,597; 6,083,878; 6,825,400; 7,227,056; RE39247; for YieldGard VT Triple® – 5,322,938; 5,352,605; 5,424,412; 5,484,956; 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,063,597; 6,083,878; 6,180,774; 7,227,056; RE39247; for Genuity™ VT Triple PRO™ – 5,322,938; 5,352,605; 5,378,619; 5,424,412; 5,554,798; 5,641,876; 5,717,084; 5,728,925; 6,025,545; 6,051,753; 6,063,597; 6,083,878; 6,489,542; 6,645,497; 6,962,705; 7,064,249; 7,227,056; 7,250,501; RE39247; for tank mix - 6,239,072 ; for Genuity™ SmartStax™ – 5,276,268; 5,322,938; 5,352,605; 5,378,619; 5,424,412; 5,554,798; 5,641,876; 5,717,084; 5,728,925; 6,025,545; 6,051,753; 6,063,597; 6,083,878; 6,489,542; 6,645,497; 6,962,705; 7,064,249; 7,112,665; 7,227,056; 7,250,501; RE39247;

Dow AgroScience Patent Rights for Genuity™ SmartStax™ – 6,573,240; 6,737,273; 6,218,188; 5,510,474; 6,020,190; 6,127,180; 6,548,291; 6,624,145; 6,340,593; 6,893,872; 6,083,499; 6,900,371; 6,943,282; 7,288,643; 7,323,556; 7,514,544; 7,417,132; 7,435,807; 7,449,564.

**Roundup Ready® Alfalfa seed is currently not for sale or distribution. The movement and use of Roundup Ready® Alfalfa forage is subject to a USDA Administrative Order available at http://www.aphis.usda.gov/brs/pdf/RRA_A8_final.pdf. Cottonseed containing Monsanto traits may not be exported for the purpose of planting without a license from Monsanto.** *B.t.* **products** may not yet be registered in all states. Check with your Monsanto representative for the registration status in your state.

**Growers may utilize the natural refuge option for varieties containing the Genuity™ Bollgard II® trait in the following states:** AL, AR, FL, GA, KS, KY, LA, MD, MS, MO, NC, OK, SC, TN, VA, and most of Texas (excluding the Texas counties of Brewster, Crane, Crockett, Culberson, El Paso, Hudspeth, Jeff Davis, Loving, Pecos, Presidio, Reeves, Terrell, Val Verde, Ward and Winkler). The natural refuge option does not apply to **Genuity™ Bollgard II®** cotton grown in areas where pink bollworm is a pest, including CA, AZ, NM, and the above listed Texas counties. It also remains the case that **Bollgard® and Genuity™ Bollgard II®** cotton may not be planted south of Highway 60 in Florida, and that **Bollgard** cotton cannot be planted in certain other counties in the Texas panhandle. Refer to the Technology Use Guide (TUG) and IRM Guide for additional information regarding Bollgard II, Bollgard, natural refuge and EPA-mandated geographical restrictions on the planting of *B.t.* cotton.

**ALWAYS READ AND FOLLOW PESTICIDE LABEL DIRECTIONS. Genuity™ SmartStax™** commercialization is dependent on many factors, including successful conclusion of regulatory process. Genuity™ SmartStax™ has not been registered by the U.S. Environmental Protection Agency. It is a violation of federal law to promote or sell an unregistered pesticide. Tank mixtures: The applicable labeling for each product must be in the possession of the user at the time of application. Follow applicable use instructions, including application rates, precautions and restrictions of each product used in the tank mixture. Monsanto has not tested all tank mix product formulations for compatibility or performance other than specifically listed by brand name. Always predetermine the compatibility of tank mixtures by mixing small proportional quantities in advance.

**IMPORTANT: Grain Marketing and Seed Availability: Genuity™ VT Triple PRO™** has received the necessary approvals in the United States, however, as of **May 27, 2009**, approvals have not been received in all major corn export markets. **Genuity™ VT Triple PRO™** seed will only be available as part of a commercial demonstration program that includes grain marketing stewardship requirements. It is a violation of national and international law to move material containing biotech traits across boundaries into nations where import is not permitted. Consult with your seed representative for current stewardship information. Bollgard®, Bollgard II®, Genuity™, Roundup®, Roundup Ready®, Roundup Ready 2 Yield®, Roundup Rewards®, SmartStax™, SmartStax and Design™, Vistive®, VT Triple PRO™, YieldGard®, YieldGard VT®, YieldGard VT Rootworm/RR2®, and YieldGard VT Triple® are trademarks of Monsanto Technology LLC. ©2009 Monsanto Company. [19634Apgd]

**GROWER SIGNATURE AND DATE REQUIRED** ▶

_____      _____
Name                                                Date

*Please return all 4 pages (initialed and signed) to: Monsanto, 622 Emerson Road, Suite 150, St. Louis, MO 63141*