# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(MARK ONE)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended Aug. 31, 2010
or

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____
Commission file number 001-16167



# MONSANTO COMPANY
*Exact name of registrant as specified in its charter*

| Delaware | 43-1878297 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

| 800 North Lindbergh Blvd., St. Louis, Missouri | 63167 |
|---|---|
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number including area code:                    (314) 694-1000

Securities registered pursuant to Section 12(b) of the Act:

| *Title of each class* | *Name of each exchange on which registered* |
|---|---|
| Common Stock $0.01 par value | New York Stock Exchange |

Securities Registered Pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [X] No [ ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 of Section 15(d) of the Act. Yes [ ] No [X]

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check One): Large Accelerated Filer [X] Accelerated Filer [ ] Non-Accelerated Filer [ ] Smaller Reporting Company [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes [ ] No [X]

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter (Feb. 28, 2010): approximately $38.4 billion.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: 536,392,459 shares of common stock, $0.01 par value, outstanding at Oct. 21, 2010.

Documents Incorporated by Reference

Portions of Monsanto Company's definitive proxy statement, which is expected to be filed with the Securities and Exchange Commission pursuant to Regulation 14A in December 2010, are incorporated herein by reference into Part III of this Annual Report on Form 10-K.

MONSANTO COMPANY                                                            2010 FORM 10-K

## INTRODUCTION

This Annual Report on Form 10-K is a document that U.S. public companies file with the Securities and Exchange Commission every year. Part II of the Form 10-K contains the business information and financial statements that many companies include in the financial sections of their annual reports. The other sections of this Form 10-K include further information about our business that we believe will be of interest to investors. We hope investors will find it useful to have all of this information in a single document.

The SEC allows us to report information in the Form 10-K by "incorporating by reference" from another part of the Form 10-K or from the proxy statement. You will see that information is "incorporated by reference" in various parts of our Form 10-K. The proxy statement will be available on our Web site after it is filed with the SEC in December 2010.

Monsanto was incorporated in Delaware on Feb. 9, 2000, as a subsidiary of Pharmacia Corporation. Monsanto includes the operations, assets and liabilities that were previously the agricultural business of Pharmacia. Pharmacia is now a subsidiary of Pfizer Inc.

"Monsanto," "the company," "we," "our," and "us" are used interchangeably to refer to Monsanto Company or to Monsanto Company and its subsidiaries, as appropriate to the context. With respect to the time period prior to Sept. 1, 2000, these defined terms also refer to the agricultural business of Pharmacia.

Unless otherwise indicated, trademarks owned or licensed by Monsanto or its subsidiaries are shown in special type. Unless otherwise indicated, references to "*Roundup*" herbicides" mean *Roundup* branded herbicides, excluding all lawn-and-garden herbicides, and references to "*Roundup* and other glyphosate-based herbicides" exclude all lawn-and-garden herbicides.

Information in this Form 10-K is current as of Oct. 27, 2010, unless otherwise specified.

## CAUTION REGARDING FORWARD-LOOKING STATEMENTS

In this report, and from time to time throughout the year, we share our expectations for our company's future performance. These forward-looking statements include statements about our business plans; the potential development, regulatory approval, and public acceptance of our products; our expected financial performance, including sales performance, and the anticipated effect of our strategic actions; the anticipated benefits of recent acquisitions; the outcome of contingencies, such as litigation; domestic or international economic, political and market conditions; and other factors that could affect our future results of operations or financial position, including, without limitation, statements under the captions "Legal Proceedings," "Overview — Executive Summary — Outlook," "Seeds and Genomics Segment," "Agricultural Productivity Segment," "Financial Condition, Liquidity, and Capital Resources," and "Outlook." Any statements we make that are not matters of current reportage or historical fact should be considered forward-looking. Such statements often include words such as "believe," "expect," "anticipate," "intend," "plan," "estimate," "will," and similar expressions. By their nature, these types of statements are uncertain and are not guarantees of our future performance.

Our forward-looking statements represent our estimates and expectations at the time that we make them. However, circumstances change constantly, often unpredictably, and investors should not place undue reliance on these statements. Many events beyond our control will determine whether our expectations will be realized. We disclaim any current intention or obligation to revise or update any forward-looking statements, or the factors that may affect their realization, whether in light of new information, future events or otherwise, and investors should not rely on us to do so. In the interests of our investors, and in accordance with the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, Part I. Item 1A. Risk Factors below explains some of the important reasons that actual results may be materially different from those that we anticipate.

1

MONSANTO COMPANY                                          2010 FORM 10-K

**TABLE OF CONTENTS FOR FORM 10-K**

**PART I**                                                          **Page**

| | | |
|---|---|---|
| Item 1. | Business | 4 |
| | Seeds and Genomics Segment | 4 |
| | Agricultural Productivity Segment | 6 |
| | Research and Development | 8 |
| | Seasonality and Working Capital; Backlog | 8 |
| | Employee Relations | 9 |
| | Customers | 9 |
| | International Operations | 9 |
| | Segment and Geographic Data | 9 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 13 |
| Item 2. | Properties | 13 |
| Item 3. | Legal Proceedings | 13 |
| Item 4. | [Removed and Reserved.] | 16 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 17 |
| Item 6. | Selected Financial Data | 20 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| | Overview | 22 |
| | Results of Operations | 25 |
| | Seeds and Genomics Segment | 29 |
| | Agricultural Productivity Segment | 30 |
| | Restructuring | 31 |
| | Financial Condition, Liquidity, and Capital Resources | 33 |
| | Outlook | 40 |
| | Critical Accounting Policies and Estimates | 43 |
| | New Accounting Standards | 47 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 48 |
| Item 8. | Financial Statements and Supplementary Data | 50 |
| | Management Report | 50 |
| | Management's Annual Report on Internal Control over Financial Reporting | 51 |
| | Reports of Independent Registered Public Accounting Firm | 52 |
| | Statements of Consolidated Operations | 54 |
| | Statements of Consolidated Financial Position | 55 |
| | Statements of Consolidated Cash Flows | 56 |
| | Statements of Consolidated Shareowners' Equity and Comprehensive Income | 57 |
| | Notes to Consolidated Financial Statements | 59 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 125 |
| Item 9A. | Controls and Procedures | 125 |
| Item 9B. | Other Information | 125 |

2

MONSANTO COMPANY

2010 FORM 10-K

**PART III**

| Item 10. | Directors, Executive Officers and Corporate Governance | 126 |
| Item 11. | Executive Compensation | 127 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 128 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 128 |
| Item 14. | Principal Accounting Fees and Services | 128 |

**PART IV**

| Item 15. | Exhibits, Financial Statement Schedules | 129 |
| **SIGNATURES** | | 130 |
| **EXHIBIT INDEX** | | 132 |

3

## PART I

## ITEM 1. BUSINESS

Monsanto Company, along with its subsidiaries, is a leading global provider of agricultural products for farmers. Our seeds, biotechnology trait products, and herbicides provide farmers with solutions that improve productivity, reduce the costs of farming, and produce better foods for consumers and better feed for animals.

We manage our business in two segments: Seeds and Genomics and Agricultural Productivity. We view our Seeds and Genomics segment as the driver for future growth for our company. Our Agricultural Productivity segment has encountered significant change in the glyphosate industry as numerous major global manufacturing competitors have increased production at the same time that there has been an increase in the number of distributors packaging and selling generic glyphosate sourced from these suppliers. The growth in supply and sellers has added to the competitiveness and margin erosion in the glyphosate industry and in certain regions has increased the channel inventory.

We provide information about our business, including analyses, significant news releases, and other supplemental information, on our Web site: www.monsanto.com. In addition, we make available through our Web site, free of charge, our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to those reports, as soon as reasonably practicable after they have been filed with or furnished to the SEC pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934. Forms 3, 4 and 5 filed with respect to our equity securities under Section 16(a) of the Exchange Act are also available on our site by the end of the business day after filing. All of these materials can be found under the "Investors" tab. Our Web site also includes the following corporate governance materials, under the tab "Corporate Responsibility": our Code of Business Conduct, our Code of Ethics for Chief Executive and Senior Financial Officers, our Board of Directors' Charter and Corporate Governance Guidelines, and charters of our Board committees. These materials are also available on paper. Any shareowner may request them by contacting the Office of the General Counsel, Monsanto Company, 800 N. Lindbergh Blvd., St. Louis, Missouri, 63167. Information on our Web site does not constitute part of this report.

A description of our business follows.

## SEEDS AND GENOMICS SEGMENT

Through our Seeds and Genomics segment, we produce leading seed brands, including *DEKALB, Asgrow, Deltapine, Seminis,* and *De Ruiter* and we develop biotechnology traits that assist farmers in controlling insects and weeds. We also provide other seed companies with genetic material and biotechnology traits for their seed brands. Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) — Seeds and Genomics Segment — the

4

MONSANTO COMPANY                                                      2010 FORM 10-K

tabular information about net sales of our seeds and traits, is incorporated herein by reference.

| Major Products Applications | | Major Brands |
| --- | --- | --- |
| Germplasm | Row crop seeds: | |
| | Corn hybrids and foundation seed | *DEKALB, Channel Bio* for corn |
| | Soybean varieties and foundation seed | *Asgrow* for soybeans |
| | Cotton varieties, hybrids and foundation seed | *Deltapine* for cotton |
| | Other row crop varieties and hybrids, such as canola | |
| | Vegetable seeds: | |
| | Open field and protected-culture seed for tomato, pepper, eggplant, melon, cucumber, pumpkin, squash, beans, broccoli, onions, and lettuce, among others | *Seminis* and *De Ruiter* for vegetable seeds |
| Biotechnology traits[1] | Enable crops to protect themselves from borers and rootworm in corn and leaf- and boll-feeding worms in cotton, reducing the need for applications of insecticides | *SmartStax, YieldGard, YieldGard VT Triple, VT Triple PRO and VT Double PRO* for corn; *Bollgard* and *Bollgard II* for cotton |
| | Enable crops, such as corn, soybeans, cotton, and canola to be tolerant of *Roundup* and other glyphosate-based herbicides | *Roundup Ready* and *Roundup Ready 2 Yield* (soybeans only) |
| | | *Genuity*, global umbrella trait brand |

[1]  Monsanto also offers farmers stacked-trait products, which are single-seed products in which two or more traits are combined.

**Distribution of Products**

We have a worldwide distribution and sales and marketing organization for our seeds and traits. We sell our products under Monsanto brands and license technology and genetic material to others for sale under their own brands. Through distributors, independent retailers and dealers, agricultural cooperatives, plant raisers, and agents, we market our *DEKALB, Asgrow* and *Deltapine* branded germplasm to farmers in every agricultural region of the world. In the United States, we market regional seed brands under our American Seeds, LLC and Channel Bio, LLC businesses to farmers directly, as well as through dealers, agricultural cooperatives and agents. In countries where they are approved for sale, we market and sell our trait technologies with our branded germplasm, pursuant to license agreements with our farmer customers. In Brazil and Paraguay, we have implemented a point-of-delivery, grain-based payment system. We contract with grain handlers to collect applicable trait fees when farmers deliver their grain. In addition to selling our products under our own brands, we license a broad package of germplasm and trait technologies to large and small seed companies in the United States and certain international markets. Those seed companies in turn market our trait technologies in their branded germplasm; they may also market our germplasm under their own brand name. Our vegetable seeds are marketed in more than 100 countries through distributors, independent retailers and dealers, agricultural cooperatives, plant raisers and agents, as well as directly to farmers.

**Competition**

The global market for the products of our Seeds and Genomics segment is competitive and the competition has intensified. Both our row crops and our vegetable seed businesses compete with numerous multinational agrichemical and seed marketers globally and with hundreds of smaller companies regionally. With the exception of competitors in our Seminis and De Ruiter vegetable seed business, most of our seed competitors are also licensees of our germplasm or biotechnology traits. In certain countries, we also compete with government-owned seed companies. Our biotechnology traits compete as a system with other practices, including the application of agricultural chemicals, and traits developed by other companies. Our weed- and insect-control systems compete with chemical and seed products produced by other agrichemical and seed marketers. Competition for the discovery of new traits based on biotechnology or genomics is likely to come from major global agrichemical companies, smaller biotechnology research companies and institutions, state-funded programs, and academic institutions. Enabling technologies to enhance biotechnology trait development may also come from academic researchers and biotechnology research companies. Competitors using our technology outside of license terms and farmers who save seed from one year to the next (in violation of license or other commercial terms) also affect competitive conditions.

Product performance (in particular, crop vigor and yield for our row crops and quality for our vegetable seeds), customer support and service, intellectual property rights and protection, product availability and planning, and price are important elements of our market success in seeds. In addition, distributor, retailer and farmer relationships are important in the United

States and many other countries. The primary factors underlying the competitive success of traits are performance and commercial viability; timeliness of introduction; value compared with other practices and products; market coverage; service provided to distributors, retailers and farmers; governmental approvals; value capture; public acceptance; and environmental characteristics.

## Patents, Trademarks, and Licenses

In the United States and many foreign countries, Monsanto holds a broad business portfolio of patents, trademarks and licenses that provide intellectual property protection for its seeds and genomics-related products and processes. Monsanto routinely obtains patents and/or plant variety protection for its breeding technology, commercial varietal seed products, and for the parents of its commercial hybrid seed products. Monsanto also routinely obtains registrations for its commercial seed products in registration countries, as well as Plant Variety Protection Act Certificates in the United States and equivalent plant breeders' rights in other countries. Monsanto's insect-protection traits (including *YieldGard* Corn Borer in corn seed and *Bollgard* trait in cotton seed) are protected by patents in various countries that extend at least until 2011, and *YieldGard* Corn Rootworm traits extend at least until 2018. Having filed patent applications in 2001 and 2002, Monsanto anticipates that the *Bollgard II* product will be patent-protected in the United States, and in other areas in which patent protection was sought, at least through 2021. Monsanto's herbicide-tolerant products (*Roundup Ready* traits in soybean, corn, canola and cotton seeds) are protected by U.S. patents that extend at least until 2014; and its second-generation herbicide-tolerant cotton, *Roundup Ready* Flex, and soybean, *Roundup Ready 2 Yield*, are protected by U.S. patents that extend until at least 2020.

Monsanto broadly licenses technology and patents to other parties. For example, Monsanto has licensed the *Roundup Ready* trait in soybean, corn, canola, and cotton seeds and the *YieldGard* traits in corn to a wide range of commercial entities and academic institutions. Monsanto also holds licenses from other parties relating to certain products and processes. For example, Monsanto has obtained licenses to certain technologies that it uses to produce *Roundup Ready* seeds and *Genuity SmartStax* corn. These licenses generally last for the lifetime of the applicable patents.

Monsanto owns trademark registrations and files trademark applications for the names and many of the designs used on its branded products around the world. Important company trademarks include *Roundup Ready, Bollgard, Bollgard II, YieldGard, Genuity, Roundup Ready 2 Yield* and *SmartStax* for traits; *Acceleron* for seed treatment products, *DEKALB, Asgrow, Deltapine*, and *Vistive* for row crop seeds, and *Seminis* and *De Ruiter* for vegetable seeds.

## Raw Materials and Energy Resources

In growing locations throughout the world, we produce directly or contract with third-party growers for corn seed, soybean seed, vegetable seeds, cotton seed, canola seed and other seeds. The availability and cost of seed depends primarily on seed yields, weather conditions, farmer contract terms, commodity prices, and global supply and demand. We seek to manage commodity price fluctuations through the use of futures contracts and other hedging mechanisms. Where practicable, we attempt to minimize the weather risks by producing seed at multiple growing locations and under irrigated conditions. Our Seeds and Genomics segment also purchases the energy we need to process our seed; these energy purchases are managed in conjunction with our Agricultural Productivity segment.

## AGRICULTURAL PRODUCTIVITY SEGMENT

Through our Agricultural Productivity segment, we manufacture Roundup brand herbicides and other herbicides and provide lawn-and-garden herbicide products for the residential market. Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) — Agricultural Productivity Segment — the tabular information about net sales of Roundup and other glyphosate-based herbicides and other agricultural productivity products is incorporated

6

MONSANTO COMPANY                                                          2010 FORM 10-K

by reference herein.

| Major Products | Applications | Major Brands |
| --- | --- | --- |
| Glyphosate-based herbicides | Nonselective agricultural, industrial, ornamental and turf applications for weed control | *Roundup* |
| Selective herbicides | Control of preemergent annual grass and small seeded broadleaf weeds in corn and other crops | *Harness* for corn and cotton |
| Lawn-and-garden herbicides | Residential lawn-and-garden applications for weed control | *Roundup* |

**Distribution of Products**

In some world areas we use the same distribution and sales and marketing organization for our crop protection products as for our seeds and traits. In other world areas, we have separate distribution and sales and marketing organizations for our crop protection products. We sell our crop protection products through distributors, independent retailers and dealers and agricultural cooperatives. In some cases outside the United States, we sell such products directly to farmers. We also sell certain of the chemical intermediates of our crop protection products to other major agricultural chemical producers, who then market their own branded products to farmers. We market our lawn-and-garden herbicide products through The Scotts Miracle-Gro Company.

**Competition**

Our agricultural herbicide products have numerous major global manufacturing competitors who increased production at the same time that there has been an increase in the number of distributors packaging and selling generic glyphosate sourced from these suppliers. The growth in supply and sellers has added to the competitiveness and margin erosion in the glyphosate industry and in certain regions has increased the channel inventory. Competition from local or regional companies may also be significant. Our lawn-and-garden business has fewer than five significant national competitors and a larger number of regional competitors in the United States. The largest market for our lawn-and-garden herbicides is the United States.

Competitive success in crop protection products depends on price, product performance, the scope of solutions offered to farmers, market coverage, product availability and planning, and the service provided to distributors, retailers and farmers. Our lawn-and-garden herbicides compete on product performance and the brand value associated with our trademark *Roundup*. For additional information on competition for our agricultural herbicides, see Item 7 — MD&A — Outlook — Agricultural Productivity, which is incorporated by reference herein.

**Patents, Trademarks, Licenses, Franchises and Concessions**

Monsanto also relies on patent protection for the Agricultural Productivity segment of its business. Patents covering glyphosate, an active ingredient in *Roundup* herbicides, have expired in the United States and all other countries. However, some of the patents on Monsanto glyphosate formulations and manufacturing processes in the United States and other countries extend beyond 2015. Monsanto has obtained licenses to chemicals used to make *Harness* herbicides and holds trademark registrations for the brands under which its chemistries are sold. The most significant trademark in this segment is *Roundup*.

Monsanto holds (directly or by assignment) numerous phosphate leases issued on behalf of or granted by the U.S. government, the state of Idaho, and private parties. None of these leases are material individually, but are significant in the aggregate because elemental phosphorus is a key raw material for the production of glyphosate-based herbicides. The phosphate leases have varying terms. The leases obtained from the U.S. government are of indefinite duration, subject to the modification of lease terms at 20-year intervals.

7

**Environmental Matters**

Our operations are subject to environmental laws and regulations in the jurisdictions in which we operate. Some of these laws restrict the amount and type of emissions that our operations can release into the environment. Other laws, such as the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 *et seq.* (Superfund), can impose liability for the entire cost of cleanup on any former or current site owners or operators or any parties who sent waste to these sites, without regard to fault or to the lawfulness of the original disposal. These laws and regulations may be amended from time to time; they may become more stringent. We are committed to long-term environmental protection and compliance programs that reduce and monitor emissions of hazardous materials into the environment, and to the remediation of identified existing environmental concerns. Although the costs of our compliance with environmental laws and regulations cannot be predicted with certainty, such costs are not expected to have a material adverse effect on our earnings or competitive position. In addition to compliance obligations at our own manufacturing locations and off-site disposal facilities, under the terms of our Sept. 1, 2000, Separation Agreement with Pharmacia (the Separation Agreement), we are required to indemnify Pharmacia for any liability it may have for environmental remediation or other environmental responsibilities that are primarily related to Pharmacia's former agricultural and chemicals businesses. For information regarding certain environmental proceedings, see Item 3 — Legal Proceedings. See also information regarding remediation of waste disposal sites and reserves for remediation, appearing in Note 25 — Commitments and Contingencies, which is incorporated herein by reference.

**Raw Materials and Energy Resources**

We are a significant purchaser of basic and intermediate raw materials. Typically, we purchase major raw materials and energy through long-term contracts with multiple suppliers. Certain important raw materials are supplied by a few major suppliers. We expect the markets for our raw materials to remain balanced, though pricing will be cyclical with recovery of the global economy. Energy is available as required, but pricing is subject to market fluctuations. We seek to manage commodity price fluctuations through the use of futures contracts and other hedging mechanisms.

Our proprietary technology is used in various global locations to produce the catalysts used in various intermediate steps in the production of glyphosate. We believe capacity is sufficient for our requirements and adequate safety stock inventory minimizes the risks associated with production outages. We manufacture and purchase disodium iminodiacetic acid, a key ingredient in the production of glyphosate. We manufacture our global supply of elemental phosphorus, a key raw material for the production of Roundup herbicides. We have multiple mineral rights which, subject to obtaining and maintaining appropriate mining permits, we believe will provide a long term supply of phosphate ore to meet our needs into the foreseeable future. As part of the ongoing course of operating our phosphorus production, we are required to periodically permit new mining leases. A new mine is currently in the process of being permitted with the U.S. Bureau of Land Management.

## RESEARCH AND DEVELOPMENT

Monsanto's expenses for research and development were $1,205 million in 2010, $1,098 million in 2009 and $980 million in 2008. In addition, we incurred charges of $163 million in 2009 and $164 million in 2008 for acquired in-process research and development (IPR&D) related to acquisitions. See Note 4 — Business Combinations — for additional information regarding these acquisitions.

## SEASONALITY AND WORKING CAPITAL; BACKLOG

For information on seasonality and working capital and backlog practices, see information in Item 7 — MD&A — Financial Condition, Liquidity, and Capital Resources, which is incorporated herein by reference.

8

MONSANTO COMPANY                                                                          2010 FORM 10-K

## EMPLOYEE RELATIONS

As of Aug. 31, 2010, we employed about 21,400 regular employees worldwide and more than 6,200 temporary employees. The number of temporary employees varies greatly during the year because of the seasonal nature of our business. We believe that relations between Monsanto and its employees are satisfactory.

## CUSTOMERS

Although no single customer (including affiliates) represented more than 10 percent of our consolidated worldwide net sales in 2010, our three largest U.S. agricultural distributors and their affiliates represented, in the aggregate, 15 percent of our worldwide net sales and 27 percent of our U.S. net sales. During 2010, one major U.S. distributor and its affiliates represented about 10 percent of the worldwide net sales for our Seeds and Genomics segment, and about 4 percent of the worldwide net sales for our Agricultural Productivity segment.

## INTERNATIONAL OPERATIONS

See Item 1A under the heading "*Our operations outside the United States are subject to special risks and restrictions, which could negatively affect our results of operations and profitability*" and Note 26 — Segment and Geographic Data, which are incorporated herein by reference. Approximately 43 percent of Monsanto's sales, including 37 percent of our Seeds and Genomics segment's sales and 57 percent of our Agricultural Productivity segment's sales, originated from our legal entities outside the United States during fiscal year 2010.

## SEGMENT AND GEOGRAPHIC DATA

For information on segment and geographic data, see Item 8 — Financial Statements and Supplementary Data — Note 26 — Segment and Geographic Data, which is incorporated by reference herein.

## ITEM 1A. RISK FACTORS

***Competition in seeds and traits and agricultural chemicals has significantly affected, and will continue to affect, our sales.***

Many companies engage in plant biotechnology and breeding research and agricultural chemicals, and speed in getting a new product to market can be a significant competitive advantage. Our competitors' success could render our existing products less competitive, resulting in reduced sales compared to our expectations or past results. We expect to see increasing competition from agricultural biotechnology firms and from major agrichemical, seed and food companies. We also expect to face continued competition for our *Roundup* herbicides and selective herbicides product lines, which could be influenced by trade and industrial policies of foreign countries. The extent to which we can realize cash and gross profit from our business will depend on our ability to: control manufacturing and marketing costs without adversely affecting sales; predict and respond effectively to competitor products, pricing and marketing; provide marketing programs meeting the needs of our customers and of the farmers who are our end users; maintain an efficient distribution system; and develop new products and services with features attractive to our end users.

***Efforts to protect our intellectual property rights and to defend claims against us can increase our costs and will not always succeed; any failures could adversely affect sales and profitability or restrict our ability to do business.***

Intellectual property rights are crucial to our business, particularly our Seeds and Genomics segment. We endeavor to obtain and protect our intellectual property rights in jurisdictions in which our products are produced or used and in jurisdictions into which our products are imported. Different nations may provide limited rights and inconsistent duration of protection for our products. We may be unable to obtain protection for our intellectual property in key jurisdictions. Even if protection is obtained, competitors, farmers, or others in the chain of commerce may raise legal challenges to our

9

rights or illegally infringe on our rights, including through means that may be difficult to prevent or detect. For example, the practice by some farmers of saving seeds from non-hybrid crops (such as soybeans, canola and cotton) containing our biotechnology traits has prevented and may continue to prevent us from realizing the full value of our intellectual property, particularly outside the United States. In addition, because of the rapid pace of technological change, and the confidentiality of patent applications in some jurisdictions, competitors may be issued patents from applications that were unknown to us prior to issuance. These patents could reduce the value of our commercial or pipeline products or, to the extent they cover key technologies on which we have unknowingly relied, require that we seek to obtain licenses or cease using the technology, no matter how valuable to our business. We cannot assure we would be able to obtain such a license on acceptable terms. The extent to which we succeed or fail in our efforts to protect our intellectual property will affect our costs, sales and other results of operations.

***We are subject to extensive regulation affecting our seed biotechnology and agricultural products and our research and manufacturing processes, which affects our sales and profitability.***

Regulatory and legislative requirements affect the development, manufacture and distribution of our products, including the testing and planting of seeds containing our biotechnology traits and the import of crops grown from those seeds, and non-compliance can harm our sales and profitability. Obtaining permits for mining and production, and obtaining testing, planting and import approvals for seeds or biotechnology traits can be time-consuming and costly, with no guarantee of success. The failure to receive necessary permits or approvals could have near- and long-term effects on our ability to sell some current and future products. Planting approvals may also include significant regulatory requirements that can limit our sales. Sales of our traits can be affected in jurisdictions where planting has been approved if we have not received approval for the import of crops containing biotechnology traits into key markets. Concern about unintended but unavoidable trace amounts (sometimes called "adventitious presence") of commercial biotechnology traits in conventional (non-biotechnology) seed, or in the grain or products produced from conventional or organic crops, among other things, could lead to increased regulation or legislation, which may include: liability transfer mechanisms that may include financial protection insurance; possible restrictions or moratoria on testing, planting or use of biotechnology traits; and requirements for labeling and traceability, which requirements may cause food processors and food companies to avoid biotechnology and select non-biotechnology crop sources and can affect farmer seed purchase decisions and the sale of our products. Further, the detection of adventitious presence of traits not approved in the importing country may result in the withdrawal of seed lots from sale or in compliance actions, such as crop destruction or product recalls. Legislation encouraging or discouraging the planting of specific crops can also harm our sales. In addition, claims that increased use of glyphosate-based herbicides or biotechnology traits increases the potential for the development of glyphosate-resistant weeds or pests resistant to our traits could result in restrictions on the use of glyphosate-based herbicides or seeds containing our traits or otherwise reduce our sales.

***The degree of public acceptance or perceived public acceptance of our biotechnology products can affect our sales and results of operations by affecting planting approvals, regulatory requirements and customer purchase decisions.***

Although all of our products go through rigorous testing, some opponents of our technology actively raise public concern about the potential for adverse effects of our products on human or animal health, other plants and the environment. The potential for adventitious presence of commercial biotechnology traits in conventional seed, or in the grain or products produced from conventional or organic crops, is another factor that can affect general public acceptance of these traits. Public concern can affect the timing of, and whether we are able to obtain, government approvals. Even after approvals are granted, public concern may lead to increased regulation or legislation or litigation against government regulators concerning prior regulatory approvals, which could affect our sales and results of operations by affecting planting approvals, and may adversely affect sales of our products to farmers, due to their concerns about available markets for the sale of crops or other products derived from biotechnology. In addition, opponents of agricultural biotechnology have attacked farmers' fields and facilities used by agricultural biotechnology companies, and may launch future attacks against farmers' fields and our field testing sites and research, production, or other facilities, which could affect our sales and our costs.

***The successful development and commercialization of our pipeline products will be necessary for our growth.***

10

We use advanced breeding technologies to produce hybrids and varieties with superior performance in the farmer's field, and we use biotechnology to introduce traits that enhance specific characteristics of our crops. The processes of breeding, biotechnology trait discovery and development and trait integration are lengthy, and a very small percentage of the genes and germplasm we test is selected for commercialization. There are a number of reasons why a new product concept may be abandoned, including greater than anticipated development costs, technical difficulties, regulatory obstacles, competition, inability to prove the original concept, lack of demand, and the need to divert focus, from time to time, to other initiatives with perceived opportunities for better returns. The length of time and the risk associated with the breeding and biotech pipelines are similar and interlinked because both are required as a package for commercial success in markets where biotech traits are approved for growers. In countries where biotech traits are not approved for widespread use, our sales depend on our germplasm. Commercial success frequently depends on being the first company to the market, and many of our competitors are also making considerable investments in similar new biotechnology or improved germplasm products. Consequently, if we are not able to fund extensive research and development activities and deliver new products to the markets we serve on a timely basis, our growth and operations will be harmed.

***Adverse outcomes in legal proceedings could subject us to substantial damages and adversely affect our results of operations and profitability.***

We are involved in major lawsuits concerning intellectual property, biotechnology, torts, contracts, antitrust allegations, employee benefits, and other matters, as well as governmental inquiries and investigations, the outcomes of which may be significant to results of operations in the period recognized or limit our ability to engage in our business activities. While we have insurance related to our business operations, it may not apply to or fully cover any liabilities we incur as a result of these lawsuits. In addition, pursuant to the Separation Agreement, we are required to indemnify Pharmacia for certain liabilities related to its former chemical and agricultural businesses. We have recorded reserves for potential liabilities where we believe the liability to be probable and reasonably estimable. However, our actual costs may be materially different from this estimate. The degree to which we may ultimately be responsible for the particular matters reflected in the reserve is uncertain.

***Our operations outside the United States are subject to special risks and restrictions, which could negatively affect our results of operations and profitability.***

We engage in manufacturing, seed production, research and development, and sales in many parts of the world. Although we have operations in virtually every region, our sales outside the United States in fiscal year 2010 were principally to customers in Brazil, Argentina, Canada, Mexico and India. Accordingly, developments in those parts of the world generally have a more significant effect on our operations than developments in other places. Our operations outside the United States are subject to special risks and restrictions, including: fluctuations in currency values and foreign-currency exchange rates; exchange control regulations; changes in local political or economic conditions; governmental pricing directives; import and trade restrictions; import or export licensing requirements and trade policy; restrictions on the ability to repatriate funds; and other potentially detrimental domestic and foreign governmental practices or policies affecting U.S. companies doing business abroad. Acts of terror or war may impair our ability to operate in particular countries or regions, and may impede the flow of goods and services between countries. Customers in weakened economies may be unable to purchase our products, or it could become more expensive for them to purchase imported products in their local currency, or sell their commodity at prevailing international prices, and we may be unable to collect receivables from such customers. Further, changes in exchange rates may affect our net income, the book value of our assets outside the United States, and our shareowners' equity.

***In the event of any diversion of management's attention to matters related to acquisitions or any delays or difficulties encountered in connection with integrating acquired operations, our business, and in particular our results of operations and financial condition, may be harmed.***

We have recently completed acquisitions and we expect to make additional acquisitions. We must fit such acquisitions into our long-term growth strategies to generate sufficient value to justify their cost. Acquisitions also present other challenges, including geographical coordination, personnel integration and retention of key management personnel, systems integration and the reconciliation of corporate cultures. Those operations could divert management's attention

11

from our business or cause a temporary interruption of or loss of momentum in our business and the loss of key personnel from the acquired companies.

***Fluctuations in commodity prices can increase our costs and decrease our sales.***

We contract production with multiple growers at fair value and retain the seed in inventory until it is sold. These purchases constitute a significant portion of the manufacturing costs for our seeds. Additionally, our chemical manufacturing operations use chemical intermediates and energy, which are subject to increases in price as the costs of oil and natural gas increase. Accordingly, increases in commodity prices may negatively affect our cost of goods sold or cause us to increase seed or chemical prices, which could adversely affect our sales. We use hedging strategies, and most of our raw material supply agreements contain escalation factors, designed to mitigate the risk of short-term changes in commodity prices. However, we are unable to avoid the risk of medium- and long-term increases. Farmers' incomes are also affected by commodity prices; as a result, fluctuations in commodity prices could have a negative effect on their ability to purchase our seed and chemical products.

***Compliance with quality controls and regulations affecting our manufacturing may be costly, and failure to comply may result in decreased sales, penalties and remediation obligations.***

Because we use hazardous and other regulated materials in our manufacturing processes and engage in mining operations, we are subject to risks of accidental environmental contamination, and therefore to potential personal injury claims, remediation expenses and penalties. Should a catastrophic event occur at any of our facilities, we could face significant reconstruction or remediation costs, penalties, third party liability and loss of production capacity, which could affect our sales. In addition, lapses in quality or other manufacturing controls could affect our sales and result in claims for defective products.

***Our ability to match our production to the level of product demanded by farmers or our licensed customers has a significant effect on our sales, costs, and growth potential.***

Farmers' decisions are affected by market, economic and weather conditions that are not known in advance. Failure to provide distributors with enough inventories of our products will reduce our current sales. However, product inventory levels at our distributors may reduce sales in future periods, as those distributor inventories are worked down. In addition, inadequate distributor liquidity could affect distributors' ability to pay for our products and, therefore, affect our sales or our ability to collect on our receivables. International glyphosate manufacturing capacity has increased in the past few years. The price of this glyphosate will impact the selling price and margin of *Roundup* brands and also on our third party sourcing business.

***Our ability to issue short-term debt to fund our cash flow requirements and the cost of such debt may affect our financial condition.***

We regularly extend credit to our customers in certain areas of the world so that they can buy agricultural products at the beginning of their growing seasons. Because of these credit practices and the seasonality of our sales, we may need to issue short-term debt at certain times of the year to fund our cash flow requirements. The amount of short-term debt will be greater to the extent that we are unable to collect customer receivables when due and to manage our costs and expenses. Any downgrade in our credit rating, or other limitation on our access to short-term financing or refinancing, would increase our interest cost and adversely affect our profitability.

***Weather, natural disasters and accidents may significantly affect our results of operations and financial condition.***

Weather conditions and natural disasters can affect the timing of planting and the acreage planted, as well as yields and commodity prices. In turn, the quality, cost and volumes of the seed that we are able to produce and sell will be affected, which will affect our sales and profitability. Natural disasters or industrial accidents could also affect our manufacturing facilities, or those of our major suppliers or major customers, which could affect our costs and our ability to meet supply. One of our major U.S. glyphosate manufacturing facilities is located in Luling, Louisiana, which is an area subject to hurricanes. In addition, several of our key raw material and utility suppliers have production assets in the U.S. gulf coast

12

region and are also susceptible to damage risk from hurricanes. Hawaii, which is also subject to hurricanes, is a major seeds and traits location for our pipeline products.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

At Aug. 31, 2010, there were no unresolved comments from the staff of the SEC related to our periodic or current reports under the Exchange Act.

## ITEM 2. PROPERTIES

We and our subsidiaries own or lease manufacturing facilities, laboratories, seed production and other agricultural facilities, office space, warehouses, and other land parcels in North America, South America, Europe, Asia, Australia, and Africa. Our general offices, which we own, are located in St. Louis County, Missouri. These office and research facilities are principal properties.

Additional principal properties used by the Seeds and Genomics segment include seed production and conditioning plants at Boone, Grinnell and Williamsburg, Iowa; Constantine, Michigan; Enkhuizen and Bergschenhoek, Netherlands; Illiopolis, Waterman and Farmer City, Illinois; Remington, Indiana; Kearney and Waco, Nebraska; Oxnard, California; Peyrehorade and Trèbes, France; Rojas, Argentina; Sinesti, Romania; and Uberlândia, Brazil; and research sites at Ankeny, Iowa; Research Triangle Park, North Carolina; Maui, Hawaii; Middleton, Wisconsin; Mystic, Connecticut; and Woodland, California. We own all of these properties, except the one in Maui. The Seeds and Genomics segment also uses seed foundation and production facilities, breeding facilities, and genomics and other research laboratories at various other locations worldwide.

The Agricultural Productivity segment has principal chemicals manufacturing facilities at Antwerp, Belgium; Camaçari, Brazil; Luling, Louisiana; Muscatine, Iowa; São José dos Campos, Brazil; Soda Springs, Idaho; and Zárate, Argentina. We own all of these properties, except the one in Antwerp, Belgium, which is subject to a lease for the land underlying the facility.

We believe that our principal properties are suitable and adequate for their use. Our facilities generally have sufficient capacity for our existing needs and expected near-term growth. Expansion projects are undertaken as necessary to meet future needs. In particular, we have undertaken significant multiyear projects to expand our corn production facilities in North America in anticipation of increased demand for our corn seed and completed projects that increased capacity and improved the process at our Luling, Louisiana, glyphosate facility. Use of these facilities may vary with seasonal, economic and other business conditions, but none of the principal properties is substantially idle. In certain instances, we have leased portions of sites not required for current operations to third parties.

## ITEM 3. LEGAL PROCEEDINGS

We are involved in various legal proceedings that arise in the ordinary course of our business, as well as proceedings that we have considered to be material under SEC regulations. These include proceedings to which we are party in our own name and proceedings to which our former parent Pharmacia Corporation or its former subsidiary Solutia Inc. is a party but that we manage and for which we are responsible. Information regarding certain material proceedings and the possible effects on our business of proceedings we are defending is disclosed in Note 25 under the subheading "Environmental and Litigation Liabilities — Litigation" and is incorporated by reference herein. Following is information regarding other material proceedings for which we are responsible.

13

MONSANTO COMPANY                                                                    2010 FORM 10-K

**Patent and Commercial Proceedings**

On Dec. 23, 2008, we entered into a dispute resolution process with Pioneer Hi-Bred International, Inc. (Pioneer), a wholly owned subsidiary of E. I. du Pont de Nemours and Company (DuPont), to address issues regarding the unauthorized use of our proprietary technology. Pioneer has announced plans to combine or stack their Optimum ® GAT ® trait in soybeans with our patented first generation *Roundup Ready* technology, contrary to their previously disclosed plans to discontinue use of soybean varieties containing our technology and pursue the Optimum® GAT® trait alone. We believe that Pioneer is not authorized to make this genetic combination, and we are seeking to prevent non-consensual use of our proprietary technology. On May 4, 2009, following unsuccessful discussions, Monsanto filed suit against DuPont and Pioneer in Federal District Court in St. Louis asserting patent infringement and breach of contract claims to prevent the unauthorized use of our *Roundup Ready* technology in corn and soybeans. On June 16, 2009, the defendants filed an answer and counterclaim seeking injunctive relief, damages and specific performance asserting a claim of license as well as the invalidity or unenforceability of the patent asserted by Monsanto, and also claiming alleged anticompetitive behavior relating to traits for corn and soybeans. The court, on Sept. 16, 2009, severed the antitrust defense interposed by DuPont for a separate, subsequent trial following our case for patent infringement and license breach. On Oct. 23, 2009, the Court heard our motion for judgment on the pleadings to declare DuPont and Pioneer in breach of their corn and soybean licensing agreements with us. On Jan. 15, 2010, the Court granted our motion declaring that DuPont and Pioneer are not licensed to create a product containing *Roundup Ready* and Optimum® GAT® traits stacked in combination. The remaining patent claims are set for trial on Oct. 17, 2011. We believe we have meritorious legal positions and will continue to represent our interests vigorously in this matter.

Two purported class action suits were filed against us on Sept. 26, 2006, supposedly on behalf of all farmers who purchased our *Roundup* brand herbicides in the United States for commercial agricultural purposes since Sept. 26, 2002. Plaintiffs essentially allege that we have monopolized the market for glyphosate for commercial agricultural purposes. Plaintiffs seek an unspecified amount of damages and injunctive relief. In late February 2007, three additional suits were filed, alleging similar claims. All of these suits were filed in the U.S. District Court for the District of Delaware. On July 18, 2007, the court ruled that any such suit had to be filed in federal or state court in Missouri; the court granted our motion to dismiss the two original cases. On Aug. 8, 2007, plaintiffs in the remaining three cases voluntarily dismissed their complaints, which have not been re-filed. On Aug. 10, 2007, the same set of counsel filed a parallel action in federal court in San Antonio, Texas, on behalf of a retailer of glyphosate named Texas Grain. Plaintiffs seek to certify a national class of all entities that purchased glyphosate directly from us since August 2003. The magistrate judge issued his recommendation to the District Court on Aug. 7, 2009, denying class certification. We believe we have meritorious legal positions and will continue to represent our interests vigorously in this matter.

**Governmental Proceedings and Undertakings**

On Sept. 17, 2007, the EPA issued a Notice of Violation to us, alleging violations of the Clean Water Act at the South Rasmussen Mine near Soda Springs, Idaho. The EPA has asserted that the alleged violations may subject us to civil penalties. We are working with the EPA to reach a resolution of this matter. We believe we have meritorious legal positions and will continue to represent our interests vigorously in this matter.

On April 18, 2005, we received a subpoena from the Illinois Attorney General and have produced documents relating to the prices and terms upon which we license technology for genetically modified seeds, and upon which we sell or license genetically modified seeds to farmers. We believe we have meritorious legal positions and will continue to represent our interests vigorously in this matter.

On Sept. 4, 2007, we received a civil investigative demand from the Iowa Attorney General seeking information regarding the production and marketing of glyphosate and the development, production, marketing, or licensing of soybean, corn, or cotton germplasm containing transgenic traits. Iowa coordinated this inquiry with several other states. We have fully cooperated with this investigation and complied with all requests. We believe we have meritorious legal positions and will continue to represent our interests vigorously in this matter.

We have reported to the EPA that in prior years sales and planting of our *Bollgard* and *Bollgard II* cotton products occurred in ten Texas counties where the registrations had included relevant restrictions. On July 1, 2010, we finalized a settlement with the EPA, without admitting liability, and paid a civil penalty of an immaterial amount.

14

On Dec. 2, 2005, the Federal Revenue Service of the Ministry of Finance of Brazil issued a tax assessment against our wholly owned subsidiary, Monsanto do Brasil Ltda., challenging the tax treatment of $575 million of notes issued in 1998 on the basis that the transactions involving the notes represented contributions to the capital of Monsanto do Brasil rather than funding through issuance of notes. The assessment denies tax deductions for approximately $1.2 billion (subject to currency exchange rates) of interest expense and currency exchange losses that were claimed by Monsanto do Brasil under the notes. The assessment seeks payment of approximately $243 million (subject to currency exchange rates) of tax, penalties and interest related to the notes, and would preclude Monsanto do Brasil from using a net operating loss carryforward of approximately $1.1 billion (subject to currency exchange rates). The issuance of the notes was properly registered with the Central Bank of Brazil and we believe that there is no basis in law for this tax assessment. On Dec. 29, 2005, Monsanto do Brasil filed an appeal of this assessment with the Federal Revenue Service. On Oct. 28, 2008, the company received a partially favorable decision issued by the first level of Administrative Court. The Court reduced the assessed penalty from 150% to 75%, respectively, from $82 million to $41 million (each subject to currency exchange rates) and maintained the tax and interest. On Nov. 26, 2008, we filed an appeal before the second level of Administrative Court with regard to the adverse portion of the decision by the first level of Administrative Court. The Federal Revenue Service also appealed the portion of the decision favorable to Monsanto do Brasil. On Sept. 17, 2010, the appeals were assigned to the Administrative Council of Tax Appeals. The court date is pending. The company continues to believe that there is no basis in law for this tax assessment. Under the terms of a tax sharing agreement concluded with Pharmacia at the time of our separation from Pharmacia, Pharmacia would be responsible for a portion of any liability incurred by virtue of the tax assessment. As noted, certain dollar amounts have been calculated based on an exchange rate of 1.7 Brazilian reais per U.S. dollar, and will fluctuate with exchange rates in the future. We believe we have meritorious legal positions and will continue to represent our interests vigorously in this matter.

On Jan. 12, 2010, the Antitrust Division of the U.S. Department of Justice (DOJ) issued a civil investigative demand to Monsanto requesting information on our soybean traits business. Among other things, the DOJ has requested information regarding our plans for and licensing of soybean seed containing *Roundup Ready* or *Roundup Ready 2 Yield* traits. We are cooperating with this request. We believe we have meritorious legal positions and will continue to represent our interests vigorously in this matter.

**Securities and Derivative Proceedings**

On July 29, 2010, a purported class action suit, styled Rochester Laborers Pension Fund v. Monsanto Co., et al., was filed against us and three of our past and present executive officers in the U.S. District Court for the Eastern District of Missouri. The suit alleges that defendants violated the federal securities laws by making false or misleading statements between Jan. 7, 2009, and May 27, 2010, regarding our earnings guidance for fiscal 2009 and 2010 and the anticipated future performance of our *Roundup* business. The alleged class consists of all persons who purchased or otherwise acquired Monsanto common stock between Jan. 7, 2009, and May 27, 2010. Plaintiff claims that these statements artificially inflated the price of our stock and that purchasers of our stock during the relevant period were damaged when the stock price later declined. Plaintiff seeks the award of unspecified amount of damages on behalf of the alleged class, counsel fees and costs. We believe we have meritorious legal positions and will continue to represent our interests vigorously in this matter. On Sept. 27, 2010, three members of the alleged class moved to be appointed the lead plaintiff in the action. Those motions have not yet been ruled upon. On Sept. 28, 2010, plaintiff Rochester Laborers Pension Fund advised the Court that it does not intend to file a motion for appointment as lead plaintiff, but is willing to serve as lead plaintiff should the movants fail to satisfy the requirements for doing so.

On Aug. 4 and 5, 2010, two purported derivative suits styled Espinoza v. Grant, et al. and Clark v. Grant, et al., were filed on our behalf against our directors and three of our past and present executive officers in the Circuit Court of St. Louis County, Missouri. Asserting claims for breach of fiduciary duty, corporate waste and unjust enrichment, plaintiffs allege that our directors themselves made or allowed Monsanto to make the same allegedly false and misleading statements at issue in the purported class action. Plaintiffs also assert a claim arising out of the acceleration of certain stock options held by one of our former executive officers upon his retirement, as well as a claim based on one director's sale of Monsanto stock while allegedly in possession of material, non-public information relating to our earnings guidance. Plaintiffs seek injunctive relief and the award of unspecified amounts of damages and restitution for Monsanto, counsel fees and costs. Plaintiffs have moved for an order consolidating the Espinoza and Clark actions and appointing lead and liaison counsel. The parties have stipulated to the consolidation of the Espinoza and Clark actions and submitted the stipulation to the Court for its approval. Defendants have moved for a stay of these actions in favor of the proposed federal securities class action (described above) and the federal derivative action (described below). The parties have stipulated to a stay of these actions pending resolution of

15

MONSANTO COMPANY                                                                     2010 FORM 10-K

motions to dismiss expected to be filed in the federal actions, subject to specified exceptions, and have submitted their stipulation to the Court for its approval.

On Aug. 30, 2010, another purported derivative action styled Kurland v. AtLee, et al., was filed on our behalf against our directors in the U.S. District Court for the Eastern District of Missouri. Asserting claims for breach of fiduciary duty, abuse of control, gross mismanagement, corporate waste, unjust enrichment and insider selling and misappropriation under Delaware law, the complaint contains allegations similar to the two state court derivative actions described above relating to the same allegedly false and misleading statements and a director's sale of shares, and adds allegations relating to a senior executive's sale of Monsanto stock while allegedly in possession of material, non-public information. Plaintiffs seek injunctive relief and the award of unspecified amounts of compensatory and exemplary damages, counsel fees and costs. On Sept. 3, 2010, defendants in the Rochester securities class action described above moved for consolidation and coordination of that action with the Kurland derivative action. On Sept. 28, 2010, the Court denied this motion, stating that pretrial coordination of the federal actions should occur. On Oct. 11, 2010, a second purported derivative action styled Stone v. Bachmann, et al., was filed on our behalf against certain of our directors. The allegations made and relief sought in the Stone action are substantially similar to the allegations made and relief sought in the Kurland action. On Oct. 13, 2010, a third purported derivative action, Styled Fagin v. AtLee, et al., was filed on our behalf against our directors in the U.S. District Court for the Eastern District of Missouri. The allegations made and relief sought in the Fagin action are substantially similar to the allegations made and relief sought in both the Kurland and Stone actions.

**ITEM 4. [Removed and Reserved.]**

**Executive Officers**

See Part III — Item 10 of this Report on Form 10-K for information about our Executive Officers.

16

MONSANTO COMPANY

2010 FORM 10-K

## PART II

### ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES

Monsanto's common stock is traded principally on the New York Stock Exchange, under the symbol MON. The number of shareowners of record as of Oct. 21, 2010, was 40,580.

On June 27, 2006, the board of directors approved a two-for-one split of the company's common shares. The additional shares resulting from the stock split were paid on July 28, 2006, to shareowners of record on July 7, 2006. All share and per share information herein reflects this stock split.

The original dividend rate adopted by the board of directors following the initial public offering (IPO) in October 2000 was $0.06. The board of directors increased the company's quarterly dividend rate in April 2003 to $0.065, in May 2004 to $0.0725, in December 2004 to $0.085, in December 2005 to $0.10, in December 2006 to $0.125, in August 2007 to $0.175, in June 2008 to $0.24, in January 2009 to $0.265 and in August 2010 to $0.28.

The following table sets forth dividend declarations, as well as the high and low sales prices for Monsanto's common stock, for the fiscal year 2010 and 2009 quarters indicated.

| Dividends per Share | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter | Fiscal Year |
|---|---|---|---|---|---|
| **2010** | **$—** | **$0.53**[1] | **$—** | **$0.55**[1] | **$1.08** |
| 2009 | $— | $0.51[2] | $— | $0.53[2] | $1.04 |

| Common Stock Price | | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter | Fiscal Year |
|---|---|---|---|---|---|---|
| **2010** | **High** | **$ 84.36** | **$87.06** | **$74.80** | **$62.29** | **$ 87.06** |
| | **Low** | **66.57** | **70.53** | **48.16** | **44.61** | **44.61** |
| 2009 | High | $121.32 | $87.32 | $93.35 | $87.40 | $121.32 |
| | Low | 63.47 | 65.60 | 69.62 | 70.08 | 63.47 |

[1] During the period from Dec. 1, 2009, through Feb. 28, 2010, Monsanto declared two dividends, $0.265 per share on Dec. 7, 2009, and $0.265 per share on Jan. 26, 2010. During the period from June 1, 2010, through Aug. 31, 2010, Monsanto declared two dividends, $0.265 per share on June 9, 2010, and $0.28 per share on Aug. 4, 2010.

[2] During the period from Dec. 1, 2008, through Feb. 28, 2009, Monsanto declared two dividends, $0.24 per share on Dec. 8, 2008, and $0.265 per share on Jan. 14, 2009. During the period from June 1, 2009, through Aug. 31, 2009, Monsanto declared two dividends, $0.265 per share on June 9, 2009, and $0.265 per share on Aug. 5, 2009.

17

MONSANTO COMPANY

2010 FORM 10-K

**Issuer Purchases of Equity Securities**

The following table summarizes purchases of equity securities during the fourth quarter of fiscal year 2010 by Monsanto and affiliated purchasers, pursuant to SEC rules.

| Period | (a) Total Number of Shares Purchased | (b) Average Price Paid per Share[1] | (c) Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | (d) Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| **June 2010:** | | | | |
| June 1, 2010, through June 30, 2010 | **204,558**[2] | **$49.63** | **204,400** | $    23,090,661 |
| **July 2010:** | | | | |
| July 1, 2010, through July 31, 2010 | **356,400**[3] | **$53.17** | **288,900** | $1,007,656,927 |
| **August 2010:** | | | | |
| Aug. 1, 2010, through Aug. 31, 2010 | **149,600** | **$58.17** | **149,600** | $  998,954,568 |
| **Total** | **710,558** | **$53.20** | **642,900** | $  998,954,568 |

[1]    The average price paid per share is calculated on a trade date basis and excludes commission.

[2]    Includes 158 shares withheld to cover the withholding taxes upon the vesting of restricted stock.

[3]    Includes 67,500 shares purchased by affiliated purchasers.

In April 2008, the board of directors authorized a repurchase program of up to $800 million of the company's common stock over a three-year period. This repurchase program commenced Dec. 23, 2008, and was completed on Aug. 24, 2010. In June 2010, the board of directors authorized a new repurchase program of up to an additional $1 billion of the company's common stock over a three-year period beginning July 1, 2010. This repurchase program commenced Aug. 24, 2010, and will expire on Aug. 24, 2013. There were no other publicly announced plans outstanding as of Aug. 31, 2010.

18

MONSANTO COMPANY                                                          2010 FORM 10-K

**Stock Price Performance Graph**

The graph below compares the performance of Monsanto's common stock with the performance of the Standard & Poor's 500 Stock Index (a broad-based market index) and a peer group index over a 60-month period extending through the end of the 2010 fiscal year. The graph assumes that $100 was invested on Sept. 1, 2005, in our common stock, in the Standard & Poor's 500 Stock Index and the peer group index, and that all dividends were reinvested.

Because we are involved both in the agricultural products business and in the seeds and genomics business, no published peer group accurately mirrors our portfolio of businesses. Accordingly, we created a peer group index that includes Bayer AG ADR, Dow Chemical Company, DuPont (E.I.) de Nemours and Company, BASF AG and Syngenta AG. The Standard & Poor's 500 Stock Index and the peer group index are included for comparative purposes only. They do not necessarily reflect management's opinion that such indices are an appropriate measure of the relative performance of the stock involved, and they are not intended to forecast or be indicative of possible future performance of our common stock.



|                  | 08/31/05 | 08/31/06 | 08/31/07 | 08/31/08 | 08/31/09 | 08/31/10 |
|------------------|----------|----------|----------|----------|----------|----------|
| Monsanto Company | 100      | 150.08   | 222.53   | 367.08   | 272.90   | 174.09   |
| S&P 500 Index    | 100      | 108.88   | 125.36   | 111.40   | 91.06    | 95.53    |
| Peer Group       | 100      | 114.18   | 162.31   | 159.30   | 131.93   | 145.22   |

In accordance with the rules of the SEC, the information contained in the Stock Price Performance Graph on this page shall not be deemed to be "soliciting material," or to be "filed" with the SEC or subject to the SEC's Regulation 14A, or to the liabilities of Section 18 of the Exchange Act, except to the extent that Monsanto specifically requests that the information be treated as soliciting material or specifically incorporates it by reference into a document filed under the Securities Act, or the Exchange Act.

19

MONSANTO COMPANY                                                    2010 FORM 10-K

## ITEM 6. SELECTED FINANCIAL DATA

## SELECTED FINANCIAL DATA

| | | | Year Ended Aug. 31, | | |
|---|---|---|---|---|---|
| (Dollars in millions, except per share amounts) | **2010** | 2009 | 2008 | 2007 | 2006 |
| **Operating Results:** | | | | | |
| Net sales[1] | **$10,502** | $11,724 | $11,365 | $ 8,349 | $ 7,065 |
| Income from operations | **1,607** | 3,103 | 2,721 | 1,409 | 1,139 |
| Income from continuing operations[6] | **1,124** | 2,122 | 2,027 | 925 | 688 |
| Income on discontinued operations[2] | **4** | 11 | 17 | 80 | 24 |
| Cumulative effect of a change in accounting principle, net of tax benefit[3] | **—** | — | — | — | (6) |
| Net income attributable to Monsanto Company | **1,109** | 2,109 | 2,024 | 993 | 689 |
| **Basic Earnings (Loss) per Share Attributable to Monsanto Company:[4][5]** | | | | | |
| Income from continuing operations | **$ 2.03** | $ 3.83 | $ 3.66 | $ 1.68 | $ 1.24 |
| Income on discontinued operations[2] | **0.01** | 0.02 | 0.03 | 0.14 | 0.04 |
| Cumulative effect of accounting change[3] | **—** | — | — | — | (0.01) |
| Net income | **2.04** | 3.85 | 3.69 | 1.82 | 1.27 |
| **Diluted Earnings (Loss) per Share Attributable to Monsanto Company:[4][5]** | | | | | |
| Income from continuing operations | **$ 2.01** | $ 3.78 | $ 3.59 | $ 1.64 | $ 1.22 |
| Income on discontinued operations[2] | **—** | 0.02 | 0.03 | 0.15 | 0.04 |
| Cumulative effect of accounting change[3] | **—** | — | — | — | (0.01) |
| Net income | **2.01** | 3.80 | 3.62 | 1.79 | 1.25 |
| **Financial Position at end of Period:** | | | | | |
| Total assets | **$17,867** | $17,877 | $17,991 | $12,983 | $11,728 |
| Working capital[7] | **3,581** | 4,127 | 3,170 | 2,009 | 3,182 |
| Current ratio[7] | **2.01:1** | 2.10:1 | 1.71:1 | 1.65:1 | 2.40:1 |
| Long-term debt | **1,862** | 1,724 | 1,792 | 1,150 | 1,639 |
| Debt-to-capital ratio[8] | **17%** | 15% | 16% | 16% | 20% |
| **Other Data:[4]** | | | | | |
| Dividends per share | **$ 1.08** | $ 1.04 | $ 0.83 | $ 0.55 | $ 0.40 |
| Stock price per share: | | | | | |
|   High | **$ 87.06** | $121.32 | $145.80 | $ 70.88 | $ 47.58 |
|   Low | **$ 44.61** | $ 63.47 | $ 69.22 | $ 42.75 | $ 27.80 |
| End of period | **$ 52.65** | $ 83.88 | $114.25 | $ 69.74 | $ 47.44 |
| Basic shares outstanding[5] | **543.7** | 547.1 | 548.9 | 544.8 | 540.6 |
| Diluted shares outstanding[5] | **550.8** | 555.6 | 559.7 | 555.3 | 551.9 |

See Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations — for information regarding the factors that have affected or may affect the comparability of our business results.

[1]    In 2006 and 2007, American Seeds acquired several regional seed companies. In 2007, we acquired Delta and Pine Land Company (DPL) and divested the Stoneville® and NexGen® cotton seed brands and related business assets. In 2008, we acquired De Ruiter, Cristiani, and Agroeste and entered into an agreement to divest the Dairy business. In 2009, we acquired Aly Participacoes Ltda. and WestBred, LLC and divested the Dairy business. See Note 4 — Business Combinations for further details of these acquisitions and Note 29 — Discontinued Operations for further details of these divestitures.

[2]    In 2006, we recorded an additional write-down of $3 million aftertax related to the remaining assets associated with the environmental technologies businesses. In 2007, we sold the Stoneville and NexGen businesses as part of the U.S. Department of Justice (DOJ) approval for the acquisition of DPL. In 2008, we entered into an agreement to sell the Dairy business. Accordingly, these businesses have been presented as discontinued operations in the Statements of Consolidated Operations for all periods presented above. See Note 29 — Discontinued Operations for further details of these completed dispositions.

[3]    In 2006, we adopted the Asset Retirement and Environmental Obligations topic of the Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC). In connection with the adoption of this new accounting guidance, we recorded a cumulative effect of accounting change of $6 million aftertax.

[4]    For all periods presented, the share and per share amounts (including stock price) reflect the effect of the two-for-one stock split (in

the form of a 100 percent stock dividend) that was completed on July 28, 2006.

20

MONSANTO COMPANY                                          2010 FORM 10-K

(5)   Effective Sept. 1, 2009, we retrospectively adopted a FASB-issued standard that requires unvested share-based payment awards that contain rights to receive non-forfeitable dividends or dividend equivalents to be included in the two-class method of computing earnings per share as described in the Earnings Per Share topic of the ASC.

(6)   Effective Sept. 1, 2009, we retrospectively adopted the new accounting guidance related to the Consolidation topic of the ASC.

(7)   Working capital is total current assets less total current liabilities; current ratio represents total current assets divided by total current liabilities.

(8)   Debt-to-capital ratio is the sum of short-term and long-term debt, divided by the sum of short-term and long-term debt and shareowners' equity.

21

MONSANTO COMPANY                                                                    2010 FORM 10-K

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### OVERVIEW

#### Background

Monsanto Company, along with its subsidiaries, is a leading global provider of agricultural products for farmers. Our seeds, biotechnology trait products, and herbicides provide farmers with solutions that improve productivity, reduce the costs of farming, and produce better foods for consumers and better feed for animals.

We manage our business in two segments: Seeds and Genomics and Agricultural Productivity. Through our Seeds and Genomics segment, we produce leading seed brands, including *DEKALB, Asgrow, Deltapine, Seminis* and *De Ruiter,* and we develop biotechnology traits that assist farmers in controlling insects and weeds. We also provide other seed companies with genetic material and biotechnology traits for their seed brands. Through our Agricultural Productivity segment, we manufacture *Roundup* brand herbicides and other herbicides and provide lawn-and-garden herbicide products for the residential market. Approximately 43 percent of our total company sales, 37 percent of our Seeds and Genomics segment sales, and 57 percent of our Agricultural Productivity segment sales originated from our legal entities outside the United States during fiscal year 2010.

In the fourth quarter of 2008, we entered into an agreement to divest the animal agricultural products business (the Dairy business). This transaction was consummated on Oct. 1, 2008. As a result, financial data for this business has been presented as discontinued operations as outlined below. The financial statements have been prepared in compliance with the provisions of the Property, Plant and Equipment topic of the Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC). Accordingly, for all periods presented herein, the Statements of Consolidated Operations and Consolidated Financial Position have been conformed to this presentation. The Dairy business was previously reported as part of the Agricultural Productivity segment. See Note 29 — Discontinued Operations — for further details.

This MD&A should be read in conjunction with Monsanto's consolidated financial statements and the accompanying notes. The notes to the consolidated financial statements referred to throughout this MD&A are included in Part II — Item 8 — Financial Statements and Supplementary Data — of this Report on Form 10-K. Unless otherwise indicated, "earnings (loss) per share" and "per share" mean diluted earnings (loss) per share. Unless otherwise noted, all amounts and analyses are based on continuing operations.

#### Non-GAAP Financial Measures

MD&A includes financial information prepared in accordance with U.S. generally accepted accounting principles (GAAP), as well as two other financial measures, EBIT and free cash flow, that are considered "non-GAAP financial measures." Generally, a non-GAAP financial measure is a numerical measure of a company's financial performance, financial position or cash flows that excludes (or includes) amounts that are included in (or excluded from) the most directly comparable measure calculated and presented in accordance with GAAP. The presentation of EBIT and free cash flow information is intended to supplement investors' understanding of our operating performance and liquidity. Our EBIT and free cash flow measures may not be comparable to other companies' EBIT and free cash flow measures. Furthermore, these measures are not intended to replace net income (loss), cash flows, financial position, or comprehensive income (loss), as determined in accordance with U.S. GAAP.

EBIT is defined as earnings (loss) before interest and taxes. Earnings (loss) is intended to mean net income (loss) as presented in the Statements of Consolidated Operations under GAAP. EBIT is the primary operating performance measure for our two business segments. We believe that EBIT is useful to investors and management to demonstrate the operational profitability of our segments by excluding interest and taxes, which are generally accounted for across the entire company on a consolidated basis. EBIT is also one of the measures used by Monsanto management to determine resource allocations within the company. See Note 26 — Segment and Geographic Data — for a reconciliation of EBIT to net income (loss) for fiscal years 2010, 2009 and 2008.

We also provide information regarding free cash flow, an important liquidity measure for Monsanto. We define free cash flow as the total of net cash provided or required by operating activities and net cash provided or required by investing activities. We believe that free cash flow is useful to investors and management as a measure of the ability of our business to

22

generate cash. This cash can be used to meet business needs and obligations, to reinvest in the company for future growth, or to return to our shareowners through dividend payments or share repurchases. Free cash flow is also used by management as one of the performance measures in determining incentive compensation. See the "Financial Condition, Liquidity, and Capital Resources — Cash Flow" section of MD&A for a reconciliation of free cash flow to net cash provided by operating activities and net cash required by investing activities on the Statements of Consolidated Cash Flows.

## Executive Summary

**Consolidated Operating Results** — Net sales in 2010 decreased $1,222 million from 2009. This decline was primarily a result of decreased sales of *Roundup* and other glyphosate-based herbicides in the United States, Europe and Brazil. Net income attributable to Monsanto Company in 2010 was $2.01 per share, compared with $3.80 per share in 2009.

The following factors affected the two-year comparison:

2010:

- We recorded restructuring charges of $324 million in 2010 which was recorded in restructuring charges for $210 million and cost of goods sold for $114 million in the Statement of Consolidated Operations. See Note 5 — Restructuring — for further discussion.

2009:

- We recorded restructuring charges of $406 million in fourth quarter 2009 which was recorded in restructuring charges for $361 million and cost of goods sold for $45 million in the Statement of Consolidated Operations. See Note 5 — Restructuring — for further discussion.

**Financial Condition, Liquidity, and Capital Resources** — In 2010, net cash provided by operating activities was $1,398 million, compared with $2,246 million in 2009. Net cash required by investing activities was $834 million in 2010, compared with $723 million in 2009. As a result, our free cash flow, as defined in the "Overview — Non-GAAP Financial Measures" section of MD&A, was a source of cash of $564 million in 2010, compared with $1,523 million in 2009. We used cash of $57 million in 2010 for acquisitions of businesses, compared with $329 million in 2009. For a more detailed discussion of the factors affecting the free cash flow comparison, see the "Cash Flow" section of the "Financial Condition, Liquidity, and Capital Resources" section in this MD&A.

**Outlook** — We plan to continue to improve our products in order to maintain market leadership and to support near-term performance. We are focused on applying innovation and technology to make our farmer customers more productive and profitable by protecting yields and improving the ways they can produce food, fiber and feed. We use the tools of modern biology to make seeds easier to grow, to allow farmers to do more with fewer resources, and to produce healthier foods for consumers. Our current research and development (R&D) strategy and commercial priorities are focused on bringing our farmer customers second- and third-generation traits, on delivering multiple solutions in one seed ("stacking"), and on developing new pipeline products. Our capabilities in biotechnology and breeding research are generating a rich product pipeline that is expected to drive long-term growth. The viability of our product pipeline depends in part on the speed of regulatory approvals globally, and on continued patent and legal rights to offer our products.

We plan to improve and to grow our vegetable seeds business. We have applied our molecular breeding and marker capabilities to our library of vegetable germplasm. In the future, we will continue to focus on accelerating the potential growth of this business and executing our business plans.

*Roundup* herbicides remain the largest crop protection brand globally. Following a period of increasing inventories within the global glyphosate market and expansion of global glyphosate production capacity, the market has moved to an oversupply position. As a result, the significant supply of lower-priced generics has caused increased competitive pressure in the market and a decline in the business. We are focused on managing the costs associated with our agricultural chemistry business as that sector matures globally.

23

See the "Outlook" section of MD&A for a more detailed discussion of some of the opportunities and risks we have identified for our business. For additional information related to the outlook for Monsanto, see "Caution Regarding Forward-Looking Statements" above and Part I — Item 1A — Risk Factors of this Form 10-K.

24

MONSANTO COMPANY                                                          2010 FORM 10-K

## RESULTS OF OPERATIONS

| (Dollars in millions, except per share amounts) | 2010 | 2009 | 2008 | 2010 vs. 2009 | 2009 vs. 2008 |
|---|---|---|---|---|---|
| | | Year Ended Aug. 31, | | Change | |
| Net Sales | $10,502 | $11,724 | $11,365 | (10)% | 3% |
| Gross Profit | 5,086 | 6,762 | 6,177 | (25)% | 9% |
| Operating Expenses: | | | | | |
| Selling, general and administrative expenses | 2,064 | 2,037 | 2,312 | 1% | (12)% |
| Research and development expenses | 1,205 | 1,098 | 980 | 10% | 12% |
| Acquired in-process research and development | — | 163 | 164 | NM | (1)% |
| Restructuring charges, net | 210 | 361 | — | (42)% | NM |
| Total Operating Expenses | 3,479 | 3,659 | 3,456 | (5)% | 6% |
| Income from Operations | 1,607 | 3,103 | 2,721 | (48)% | 14% |
| Interest expense | 162 | 129 | 110 | 26% | 17% |
| Interest income | (56) | (71) | (132) | (21)% | (46)% |
| Solutia-related income, net | — | — | (187) | NM | NM |
| Other expense, net | 7 | 78 | 4 | (91)% | NM |
| Income from Continuing Operations Before Income Taxes | 1,494 | 2,967 | 2,926 | (50)% | 1% |
| Income tax provision | 370 | 845 | 899 | (56)% | (6)% |
| Income from Continuing Operations Including Portion Attributable to Noncontrolling Interest | 1,124 | 2,122 | 2,027 | (47)% | 5% |
| Discontinued Operations: | | | | | |
| Income from operations of discontinued businesses | 4 | 19 | 20 | (79)% | (5)% |
| Income tax provision | — | 8 | 3 | NM | NM |
| Income on Discontinued Operations | 4 | 11 | 17 | (64)% | (35)% |
| Net Income | $ 1,128 | $ 2,133 | $ 2,044 | (47)% | 4% |
| Less: Net income attributable to noncontrolling interest | 19 | 24 | 20 | (21)% | 20% |
| Net Income Attributable to Monsanto Company | $ 1,109 | $ 2,109 | $ 2,024 | (47)% | 4% |
| Diluted Earnings per Share Attributable to Monsanto Company: | | | | | |
| Income from continuing operations | $ 2.01 | $ 3.78 | $ 3.59 | (47)% | 5% |
| Income on discontinued operations | — | 0.02 | 0.03 | (100)% | (33)% |
| Net Income Attributable to Monsanto Company | $ 2.01 | $ 3.80 | $ 3.62 | (47)% | 5% |

NM = Not Meaningful

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| Effective Tax Rate | 25% | 28% | 31% |
| Comparison as a Percent of Net Sales: | | | |
| Gross profit | 48% | 58% | 54% |
| Selling, general and administrative expenses | 20% | 17% | 20% |
| Research and development expenses (excluding acquired IPR&D) | 11% | 9% | 9% |
| Total operating expenses | 33% | 31% | 30% |
| Income from continuing operations before income taxes | 14% | 25% | 26% |
| Net income attributable to Monsanto Company | 11% | 18% | 18% |

**Overview of Financial Performance** (*2010 compared with 2009*)

The following section discusses the significant components of our results of operations that affected the comparison of fiscal year 2010 with fiscal year 2009.

**Net sales** decreased 10 percent in 2010 from 2009. Our Seeds and Genomics segment net sales improved 4 percent, and our Agricultural Productivity segment net sales declined 35 percent. The following table presents the percentage changes in 2010 worldwide net sales by segment compared with net sales in 2009, including the effect that volume, price, currency and

25

MONSANTO COMPANY                                                                          2010 FORM 10-K

acquisitions had on these percentage changes:

| | Volume | Price | Currency | Subtotal | Impact of Acquisitions[1] | Net Change |
|---|---|---|---|---|---|---|
| | 2010 Percentage Change in Net Sales vs. 2009 | | | | | |
| Seeds and Genomics Segment | (2)% | 4% | 2% | 4% | — | 4% |
| Agricultural Productivity Segment | 27% | (63)% | 1% | (35)% | — | (35)% |
| Total Monsanto Company | 9% | (21)% | 2% | (10)% | — | (10)% |

[1]  See Note 4 — Business Combinations — and "Financial Condition, Liquidity, and Capital Resources" in MD&A for details of our acquisitions in fiscal years 2010 and 2009. In this presentation, acquisitions are segregated for one year from the acquisition date.

For a more detailed discussion of the factors affecting the net sales comparison, see the "Seeds and Genomics Segment" and the "Agricultural Productivity Segment" sections.

**Gross profit** decreased 25 percent, or $1,676 million. Total company gross profit as a percent of net sales decreased 10 percentage points to 48 percent in 2010, driven by decreases in average net selling prices of *Roundup* and other glyphosate-based herbicides. Gross profit as a percent of net sales for the Seeds and Genomics segment decreased 2 percentage points to 60 percent in the 12-month comparison partially due to increased restructuring charges recorded in cost of goods sold related to inventory impairments over the prior year. Gross profit as a percent of net sales for the Agricultural Productivity segment decreased 32 percentage points to 19 percent in the 12-month comparison. See the "Seeds and Genomics Segment" and "Agricultural Productivity Segment" sections of MD&A for details.

**Operating expenses** decreased 5 percent, or $180 million, in 2010 from 2009, primarily because of the $163 million of acquired in-process R&D in 2009 and $151 million less in restructuring charges. Selling, general and administrative (SG&A) expenses increased 1 percent primarily because of increased marketing expense offset by lower spending for administrative functions and incentives. R&D expenses increased 10 percent due to an increase in activity of our expanded product pipeline. Restructuring charges decreased 42 percent because the majority of the actions took place upon approval and communication of the 2009 Restructuring Plan in fiscal year 2009. As a percent of net sales, SG&A expenses increased 3 points to 20 percent of net sales, and R&D expenses increased 2 points to 11 percent of net sales in 2010.

**Interest expense** increased 26 percent, or $33 million, in fiscal year 2010 from 2009. The increased expense was primarily due to an increased level of customer financing costs during 2010 compared to 2009.

**Interest income** decreased 21 percent, or $15 million, in 2010 because of less interest earned on lower average cash balances primarily in the United States, Brazil and Europe.

**Other expense — net** was $7 million in 2010, compared with $78 million in 2009. The decrease occurred due to the gain recorded on the Seminium, S.A. (Seminium) acquisition as well as a decline in foreign currency losses in 2010. See Note 4 — Business Combinations — for further information on the Seminium acquisition.

**Income tax provision** for 2010 decreased to $370 million, a decrease of $475 million from 2009 primarily as a result of the decrease in pretax income from continuing operations. The effective tax rate decreased to 25 percent, a decrease of 3 percentage points from fiscal year 2009. The following items had an impact on the effective tax rate:

- The effective tax rate for 2010 decreased because of the restructuring charges of $324 million ($224 million after tax).

- Benefits totaling $100 million were recorded in 2010 relating to several discrete tax adjustments. The majority of these items was the result of the resolution of several domestic and ex-US tax audits, favorable adjustments from the filing of tax returns and the expiration of statutes of limitations in several jurisdictions. These benefits were partially offset by a tax charge of $8 million as a result of the elimination of the tax benefit associated with the Medicare Part D subsidy as a result of the Patient Protection and Affordable Care Act signed by President Obama on March 23,

26

2010, and the Health Care and Education Act of 2010 signed on March 30, 2010 (collectively the "Healthcare Acts").

- Benefits totaling $168 million were recorded in 2009 relating to several discrete tax adjustments. The majority of these items was the result of the resolution of several domestic and ex-US tax audits and other tax matters in addition to the retroactive extension of the R&D credit that was enacted on Oct. 3, 2008, as part of the Emergency Economic Stabilization Act of 2008.

Without these items, our effective tax rate for 2010 would still have been lower than the 2009 rate, primarily driven by a shift in our earnings mix to lower tax rate jurisdictions.

**Overview of Financial Performance** (*2009 compared with 2008*)

The following section discusses the significant components of our results of operations that affected the comparison of fiscal year 2009 with fiscal year 2008.

**Net sales** increased 3 percent in 2009 from 2008. Our Seeds and Genomics segment net sales improved 15 percent, and our Agricultural Productivity segment net sales declined 11 percent. The following table presents the percentage changes in 2009 worldwide net sales by segment compared with net sales in 2008, including the effect that volume, price, currency and acquisitions had on these percentage changes:

| | 2009 Percentage Change in Net Sales vs. 2008 | | | | | |
|---|---|---|---|---|---|---|
| | Volume | Price | Currency | Subtotal | Impact of Acquisitions[1] | Net Change |
| Seeds and Genomics Segment | (1)% | 19% | (5)% | 13% | 2% | 15% |
| Agricultural Productivity Segment | (24)% | 17% | (4)% | (11)% | — | (11)% |
| Total Monsanto Company | (11)% | 17% | (4)% | 2% | 1% | 3% |

[1] See Note 4 — Business Combinations — and "Financial Condition, Liquidity, and Capital Resources" in MD&A for details of our acquisitions in fiscal years 2009 and 2008. In this presentation, acquisitions are segregated for one year from the acquisition date.

For a more detailed discussion of the factors affecting the net sales comparison, see the "Seeds and Genomics Segment" and the "Agricultural Productivity Segment" sections.

**Gross profit** increased 9 percent, or $585 million. Total company gross profit as a percent of net sales increased 4 percentage points to 58 percent in 2009, driven by increases in average net selling prices of corn and soybean seed and traits and *Roundup* and other glyphosate-based herbicides. Gross profit as a percent of net sales for the Seeds and Genomics segment increased 1 percentage point to 62 percent in the 12-month comparison. Gross profit as a percent of net sales for the Agricultural Productivity segment increased 5 percentage points to 51 percent in the 12-month comparison. See the "Seeds and Genomics Segment" and "Agricultural Productivity Segment" sections of MD&A for details.

**Operating expenses** increased 6 percent, or $203 million, in 2009 from 2008, primarily because of the $361 million pre-tax restructuring charge in 2009. Selling, general and administrative (SG&A) expenses decreased 12 percent primarily because of lower spending for marketing, administrative functions and incentives. R&D expenses increased 12 percent due to an increase in our investment in our product pipeline. As a percent of net sales, SG&A expenses decreased 3 points to 17 percent of net sales, and R&D expenses remained at 9 percent of net sales in 2009.

**Interest expense** increased 17 percent, or $19 million, in fiscal year 2009 from 2008. The increased expense was primarily due to higher long-term debt interest expense due to the $550 million of debt issued in third quarter 2008.

**Interest income** decreased 46 percent, or $61 million, in 2009 because of lower average cash balances primarily in Brazil and lower interest rates.

27

We recorded **Solutia-related income** of $187 million in 2008. We recorded a gain of $210 million pretax (Solutia-related gain), associated with the settlement of our claim on Feb. 28, 2008, in connection with Solutia's emergence from bankruptcy. Since Solutia has emerged from bankruptcy, any related expenses for these assumed liabilities are now included within operating expenses.

**Other expense — net** increased $74 million, to $78 million in 2009. The increase is primarily due to hedging losses partially offset by foreign currency gains.

**Income tax provision** for 2009 decreased to $845 million, a decrease of $54 million from 2008. The effective tax rate on continuing operations was 28 percent, a decrease of 3 percentage points from fiscal year 2008. This difference was primarily the result of the following items:

- Benefits totaling $168 million were recorded in 2009 relating to several discrete tax adjustments. The majority of these items was the result of the resolution of several domestic and ex-U.S. tax audits and other tax matters in addition to the retroactive extension of the R&D credit that was enacted on Oct. 3, 2008, as part of the Emergency Economic Stabilization Act of 2008.

- The effective tax rate for 2008 was affected by our Solutia-related gain for which taxes were provided at a higher U.S.-based rate, a tax benefit of $43 million for the reversal of our remaining valuation allowance in Argentina and additional tax expense for a transfer pricing item.

Without these items, our effective tax rate for 2009 would have been higher than the 2008 rate, primarily driven by a shift in our earnings mix to higher tax rate jurisdictions.

The factors noted above explain the change in income from continuing operations. In 2009, we recorded **income on discontinued operations** of $11 million compared to $17 million in 2008 due to the gain recorded on the sale of the Dairy business. In 2008, the $17 million related to income from operations of the Dairy business.

MONSANTO COMPANY                                                  2010 FORM 10-K

## SEEDS AND GENOMICS SEGMENT

| (Dollars in millions) | Year Ended Aug. 31, | | | Change | |
| | **2010** | 2009 | 2008 | **2010 vs. 2009** | 2009 vs. 2008 |
|---|---|---|---|---|---|
| **Net Sales** | | | | | |
| Corn seed and traits | **$4,260** | $4,113 | $3,542 | **4%** | 16% |
| Soybean seed and traits | **1,486** | 1,448 | 1,174 | **3%** | 23% |
| Cotton seed and traits | **611** | 466 | 450 | **31%** | 4% |
| Vegetable seeds | **835** | 808 | 744 | **3%** | 9% |
| All other crops seeds and traits | **419** | 462 | 459 | **(9)%** | 1% |
| **Total Net Sales** | **$7,611** | $7,297 | $6,369 | **4%** | 15% |
| **Gross Profit** | | | | | |
| Corn seed and traits | **$2,464** | $2,606 | $2,174 | **(5)%** | 20% |
| Soybean seed and traits | **905** | 871 | 725 | **4%** | 20% |
| Cotton seed and traits | **454** | 344 | 313 | **32%** | 10% |
| Vegetable seeds | **492** | 416 | 394 | **18%** | 6% |
| All other crops seeds and traits | **223** | 267 | 251 | **(16)%** | 6% |
| **Total Gross Profit** | **$4,538** | $4,504 | $3,857 | **1%** | 17% |
| **EBIT**[1] | **$1,597** | $1,655 | $1,200 | **(4)%** | 38% |

[1] EBIT is defined as earnings (loss) before interest and taxes. Interest and taxes are recorded on a total company basis. We do not record these items at the segment level. See Note 26 — Segment and Geographic Data and the "Overview — Non-GAAP Financial Measures" section of MD&A for further details.

### Seeds and Genomics Financial Performance for Fiscal Year 2010

Net sales of corn seed and traits increased 4 percent, or $147 million, in the 12-month comparison. In 2010, sales improved primarily in the United States and Argentina because of increased average net selling price and a shift to higher margin corn trait products.

Cotton seed and traits net sales increased 31 percent, or $145 million, in 2010. This sales increase was driven by an increase in planted acres primarily in the United States and India.

In 2010, all other crops seeds and traits net sales decreased 9 percent, or $43 million, in the 12-month comparison because of the divestiture of our global sunflower assets in August 2009.

Gross profit increased 1 percent for this segment due to increased net sales. Gross profit as a percent of sales for this segment decreased 2 percentage points to 60 percent in 2010. This decline was primarily driven by higher U.S. hedging losses on commodity prices and higher manufacturing costs for corn. In addition, we recorded inventory impairments of $93 million in 2010 compared with $24 million in 2009 related to discontinued seed products worldwide as part of our 2009 Restructuring Plan in 2010. See Note 5 — Restructuring — for further information.

EBIT for the Seeds and Genomics segment decreased $58 million to $1,597 million in 2010.

### Seeds and Genomics Financial Performance for Fiscal Year 2009

Net sales of corn seed and traits increased 16 percent, or $571 million, in the 12-month comparison. In 2009, our U.S. corn seed and traits sales improved because of increased average net selling price and a demand shift to higher margin triple trait corn products, compared with 2008.

Soybean seed and traits net sales increased 23 percent, or $274 million, in 2009. This sales increase was driven by an increase in sales volume of U.S. soybean seed and traits driven by an increase in soybean acres and stronger customer demand in the United States. Also, soybean seed and traits revenues increased in the United States because of higher average net selling prices.

29

MONSANTO COMPANY                                                          2010 FORM 10-K

In 2009, vegetable seeds net sales increased 9 percent, or $64 million, in the 12-month comparison because of the De Ruiter acquisition in June 2008 and higher average net selling prices. These increases were partially offset by unfavorable foreign currency translation rate of the European euro vs. the U.S. dollar.

Gross profit increased 17 percent for this segment due to increased net sales. Gross profit as a percent of sales for this segment increased 1 percentage point to 62 percent in 2009. This improvement was primarily driven by increased prices in U.S. corn seed and traits, U.S. soybean seed and traits and a demand shift to higher margin triple trait corn products. These positive factors were partially offset by higher costs in the United States resulting from higher commodity prices paid for our seed production.

EBIT for the Seeds and Genomics segment increased $455 million to $1,655 million in 2009. In the 12-month comparison, incremental SG&A and R&D expenses related to the growth of the business and the 2009 acquisitions partially offset the gross profit improvement from higher net sales across all crops. Further, restructuring charges incurred of $292 million reduced EBIT in fourth quarter 2009. For further information see Note 5 — Restructuring.

**AGRICULTURAL PRODUCTIVITY SEGMENT**

| (Dollars in millions) | Year Ended Aug. 31, | | | Change | |
| --- | --- | --- | --- | --- | --- |
| | **2010** | 2009 | 2008 | **2010 vs. 2009** | 2009 vs. 2008 |
| **Net Sales** | | | | | |
| *Roundup* and other glyphosate-based herbicides | **$2,029** | $3,527 | $4,094 | **(42)%** | (14)% |
| All other agricultural productivity products | **862** | 900 | 902 | **(4)%** | — |
| **Total Net Sales** | **$2,891** | $4,427 | $4,996 | **(35)%** | (11)% |
| **Gross Profit** | | | | | |
| *Roundup* and other glyphosate-based herbicides | **$ 142** | $1,836 | $1,976 | **(92)%** | (7)% |
| All other agricultural productivity products | **406** | 422 | 344 | **(4)%** | 23% |
| **Total Gross Profit** | **$ 548** | $2,258 | $2,320 | **(76)%** | (3)% |
| **EBIT**[1] | **$ (25)** | $1,352 | $1,691 | **(102)%** | (20)% |

[1]   EBIT is defined as earnings (loss) before interest and taxes. Interest and taxes are recorded on a total company basis. We do not record these items at the segment level. See Note 26 — Segment and Geographic Data and the "Overview — Non-GAAP Financial Measures" section of MD&A for further details.

**Agricultural Productivity Financial Performance for Fiscal Year 2010**

Net sales of *Roundup* and other glyphosate-based herbicides decreased 42 percent, or $1,498 million, in 2010. In the 12-month comparison, sales of *Roundup* and other glyphosate-based herbicides decreased primarily in the United States, Europe and Brazil. The average net selling price decreased in all regions because of a previously announced price decrease on our products and increased marketing programs over the prior year. Offsetting this decline, global sales volumes of *Roundup* and other glyphosate-based herbicides increased 38 percent in 2010 from 2009.

Sales of *Roundup* and other glyphosate-based herbicides declined in the United States and other world areas primarily because of a decrease in the net selling price due to a shift in the market to generic competition.

Gross profit as a percent of sales decreased 32 percentage points for the Agricultural Productivity segment to 19 percent in 2010. This decrease was primarily because of lower average net selling prices of *Roundup* and other glyphosate-based herbicides.

The sales decreases discussed in this section resulted in $1,710 million lower gross profit in 2010. EBIT for the Agricultural Productivity segment decreased $1,377 million, to a negative $25 million in 2010. Contributing to this decrease was lower net selling prices reducing EBIT in 2010.

30

MONSANTO COMPANY                                                                    2010 FORM 10-K

**Agricultural Productivity Financial Performance for Fiscal Year 2009**

Net sales of *Roundup* and other glyphosate-based herbicides decreased 14 percent, or $567 million, in 2009. In the 12-month comparison, sales of *Roundup* and other glyphosate-based herbicides increased primarily in Brazil and Canada. The average net selling price increased in most regions. Offsetting these increases, global sales volumes of *Roundup* and other glyphosate-based herbicides decreased 29 percent in 2009 from 2008.

Sales volumes of *Roundup* and other glyphosate-based herbicides increased in Brazil primarily in the first quarter of the fiscal year as the herbicide market increased with improved farmer liquidity resulting from higher soybean commodity prices and the increase in acres planted for *Roundup Ready* soybeans and sugarcane in 2009 over 2008.

Sales of *Roundup* and other glyphosate-based herbicides declined in the United States and other world areas except as mentioned above because demand fell due to the increased price of our product and shift to generic competition.

Gross profit as a percent of sales increased 5 percentage points for the Agricultural Productivity segment to 51 percent in 2009. This improvement was primarily because of an increase in the average net selling prices of *Roundup* and other glyphosate-based herbicides.

The sales decreases discussed in this section resulted in $62 million lower gross profit in 2009. EBIT for the Agricultural Productivity segment decreased $339 million, to $1,352 million in 2009. Contributing to this decrease was our Solutia-related gain of $210 million recorded in second quarter 2008. See further discussion at Note 27 — Other Expense and Solutia-Related Items. Further, restructuring charges incurred of $114 million reduced EBIT in fourth quarter 2009. See Note 5 — Restructuring — for additional information.

## RESTRUCTURING

Restructuring charges were recorded in the Statements of Consolidated Operations as follows:

| (Dollars in millions) | Year Ended Aug. 31, | |
| --- | --- | --- |
| | **2010** | 2009 |
| Costs of Goods Sold[1] | **$(114)** | $ (45) |
| Restructuring Charges, Net[1][2] | **(210)** | (361) |
| Loss from Continuing Operations Before Income Taxes | **(324)** | (406) |
| Income Tax Benefit | **100** | 116 |
| Net Loss | **$(224)** | $(290) |

[1]   For the fiscal year ended 2010, the $114 million of restructuring charges recorded in costs of goods sold were split by segment as follows: $13 million in Agricultural Productivity and $101 million in Seeds and Genomics. For the fiscal year ended 2009, the $45 million of restructuring charges recorded in cost of goods sold were split by segment as follows: $1 million in Agricultural Productivity and $44 million in Seeds and Genomics. For the fiscal year ended 2010, the $210 million of restructuring charges recorded in restructuring charges, net were split by segment as follows: $79 million in Agricultural Productivity and $131 million in Seeds and Genomics. For the fiscal year ended 2009, the $361 million of restructuring charges were split by segment as follows: $113 million in Agricultural Productivity and $248 million in Seeds and Genomics.

[2]   The restructuring charges for the fiscal year ended 2010 include reversals of $32 million related to the 2009 Restructuring Plan. The reversals are primarily related to severance as positions originally included in the plan were eliminated through attrition.

On June 23, 2009, our Board of Directors approved a restructuring plan (2009 Restructuring Plan) to take future actions to reduce costs in light of the changing market supply environment for glyphosate. These actions are designed to enable us to stabilize the *Roundup* business and allow it to deliver optimal gross profit and a sustainable level of operating cash in the coming years, while better aligning spending and working capital needs. We also announced that we will take steps to better align the resources of our global seeds and traits business. These actions include certain product and brand rationalization within the seed businesses. On Sept. 9, 2009, we committed to take additional actions related to the previously announced restructuring plan. Furthermore, while implementing the plan, we identified additional opportunities to better align our resources, and on Aug. 26, 2010, committed to take additional actions. The plan is expected to be completed by the end of the first quarter in fiscal year 2011, and substantially all payments will be made by the end of the second quarter in fiscal year 2011.

31

MONSANTO COMPANY                                                       2010 FORM 10-K

The total restructuring costs are now expected to be $780 million and will be completed by the end of the first quarter of 2011. The charges are expected to be comprised of approximately $360 million to $370 million in severance and related benefits, $155 million of costs related to facility closures and exit costs and $255 million of asset impairments. Payments related to the 2009 Restructuring Plan will be generated from cash from operations.

The following table displays the pretax charges of $324 million and $406 million incurred by segment under the 2009 Restructuring Plan for the fiscal years ended 2010 and 2009, respectively, as well as the cumulative pretax charges of $730 million under the 2009 Restructuring Plan.

| (Dollars in millions) | Year Ended Aug. 31, 2010 | | | Year Ended Aug. 31, 2009 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Seeds and Genomics | Agricultural Productivity | Total | Seeds and Genomics | Agricultural Productivity | Total |
| Work Force Reductions | $ 85 | $47 | $132 | $175 | $ 63 | $238 |
| Facility Closures / Exit Costs | 46 | 31 | 77 | 3 | 47 | 50 |
| Asset Impairments | | | | | | |
| Property, plant and equipment | 8 | 1 | 9 | 31 | 4 | 35 |
| Inventory | 93 | 13 | 106 | 24 | — | 24 |
| Other intangible assets | — | — | — | 59 | — | 59 |
| Total Restructuring Charges, Net | $232 | $92 | $324 | $292 | $114 | $406 |

| (Dollars in millions) | Cumulative Amount through Aug. 31, 2010 | | |
| --- | --- | --- | --- |
| | Seeds and Genomics | Agricultural Productivity | Total |
| Work Force Reductions | $260 | $110 | $370 |
| Facility Closures / Exit Costs | 49 | 78 | 127 |
| Asset Impairments | | | |
| Property, plant and equipment | 39 | 5 | 44 |
| Inventory | 117 | 13 | 130 |
| Other intangible assets | 59 | — | 59 |
| Total Restructuring Charges, Net | $524 | $206 | $730 |

Our written human resource policies are indicative of an ongoing benefit arrangement with respect to severance packages. Benefits paid pursuant to an ongoing benefit arrangement are specifically excluded from the Exit or Disposal Cost Obligations topic of the ASC, therefore severance charges incurred in connection with the 2009 Restructuring Plan are accounted for when probable and estimable as required under the Compensation – Nonretirement Postemployment Benefits topic of the ASC. In addition, when the decision to commit to a restructuring plan requires an asset impairment review, we evaluate such impairment issues under the Property, Plant and Equipment topic of the ASC. Certain asset impairment charges were recorded in the fourth quarters of 2010 and 2009 related to the decisions to shut down facilities under the 2009 Restructuring Plan as the future cash flows for these facilities were insufficient to recover the net book value of the related long-lived assets.

In fiscal year 2010, pretax restructuring charges of $324 million were recorded. The $132 million in work force reductions was related primarily to Europe and the United States. The facility closures/exit costs of $77 million were related primarily to the finalization of the termination of a chemical supply contract in the United States and worldwide entity consolidation costs. In asset impairments, inventory impairments of $106 million recorded in cost of goods sold were related to discontinued products worldwide. In fiscal year 2009, pretax restructuring charges of $406 million were recorded. The $238 million in work force reductions related to site closures and downsizing primarily in the United States and Europe. The facility closures/exit costs of $50 million related primarily to the termination of a chemical supply contract in the United States and the termination of chemical distributor contracts in Central America. In asset impairments, property, plant, and equipment impairments of $35 million related to certain manufacturing and technology breeding facilities in the United States, Europe, and Central America that were closed in fiscal year 2010. Inventory impairments of $24 million were also recorded for discontinued seed products in the United States and Europe. Other intangible impairments of $59 million related to the discontinuation of certain seed brands, which included $18 million related to the write-off of intellectual property for

32

MONSANTO COMPANY                                                    2010 FORM 10-K

technology that we elected to no longer pursue. Of the $118 million total asset impairments in fiscal year 2009, $45 million was recorded in cost of goods sold and the remainder in restructuring charges.

The actions related to the overall restructuring plan are expected to produce annual cost savings of $300 million to $340 million, primarily in cost of goods sold and SG&A. Approximately one-fourth of these savings were recognized in fiscal year 2010, with the full benefit expected to be realized in 2011.

## FINANCIAL CONDITION, LIQUIDITY, AND CAPITAL RESOURCES

### Working Capital and Financial Condition

|  | As of Aug. 31, | |
| --- | --- | --- |
| (Dollars in millions, except current ratio) | **2010** | 2009 |
| Cash and Cash Equivalents | **$ 1,485** | $ 1,956 |
| Trade Receivables, Net | **1,590** | 1,556 |
| Inventory, Net | **2,739** | 2,934 |
| Other Current Assets[1] | **1,308** | 1,437 |
| Total Current Assets | **$ 7,122** | $ 7,883 |
| Short-Term Debt | **$ 241** | $ 79 |
| Accounts Payable | **752** | 676 |
| Accrued Liabilities[2] | **2,548** | 3,001 |
| Total Current Liabilities | **$ 3,541** | $ 3,756 |
| Working Capital[3] | **$ 3,581** | $ 4,127 |
| Current Ratio[3] | **2.01:1** | 2.10:1 |

[1]   Includes miscellaneous receivables, deferred tax assets and other current assets.

[2]   Includes income taxes payable, accrued compensation and benefits, accrued marketing programs, deferred revenues, grower production accruals, dividends payable, customer payable, restructuring reserves and miscellaneous short-term accruals.

[3]   Working capital is total current assets less total current liabilities; current ratio represents total current assets divided by total current liabilities.

Working capital decreased $546 million between Aug. 31, 2010, and Aug. 31, 2009, primarily because of the following factors:

- Cash and cash equivalents decreased $471 million. For a more detailed discussion of the factors affecting the cash flow comparison, see the "Cash Flow" section in this section of MD&A.

- Inventory decreased $195 million, primarily because of lower corn production in fiscal year 2010, higher obsolescence reserves and lower cost of production for Agricultural Productivity inventory.

- Short-term debt increased $162 million related to our purchase of the Chesterfield Village Research Center in April 2010.

These decreases to working capital between Aug. 31, 2010, and Aug. 31, 2009, were partially offset by the following factor:

- Customer payable decreased $224 million because fewer customers overpaid in 2010 compared to the prior year.

*Backlog*: Inventories of finished goods, goods in process, and raw materials and supplies are maintained to meet customer requirements and our scheduled production. As is consistent with the nature of the seed industry, we generally produce in one growing season the seed inventories we expect to sell the following season. In general, we do not manufacture our products against a backlog of firm orders; production is geared to projected demand.

*Customer Financing Programs*: We previously established a revolving financing program of up to $250 million, which allowed certain U.S. customers to finance their product purchases, royalties and licensing fee obligations. We received $130 million for fiscal year 2009

and $66 million for fiscal year 2008 from the proceeds of loans made to our customers through this financing program. These proceeds were included in the net cash provided by operating activities in the Statements of

33

MONSANTO COMPANY

2010 FORM 10-K

Consolidated Cash Flows. We originated these customer loans on behalf of the third-party specialty lender, a special-purpose entity (SPE) that we consolidated, using our credit and other underwriting guidelines approved by the lender. We serviced the loans and provided a first-loss guarantee of up to $130 million. Following origination, the lender transferred the loans to multiseller commercial paper conduits through a nonconsolidated qualifying special-purpose entity (QSPE). We had no ownership interest in the lender, in the QSPE, or in the loans. The program was terminated in the third quarter of fiscal year 2008. Accordingly, there were no loan balances outstanding as of Aug. 31, 2010, and Aug. 31, 2009. We accounted for this transaction as a sale, in accordance with the Transfers and Servicing topic of the ASC.

During the second quarter 2010, we began participating in a revolving financing program in Brazil. The program allows us to transfer up to 1 billion Brazilian reais (approximately $550 million) in customer receivables to a QSPE. Third parties, primarily investment funds, hold an 88 percent senior interest in the QSPE, and we hold the remaining 12 percent subordinate interest. Because QSPEs are excluded from the scope of the current guidance within the Consolidation topic of the ASC, and we do not have the unilateral right to liquidate the QSPE, the consolidation guidance does not have an effect on our accounting for this customer financing program.

Our investment in the QSPE was $10 million as of Aug. 31, 2010. It is included in other assets in the Statements of Consolidated Financial Position and is classified as a debt security. Interest earned on our investment in the QSPE was $2 million for the year ended Aug. 31, 2010, and is included in interest income on the Statements of Consolidated Operations.

Under the financing program, our transfer of select customer receivables to the QSPE is accounted for as a sale in accordance with the Transfers and Servicing topic of the ASC. We do not service the receivables. However, under the QSPE, a recourse provision requires us to cover the first 12 percent of credit losses within the program.

Proceeds from customer receivables sold through the financing program and derecognized from the Statements of Consolidated Financial Position totaled $115 million for fiscal year 2010. These proceeds are included in net cash provided by operating activities in the Statements of Consolidated Cash Flows and are net of a loss on sale of receivables of $10 million for the year ended Aug. 31, 2010. The remaining receivable balance in the QSPE outstanding as of Aug. 31, 2010, was $48 million. As of Aug. 31, 2010, there were $3 million of receivables sold through this financing program that were delinquent. Based on our historical collection experience with these customers and a current assessment of credit exposure, we recorded our recourse provision at $5 million as of Aug. 31, 2010. Adverse changes in the actual loss rate would decrease our investment asset. The maximum potential amount of future payments under the recourse provision was $15 million as of Aug. 31, 2010. If we are called upon to make payments under the recourse provision, we would have the benefit under the financing program of any amounts subsequently collected from the customer.

In August 2009, we entered into an agreement in the United States to sell customer receivables up to a maximum of $500 million and to service such accounts. These receivables qualify for sales treatment under the Transfers and Servicing topic of the ASC and, accordingly, the proceeds are included in net cash provided by operating activities in the Statements of Consolidated Cash Flows. The gross amount of receivables sold totaled $221 million and $319 million in fiscal year 2010 and 2009, respectively. The agreement includes recourse provisions and thus a liability was established at the time of sale that approximates fair value based upon our historical collection experience with such receivables and a current assessment of credit exposure. The recourse liability recorded by us was $2 million as of Aug. 31, 2010, and Aug. 31, 2009. The maximum potential amount of future payments under the recourse provisions of the agreement was $9 million as of Aug. 31, 2010. The outstanding balance of receivables sold was $223 million and $319 million as of Aug. 31, 2010, and Aug. 31, 2009, respectively. There were delinquent loans totaling $3 million as of Aug. 31, 2010, and there were no delinquent loans as of Aug. 31, 2009.

We sell accounts receivable in the United States, European regions and Argentina both with and without recourse. These sales qualify for sales treatment under the Transfers and Servicing topic of the ASC and, accordingly, the proceeds are included in net cash provided by operating activities in the Statements of Consolidated Cash Flows. The gross amounts of accounts receivable sold totaled $112 million, $72 million and $48 million for 2010, 2009 and 2008, respectively. The liability for the guarantees for sales with recourse is recorded at an amount that approximates fair value, based on our historical collection experience for the customers associated with the sales of the accounts receivable and a current assessment of credit exposure. Our guarantee liability was less than $1 million as of Aug. 31, 2010, and Aug. 31, 2009. The maximum potential amount of future payments under the recourse provisions of the agreements was $58 million as of Aug.

34

MONSANTO COMPANY                                                                          2010 FORM 10-K

31, 2010. The outstanding balance of the receivables sold was $91 million and $57 million as of Aug. 31, 2010, and Aug. 31, 2009, respectively.

We also have agreements with lenders to establish programs to provide financing of up to 550 million Brazilian reais (approximately $300 million) for selected customers in Brazil. The amount of loans outstanding was $100 million and $160 million as of Aug. 31, 2010, and Aug. 31, 2009, respectively. In this program, we provide a full guarantee of the loans in the event of customer default. The maximum potential amount of future payments under the guarantees was $100 million as of Aug. 31, 2010. The liability for the guarantee is recorded at an amount that approximates fair value, primarily based on our historical collection experience with customers that participate in the program and a current assessment of credit exposure. Our guarantee liability was $3 million and $6 million as of Aug. 31, 2010, and Aug. 31, 2009, respectively. If performance is required under the guarantee, we may retain amounts that are subsequently collected from customers.

We also have similar agreements with banks that provide financing to our customers in the United States, Brazil, Europe and Argentina. The amount of loans outstanding was $36 million and $48 million as of Aug. 31, 2010, and Aug. 31, 2009, respectively. We provide a guarantee of the loans in the event of customer default. The maximum potential amount of future payments under the guarantees was $29 million as of Aug. 31, 2010. The liability for the guarantee is recorded at an amount that approximates fair value, primarily based on our historical collection experience with customers that participate in the program and a current assessment of credit exposure. Our guarantee liability was $2 million and $5 million as of Aug. 31, 2010, and Aug. 31, 2009, respectively.

**Cash Flow**

| | Year Ended Aug. 31, | | |
|---|---|---|---|
| (Dollars in millions) | **2010** | 2009 | 2008 |
| Net Cash Provided by Operating Activities | **$ 1,398** | $ 2,246 | $ 2,837 |
| Net Cash Required by Investing Activities | **(834)** | (723) | (2,042) |
| **Free Cash Flow[1]** | **564** | 1,523 | 795 |
| Net Cash Required by Financing Activities | **(1,038)** | (1,075) | (125) |
| Effect of Exchange Rate Changes on Cash and Cash Equivalents | **3** | (105) | 77 |
| Net (Decrease) Increase in Cash and Cash Equivalents | **(471)** | 343 | 747 |
| Cash and Cash Equivalents at Beginning of Period | **1,956** | 1,613 | 866 |
| Cash and Cash Equivalents at End of Period | **$ 1,485** | $ 1,956 | $ 1,613 |

[1] Free cash flow represents the total of net cash provided or required by operating activities and provided or required by investing activities (see the "Overview — Non-GAAP Financial Measures" section in MD&A for a further discussion).

*2010 compared with 2009:* In 2010, our free cash flow was a source of cash of $564 million, compared with $1,523 million in 2009. Cash provided by operating activities decreased 38 percent, or $848 million, in 2010, primarily because of the decrease in net income of $1,005 million which was impacted by a number of noncash charges in 2010. Further, the change in accounts receivable of $548 million provided less cash from lower collections during the current year. In addition, increases in cash required by restructuring payments of $263 million in 2010 impacted operating activities. These decreases were partially offset by a change in cash provided by inventory of $851 million which occurred primarily because of a decline in inventory production. Another offset was a change in deferred revenue of $611 million due to the prepay program for *Roundup* in Brazil in August 2008 which was not repeated for the year ended Aug. 31, 2009.

Cash required by investing activities was $834 million in 2010 compared with $723 million in 2009. In 2009, we received proceeds of $300 million related to the sale of the Dairy business. In addition, we received $132 million in 2009 from the maturity of short-term equity securities. Offsetting these increases in the prior year, we acquired the sugarcane business for $264 million, and there was no similar sized acquisition in the current year. Further, our capital expenditures decreased $161 million in 2010 because of less spending on corn seed production facilities.

The amount of cash required by financing activities was $1,038 million in 2010 compared with $1,075 million in 2009. The net change in short-term financing was a source of cash of $22 million in 2010 compared with a use of cash of $112 million in 2009. Further, treasury stock purchases increased $134 million as we accelerated our repurchase of shares in 2010 compared to the same prior-year period.

35

MONSANTO COMPANY                                                    2010 FORM 10-K

*2009 compared with 2008*: In 2009, our free cash flow was a source of cash of $1,523 million, compared with $795 million in 2008. Cash provided by operating activities decreased 21 percent, or $591 million, in 2009, primarily because of the change in cash provided by deferred revenue of $1,192 million which occurred primarily because of the introduction of the prepay program for *Roundup* in Brazil in August 2008. This program did not reoccur in August 2009. These decreases were offset by higher earnings and a change in accounts receivable of $844 million due to higher collections and customer financing programs.

Cash required by investing activities was $723 million in 2009 compared with $2,042 million in 2008. This decrease is primarily attributable to cash used for acquisitions of $329 million in 2009 compared with $1,007 million in 2008. Further, we received proceeds of $300 million in 2009 related to the sale of the Dairy business. In addition, we used cash of $132 million in 2008 for the purchase of short-term equity securities compared with no purchases in 2009.

Cash required by financing activities was $1,075 million in 2009, compared with $125 million in 2008. The net change in short-term financing was a use of cash of $112 million in 2009 compared with a source of $82 million in 2008. Cash proceeds from long-term debt decreased $546 million in 2009 from 2008. Cash required for long-term debt reductions was $71 million in 2009, compared with $254 million in 2008. The 12-month comparison of long-term debt proceeds and reductions are affected because we issued $550 million of long-term debt and $238 million of short-term debt was repaid in 2008. Dividend payments increased 32 percent, or $133 million, because we paid dividends of $1.04 per share in 2009 compared with 83 cents per share in 2008. Further, stock option exercises decreased $75 million in 2009.

**Capital Resources and Liquidity**

|                                                      | As of Aug. 31, | |
| ---------------------------------------------------- | -------------: | -------: |
| (Dollars in millions, except debt-to-capital ratio)  | **2010**       | 2009    |
| Short-Term Debt                                      | **$   241**    | $   79  |
| Long-Term Debt                                       | **1,862**      | 1,724   |
| Total Shareowners' Equity                            | **10,099**     | 10,056  |
| Debt-to-Capital Ratio                                | **17%**        | 15%     |

A major source of our liquidity is operating cash flows, which are derived from net income. This cash-generating capability provides us with the financial flexibility we need to meet operating, investing and financing needs. To the extent that cash provided by operating activities is not sufficient to fund our cash needs, which generally occurs during the first and third quarters of the fiscal year because of the seasonal nature of our business, short-term commercial paper borrowings are used to finance these requirements. Although the commercial paper market has not fully returned to historical levels, the market is available to those companies with high short-term credit ratings such as Monsanto. We accessed the commercial paper markets in 2010 for periods of time to finance working capital needs and our options have not been limited. We had no commercial paper borrowings outstanding as of Aug. 31, 2010.

Our August 2010 debt-to-capital ratio increased 2 percentage points compared with the August 2009 ratio, primarily because of the increase in short-term and long-term debt due to the Chesterfield Village Research Center purchase.

We plan to issue new fixed-rate debt on or before Aug. 15, 2012, in order to repay $486 million of $7^3/_8$% Senior Notes that are due on Aug. 15, 2012. In March 2009, we entered into forward-starting interest rate swaps with a total notional amount of $250 million. In August 2010, we entered into additional forward-starting interest rate swaps with a total notional amount of $225 million. Our purpose was to hedge the variability of the forecasted interest payments on this expected debt issuance that may result from changes in the benchmark interest rate before the debt is issued.

We plan to issue additional fixed-rate debt on or before April 15, 2011. In July 2010, we entered into forward-starting interest rate swaps with a notional amount of $300 million. Our purpose was to hedge the variability of the forecasted interest payments on this expected debt issuance that may result from changes in the benchmark interest rate before the debt is issued.

We are currently evaluating the impact of the Healthcare Acts. We recorded a tax charge of $8 million during the third quarter of 2010 due to the elimination of the tax benefit associated with the Medicare Part D subsidy included in the Healthcare Acts. We are still evaluating the other impacts from the Healthcare Acts, but we do not expect them to have a material impact on our consolidated financial statements in the short term. The longer term potential impacts of the

36

MONSANTO COMPANY                                                      2010 FORM 10-K

Healthcare Acts to our consolidated financial statements are currently uncertain. We will continue to assess how the Healthcare Acts apply to us and how best to meet the stated requirements.

In August 2009, we sold our global sunflower assets to Syngenta for $160 million in proceeds which were formerly part of all other crops seeds and traits in our Seeds and Genomics segment. We recorded a pretax gain on the sale of $59 million or $.08 per share aftertax.

In June 2008, we assumed debt of $73 million as part of the De Ruiter acquisition. In February 2009, this debt was repaid. The assumed debt, denominated in European euros, was due on Sept. 25, 2012. The interest rate was a variable rate based on the Euro Interbank Offered Rate (Euribor).

In May 2002, we filed a shelf registration with the SEC for the issuance of up to $2.0 billion of registered debt (2002 shelf registration). In August 2002, we issued $800 million in $7^3/8$% Senior Notes under the 2002 shelf registration ($7^3/8$% Senior Notes). As of Aug. 31, 2010, $486 million of the $7^3/8$% Senior Notes are due on Aug. 15, 2012 (see the discussion later in this section regarding a debt exchange for $314 million of the $7^3/8$% Senior Notes). In May 2003, we issued $250 million of 4% Senior Notes (4% Senior Notes) under the 2002 shelf registration, which were repaid on May 15, 2008.

In May 2005, we filed a new shelf registration with the SEC (2005 shelf registration) that allowed us to issue up to $2.0 billion of debt, equity and hybrid offerings (including debt securities of $950 million that remained available under the 2002 shelf registration). In July 2005, we issued $5^1/2$% 2035 Senior Notes of $400 million under the 2005 shelf registration. The net proceeds from the sale of the $5^1/2$% 2035 Senior Notes were used to reduce commercial paper borrowings. In April 2008, we issued $5^1/8$% 2018 Senior Notes of $300 million. The net proceeds from the sale of the $5^1/8$% 2018 Senior Notes were used to finance the expansion of corn seed production facilities. Also in April 2008, we issued $5^7/8$% 2038 Senior Notes of $250 million. The net proceeds from the sale of the $5^7/8$% 2038 Senior Notes were used to repay $238 million of 4% Senior Notes that were due on May 15, 2008. The 2005 shelf registration expired in December 2008.

In October 2008, we filed a new shelf registration with the SEC (2008 shelf registration) that allows us to issue an unlimited capacity of debt, equity and hybrid offerings. The 2008 shelf registration will expire on Oct. 31, 2011.

In August 2005, we exchanged $314 million of new $5^1/2$% Senior Notes due 2025 ($5^1/2$% 2025 Senior Notes) for $314 million of our outstanding $7^3/8$% Senior Notes due 2012, which were issued in 2002. The exchange was conducted as a private transaction with holders of the outstanding $7^3/8$% Senior Notes who certified to the company that they were "qualified institutional buyers" within the meaning of Rule 144A under the Securities Act of 1933. Under the terms of the exchange, the company paid a premium of $53 million to holders participating in the exchange. The transaction has been accounted for as an exchange of debt under the Debt topic of the ASC, and the $53 million premium is being amortized over the life of the new $5^1/2$% 2025 Senior Notes. As a result of the debt premium, the effective interest rate on the $5^1/2$% 2025 Senior Notes will be 7.035% over the life of the debt. The exchange of debt allowed the company to adjust its debt-maturity schedule while also allowing it to take advantage of market conditions which the company considered favorable. In February 2006, we issued $314 million aggregate principal amount of our $5^1/2$% Senior Notes due 2025 in exchange for the same principal amount of our $7^3/8$% Senior Notes due 2025, which had been issued in the private placement transaction in August 2005. The offering of the notes issued in February was registered under the Securities Act through a Form S-4 filing.

During February 2007, we finalized a new $2 billion credit facility agreement with a group of banks. This agreement provides a five-year senior unsecured revolving credit facility, which replaced the $1 billion credit facility established in 2004. This facility was initiated to be used for general corporate purposes, which may include working capital requirements, acquisitions, capital expenditures, refinancing and support of commercial paper borrowings. This facility, which was unused as of Aug. 31, 2010, gives us the financial flexibility to satisfy short- and medium-term funding requirements. As of Aug. 31, 2010, we were in compliance with all debt covenants under this credit facility.

*Capital Expenditures*: Our capital expenditures were $755 million in 2010, $916 million in 2009 and $918 million in 2008. The primary driver of this year's decrease is lower spending on projects to expand corn seed production facilities compared with the prior year. We expect fiscal year 2011 capital expenditures to be $600 to $700 million. The primary driver of this decrease compared with 2010 is lower overall spending on projects.

*Purchase of Chesterfield Village Research Center*: In November 2009, we entered into an agreement to acquire Pfizer's Chesterfield Village Research Center located in Chesterfield, Missouri. We acquired the property in April 2010 for $435 million of which $111 million was paid this year and is reflected in capital expenditures and $324 million is due over the next two fiscal years.

37

MONSANTO COMPANY                                                          2010 FORM 10-K

*Pension Contributions*: In addition to contributing amounts to our pension plans if required by pension plan regulations, we continue to also make discretionary contributions if we believe they are merited. Although contributions to the U.S. qualified plan were not required, we contributed $105 million in 2010 of which $30 million was prefunded for 2011, $170 million in 2009 and $120 million in 2008. For fiscal year 2011, contributions in the range of $30 million are planned for the U.S. qualified pension plan. Although the level of required future contributions is unpredictable and depends heavily on return on plan asset experience and interest rates levels, we expect to continue contributing to the plan on a regular basis in the near term.

*Share Repurchases*: In October 2005, the board of directors authorized the purchase of up to $800 million of our common stock over a four-year period. In 2009 and 2008, we purchased $129 million and $361 million, respectively, of our common stock under the $800 million authorization. A total of 11.2 million shares have been repurchased under this program, which was completed on Dec. 23, 2008. In April 2008, the board of directors authorized another share repurchase program of up to $800 million of our common stock over a three-year period. This repurchase program commenced Dec. 23, 2008, and was completed on Aug. 24, 2010. In 2010 and 2009, we purchased $531 million and $269 million, respectively, of our common stock. A total of 11.3 million shares have been repurchased under the April 2008 program. In June 2010, the board of directors authorized a new repurchase program of up to an additional $1 billion of our common stock over a three-year period beginning July 1, 2010. In 2010, we purchased $1 million of our common stock. There were no other publicly announced plans outstanding as of Aug. 31, 2010.

*Dividends*: We paid dividends totaling $577 million in 2010, $552 million in 2009, and $419 million in 2008. In August 2010, we increased our dividend 6 percent to $0.28 per share. We continue to review our options for returning additional value to shareowners, including the possibility of a dividend increase.

*Divestiture*: In October 2008, we consummated the sale of the Dairy business after receiving approval from the appropriate regulatory agencies and received $300 million in cash, and may receive additional contingent consideration. The contingent consideration is a 10-year earn-out with potential annual payments being earned by the company if certain revenue levels are exceeded. During fiscal year 2009, income from operations of discontinued businesses included an $11 million pre-tax gain related to the sale.

*2010 Acquisitions:* In April 2010, we acquired a corn and soybean processing plant located in Paine, Chile from Anasac, a Santiago-based company that provides seed processing services. Acquisition costs were less than $1 million, and classified as selling, general, and administrative expenses. The total cash paid and the fair value of the acquisition were $34 million, and the purchase price was primarily allocated to fixed assets, goodwill, and intangibles.

In October 2009, we acquired the remaining 51 percent equity interest in Seminium, a leading Argentinean corn seed company. Acquisition costs were less than $1 million, and classified as selling, general and administrative expenses. The total fair value of Seminium was $36 million. This fair value includes $20 million of cash paid (net of cash acquired) and $16 million for the fair value of Monsanto's 49 percent equity interest in Seminium held prior to the acquisition.

*2009 Acquisitions:* In December 2008, we acquired 100 percent of the outstanding stock of Aly Participacoes Ltda. (Aly), which operates the sugarcane breeding and technology companies, CanaVialis S.A. and Alellyx S.A., both of which are based in Brazil, for 616 million Brazilian reais or $264 million (net of cash acquired), inclusive of transaction costs of less than $1 million. We consummated the transaction with existing cash.

In July 2009, we acquired the assets of WestBred, LLC, a Montana-based company that specializes in wheat germplasm, for $49 million (net of cash acquired), inclusive of transaction costs of $4 million. The acquisition will bolster the future growth of Monsanto's seeds and traits platform.

For all acquisitions described above, the business operations and employees of the acquired entities were added into the Seeds and Genomics segment results upon acquisition. These acquisitions were accounted for as purchase transactions. Accordingly, the assets and liabilities of the acquired entities were recorded at their estimated fair values at the dates of the acquisitions. See Note 4 — Business Combinations — for further discussion of these acquisitions.

38

MONSANTO COMPANY                                                             2010 FORM 10-K

*Contractual Obligations:* We have certain obligations and commitments to make future payments under contracts. The following table sets forth our estimates of future payments under contracts as of Aug. 31, 2010. See Note 25 — Commitments and Contingencies — for a further description of our contractual obligations.

| (Dollars in millions) | Total | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 and beyond |
|---|---|---|---|---|---|---|---|
| | | | Payments Due by Fiscal Year Ending Aug. 31, | | | | |
| Total Debt, including Capital Lease Obligations | $2,103 | $ 241 | $ 624 | $ 3 | $ 3 | $ 3 | $1,229 |
| Interest Payments Relating to Long-Term Debt and Capital Lease Obligations[1] | 1,433 | 107 | 107 | 71 | 71 | 71 | 1,006 |
| Operating Lease Obligations | 538 | 117 | 108 | 89 | 71 | 43 | 110 |
| Purchase Obligations: | | | | | | | |
| Uncompleted additions to property | 103 | 103 | — | — | — | — | — |
| Commitments to purchase inventories | 1,837 | 881 | 229 | 201 | 187 | 183 | 156 |
| Commitments to purchase breeding research | 129 | 45 | 45 | 3 | 3 | 3 | 30 |
| R&D alliances and joint venture obligations | 164 | 71 | 37 | 19 | 12 | 8 | 17 |
| Other purchase obligations | 9 | 4 | 4 | 1 | — | — | — |
| Other Liabilities: | | | | | | | |
| Postretirement and ESOP liabilities[2] | 127 | 71 | — | — | — | — | 56 |
| Unrecognized tax benefits[3] | 292 | 6 | | | | | |
| Other liabilities | 186 | 26 | 18 | 21 | 15 | 7 | 99 |
| Total Contractual Obligations | $6,921 | $1,672 | $1,172 | $408 | $362 | $318 | $2,703 |

[1]   For variable rate debt, interest is calculated using the applicable rates as of Aug. 31, 2010.

[2]   Includes the company's planned pension and other postretirement benefit contributions for 2011. The actual amounts funded in 2011 may differ from the amounts listed above. Contributions in 2012 through 2015 are excluded as those amounts are unknown. Refer to Note 17 — Postretirement Benefits – Pensions — and Note 18 — Postretirement Benefits – Health Care and Other Postemployment Benefits — for more information. The 2016 and beyond amount relates to the ESOP enhancement liability balance. Refer to Note 19 — Employee Savings Plans — for more information.

[3]   Unrecognized tax benefits relate to uncertain tax positions recorded under the Income Taxes topic of the ASC. We are unable to reasonably predict the timing of tax settlements, as tax audits can involve complex issues and the resolution of those issues may span multiple years, particularly if subject to negotiation or litigation. See Note 13 — Income Taxes — for more information.

**Off-Balance Sheet Arrangements**

Under our Separation Agreement with Pharmacia, we are required to indemnify Pharmacia for certain matters, such as environmental remediation obligations and litigation. To the extent we are currently managing any such matters, we evaluate them in the course of managing our own potential liabilities and establish reserves as appropriate. However, additional matters may arise in the future, and we may manage, settle or pay judgments or damages with respect to those matters in order to mitigate contingent liability and protect Pharmacia and Monsanto. See Note 25 — Commitments and Contingencies and Part I — Item 3 — Legal Proceedings — for further information.

We have entered into various customer financing programs which are accounted for in accordance with the Transfers and Servicing topic of the ASC. See Note 7 — Customer Financing Programs — for further information.

**Other Information**

As discussed in Note 25 — Commitments and Contingencies and Item 3 — Legal Proceedings, Monsanto is responsible for significant environmental remediation and is involved in a number of lawsuits and claims relating to a variety of issues. Many of these lawsuits relate to intellectual property disputes. We expect that such disputes will continue to occur as the agricultural biotechnology industry evolves.

**Seasonality**

Our fiscal year end of August 31 synchronizes our quarterly and annual results with the natural flow of the agricultural cycle in our major

markets. It provides a more complete picture of the North American and South American growing seasons in the same fiscal year. Sales by our Seeds and Genomics segment, and to a lesser extent, by our Agricultural Productivity segment, are seasonal. In fiscal year 2010, approximately 74 percent of our Seeds and Genomics segment sales occurred in the second

39

and third quarters. This segment's seasonality is primarily a function of the purchasing and growing patterns in North America. Agricultural Productivity segment sales were more evenly spread across our fiscal year quarters in 2010, with approximately 55 percent of these sales occurring in the second half of the year. Seasonality varies by the world areas where our Agricultural Productivity businesses operate. For example, the United States, Brazil and Europe were the largest contributors to Agricultural Productivity sales in 2010, and experienced most of their sales evenly across our fiscal quarters in 2010.

Net income is the highest in second and third quarters, which correlates with the sales of the Seeds and Genomics segment and its gross profit contribution. Sales and income may shift somewhat between quarters, depending on planting and growing conditions. Our inventory is at its lowest level at the end of our fiscal year, which is consistent with the agricultural cycles in our major markets. Additionally, our trade accounts receivable are at their lowest levels in our fourth quarter, primarily because of collections received on behalf of both segments in the United States and Latin America, and the seasonality of our sales.

As is the practice in our industry, we regularly extend credit to enable our customers to acquire crop protection products and seeds at the beginning of the growing season. Because of the seasonality of our business and the need to extend credit to customers, we use short-term borrowings to finance working capital requirements. Our need for such financing is generally higher in the first and third quarters of the fiscal year and lower in the second and fourth quarters of the fiscal year. Our customer financing programs are expected to continue to reduce our reliance on commercial paper borrowings.

## OUTLOOK

We believe we have achieved an industry-leading position in the areas in which we compete in both of our business segments. However, the outlook for each part of our business is quite different. In the Seeds and Genomics segment, our seeds and traits business is expected to expand via our investment in new products. In the Agricultural Productivity segment, we expect to deliver competitive products in a more stable business.

We believe that our company is positioned to deliver value-added products to growers enabling us to grow our gross profit in the future. We expect to see strong cash flow in the future, and we remain committed to returning value to shareowners through vehicles such as investments that expand the business, dividends and share repurchases. We will remain focused on cost and cash management for each segment, both to support the progress we have made in managing our investment in working capital and to realize the full earnings potential of our businesses. We plan to continue to seek additional external financing opportunities for our customers as a way to manage receivables for each of our segments.

Economic activity in the United States and globally appears to be recovering from the slowdown seen in fiscal year 2009, though credit availability is still restrained. Outside of the United States, our businesses will continue to face additional challenges related to the risks inherent in operating in emerging markets. We expect to continue to monitor these developments and the challenges and issues they place on our business. We believe we have taken appropriate measures to manage our credit exposure, which has the potential to affect sales negatively in the near term. In addition, volatility in foreign currency exchange rates may negatively affect our profitability, the book value of our assets outside the United States, and our shareowners' equity.

### Seeds and Genomics

Our capabilities in plant breeding and biotechnology research are generating a rich and balanced product pipeline that we expect will drive long-term growth. We plan to continue to invest in the areas of seeds, genomics and biotechnology and to invest in technology arrangements that have the potential to increase the efficiency and effectiveness of our R&D efforts. We believe that our seeds and traits businesses will have significant near-term growth opportunities through a combination of improved breeding and continued growth of stacked and second-generation biotech traits.

We expect advanced breeding techniques combined with improved production practices and capital investments will continue to contribute to improved germplasm quality and yields for our seed offerings, leading to increased global demand for both

40

MONSANTO COMPANY                                                                          2010 FORM 10-K

our branded germplasm and our licensed germplasm. Our vegetable portfolio will focus on 23 crops. We plan to continue applying our molecular breeding and marker capabilities to our vegetable seeds germplasm, which we expect will lead to business growth. The integration of De Ruiter has improved our abilities to develop and deliver new, innovative products to our broad customer base. The acquisition of Aly will enable us to combine our areas of breeding expertise to enhance yields in sugarcane, a crop that is vital to addressing growing global food and fuel demands. We also plan to continue making strategic acquisitions in our seed businesses to grow our branded seed market share, expand our germplasm library and strengthen our global breeding programs. We expect to see continued competition in seeds and genomics in the near term. We believe we will have a competitive advantage because of our global breeding capabilities and our multiple-channel sales approach in the United States for corn and soybean seeds.

Commercialization of second- and third-generation traits and the stacking of multiple traits in corn and cotton are expected to increase penetration in approved markets, particularly as we continue to price our traits in line with the value growers have experienced. In 2010, we saw higher-value, stacked-trait products representing a larger share of our total U.S. corn seed sales than they did in 2009. Acquisitions may also present mid to longer term opportunities to increase penetration of our traits. We experienced an increase in competition in biotechnology as more competitors launched traits in the United States and internationally. However, we believe our competitive position continues to enable us to deliver second- and third-generation traits when our competitors are delivering their first-generation traits.

Key regulatory approvals were obtained for the 2010 commercial launch of our next generation corn product. *Genuity SmartStax*, a product that contains five proteins that control important above ground (corn borer, corn ear worm) and below ground (corn root worm) pests and provides tolerance to the herbicides glyphosate and glufosinate, uses multiple modes of action for insect control, the proven means to enhance performance, reduce structured refuge and maintain long-term durability of corn trait technology. *Genuity SmartStax* uniquely features a combination of weed and insect control traits that significantly reduces the risk of resistance for both above and below ground pests. As a result, the U.S. EPA and the Canadian Food Inspection Agency allowed reduction of the typical structured farm refuge from 20 percent to 5 percent for *Genuity SmartStax* in the U.S. Corn Belt and Canada and from 50 percent to 20 percent for the U.S. Cotton Belt. *Genuity SmartStax* corn was launched in the United States in 2010.

Full regulatory submissions were completed for a 5 percent refuge-in-a-bag (RIB) seed blend to the U.S. EPA for *Genuity SmartStax* and *Genuity VT2PRO*. *Genuity SmartStax* and *VT2PRO* RIB would provide a single bag solution to enable farmers in the Corn Belt to plant corn without a separate refuge.

We have recently received Brazilian National Technical Biosafety Committee approval for *Bt Roundup Ready 2 Yield* soybeans, which is an important step toward commercialization of the first biotechnology trait developed specifically for a non-US market. Key import submissions are under regulatory review. Other global cultivation opportunities were also expanded for corn and cotton with approval of *Bollgard II* Cotton in Brazil and corn field trials in Mexico, Vietnam and Pakistan.

During 2007, we announced a long-term joint R&D and commercialization collaboration in plant biotechnology with BASF that will focus on high-yielding crops and crops that are tolerant to adverse conditions such as drought. We have completed all North American and key import country regulatory submissions for the first biotech drought-tolerant corn product. Pending necessary approvals, the product is on track for an introduction around 2012. Over the long-term life of the collaboration, we and BASF will dedicate a joint budget of potentially $2.5 billion to fund a dedicated pipeline of yield and stress tolerance traits for corn, soybeans, cotton, canola and wheat.

Our international traits businesses, in particular, will probably continue to face unpredictable regulatory environments that may be highly politicized. We operate in volatile, and often difficult, economic environments. Although we see growth potential in our India cotton business with the ongoing conversion to higher planting rates with hybrids and *Bollgard II*, this business is currently operating under state governmental pricing directives that we believe limit near-term earnings potential in India.

In Brazil, notwithstanding continuing and varied legal challenges by private and governmental parties, we expect to continue to operate our dual-track business model of certified seeds and our point-of-delivery payment system (*Roundup Ready* soybeans) or our indemnification collection system (*Bollgard* cotton) to ensure that we capture value on all of our *Roundup*

41

*Ready* soybeans and *Bollgard* cotton crops grown there. Income is expected to grow as farmers choose to plant more of these approved traits. Although Brazilian law clearly states that these products protected by pipeline patents have the duration of the U.S. patent (2014 for *Roundup Ready* soybeans and 2011 for *Bollgard* cotton), legal rulings have not consistently achieved that outcome. Continued commercial approval of new products such as the recently approved *Yieldgard VT Pro*, *Yieldgard Roundup Ready 2*, *Yieldgard* Corn Borer and *Bt Roundup Ready 2 Yield* soybeans will provide the opportunity for a step change in contributions from seeds and traits in Brazil. As noted above, *Yieldgard* Corn Borer was approved recently, and was planted in the past two growing seasons. The agricultural economy in Brazil could be impacted by global commodity prices, particularly for corn and soybeans. We continue to maintain our strict credit policy, expand our grain-based collection system, and focus on cash collection and sales, as part of a continuous effort to manage our Brazilian risk against such volatility.

Efforts to secure an orderly system in Argentina to support the introduction of new technology products are underway. We do not plan to collect on *Roundup Ready* soybeans and we do not plan to commercialize new soybean or cotton traits in Argentina until we can achieve more certainty that we will be compensated for providing the technology. All on-going soybean litigations have been settled. We are continuing to discuss alternative arrangements with various Argentine stakeholders pertaining to new soybean and cotton trait products. However, we have no certainty that any of these discussions will lead to an income producing outcome.

In March 2008, a judge of the French Supreme Administrative court (Conseil d'Etat) rejected an application for interim relief by French farmers, French grower associations and various companies, including Monsanto, to overturn the French government's suspension of planting of *Yieldgard* Corn Borer pending review and completion under a new regulatory regime. The outcome means that there will be no additional sales or planting of this product in France during the forthcoming growing season. The European Food Safety Authority (EFSA) has issued an opinion that the French suspension is not supported on a scientific basis. The case has now been referred to the European Court of Justice (ECJ) and the ban remains in place. On April 17, 2009, Germany invoked the safeguard clause and also banned the planting of *Yieldgard* Corn Borer. We sought interim relief to overturn the ban which the German administrative courts denied. As a result, there will be no sales or planting of MON810 products in Germany this growing season. The court proceedings are postponed pending the outcome of administrative proceedings. Other European Union Member States (e.g., Austria, Luxembourg and Greece) have also invoked safeguard measures but we have focused our legal challenges to those countries with significant corn plantings.

**Agricultural Productivity**

Our *Roundup* herbicide gross profit peaked in 2008 and declined 7 percent in 2009 and an additional 92 percent in 2010. The structural changes that have occurred in the global glyphosate market, including oversupply and overcapacity at the manufacturing level, have created a significant compression in the manufacturer's margin. We believe this structural change is permanent and will therefore have a long term impact on the level of profits and cash generated by this business. While we expect the business to continue to be cash positive, we have oriented the focus of Monsanto's crop protection business to strategically support Monsanto's *Roundup Ready* crops.

We have submitted a mine plan to the U.S. Bureau of Land Management (BLM) regarding a new phosphate ore mine near Soda Springs, Idaho, that we intend to use to meet existing and future production demands for our *Roundup* herbicides and licensed glyphosate. BLM is in the process of finalizing an Environmental Impact Statement (EIS) for the mine. We anticipate receiving regulatory approvals for our new mine in fiscal year 2011. However, we are aware that certain environmental groups have initiated litigation against other phosphate producers to disrupt and delay the permitting process.

Our selective chemistry business is expected to remain stable due to introductions of new formulations and our focus on weed management solutions in *Roundup Ready* crops.

The lawn-and-garden business should continue benefiting from the *Roundup* brand equity in the marketplace and remain a strong cash generator for Monsanto.

42

MONSANTO COMPANY                                                          2010 FORM 10-K

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

In preparing our financial statements, we must select and apply various accounting policies. Our most significant policies are described in Note 2 — Significant Accounting Policies. In order to apply our accounting policies, we often need to make estimates based on judgments about future events. In making such estimates, we rely on historical experience, market and other conditions, and on assumptions that we believe to be reasonable. However, the estimation process is by its nature uncertain given that estimates depend on events over which we may not have control. If market and other conditions change from those that we anticipate, our results of operations, financial condition and changes in financial condition may be materially affected. In addition, if our assumptions change, we may need to revise our estimates, or to take other corrective actions, either of which may also have a material effect on our results of operations, financial condition or changes in financial condition. Members of our senior management have discussed the development and selection of our critical accounting estimates, and our disclosure regarding them, with the audit and finance committee of our board of directors, and do so on a regular basis.

We believe that the following estimates have a higher degree of inherent uncertainty and require our most significant judgments. In addition, had we used estimates different from any of these, our results of operations, financial condition or changes in financial condition for the current period could have been materially different from those presented.

*Goodwill:* The majority of our goodwill relates to our seed company acquisitions. We are required to assess whether any of our goodwill is impaired. In order to do this, we apply judgment in determining our reporting units, which represent component parts of our business. Our annual goodwill impairment assessment involves estimating the fair value of a reporting unit and comparing it with its carrying amount. If the carrying value of the reporting unit exceeds its fair value, additional steps are required to calculate a potential impairment loss.

Calculating the fair value of the reporting units requires significant estimates and long-term assumptions. Any changes in key assumptions about the business and its prospects, or any changes in market conditions, interest rates or other externalities, could result in an impairment charge. We estimate the fair value of our reporting units by applying discounted cash flow methodologies. A discounted cash flow analysis requires us to make various judgmental estimates and assumptions that include, but are not limited to, sales growth, gross profit margin rates and discount rates. Discount rates were evaluated by reporting unit to account for differences in inherent industry risk. Sales growth and gross profit margin assumptions were based on our long range plan.

The annual goodwill impairment tests were performed as of March 1, 2010, and March 1, 2009. No indications of goodwill impairment existed as of either date. In 2010 and 2009, we recorded goodwill related to our acquisitions (see Note 4 — Business Combinations). As part of the annual goodwill impairment tests, we compared our total market capitalization with the aggregate estimated fair value of our reporting units to ensure that significant differences were understood. At March 1, 2010, and March 1, 2009, our market capitalization exceeded the aggregate estimated fair value of our reporting units. Future declines in the fair value of our reporting units could result in an impairment of goodwill and reduce net income.

In assessing goodwill for impairment for the *Roundup* and other glyphosate-based herbicides reporting unit, the estimated fair value exceeded the carrying value by approximately 8 percent. At March 1, 2010, the carrying value of this reporting unit included an allocation of goodwill of $54 million. The key assumptions with the most significant impact on reporting unit fair value calculations include the discount rate and the gross profit margin rate. The discount rate used for the *Roundup* and other glyphosate-based herbicides reporting unit was 7.5 percent and an increase in 50 basis points would have resulted in a fair value equal to the carrying value of the reporting unit. The gross profit margin rate used for the *Roundup* and other glyphosate-based herbicides reporting unit is 17 percent during the cash flow projection period, and a decrease of 50 basis points would have resulted in a fair value that was approximately 1 percent above the carrying value of the reporting unit.

*Intangible Assets:* In accordance with the Intangibles – Goodwill and Other topic of the ASC, all amortizable intangible assets are assessed for impairment whenever events indicate a possible loss. Such an assessment involves estimating undiscounted cash flows over the remaining useful life of the intangible. If the review indicates that undiscounted cash flows are less than the recorded value of the intangible asset, the carrying amount of the intangible is reduced by the estimated cash-flow shortfall on a discounted basis, and a corresponding loss is charged to the Statement of Consolidated Operations. Significant changes in key assumptions about the business, market conditions and prospects for which the intangible asset is currently utilized or expected to be utilized could result in an impairment charge.

43