

DEPARTMENT OF AGRICULTURE
OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20250

December 21, 2004

Mr. Gus Douglass
Commissioner
The National Association of State Departments of Agriculture
1156 15th Street, N.W.
Suite 1020
Washington, D.C. 20005-1711

Dear Commissioner Douglass:

Thank you for your letter on October 15, 2004, on behalf of the National Association of State Departments of Agriculture (NASDA) concerning organic agriculture and biotechnological agricultural methods, and for NASDA's statement supporting diversity in agriculture.

Your letter raised several questions that have been raised by and to NASDA members regarding the implications of genetically-modified, genetically-engineered, or biotech crops and seeds on certified organic production and handling operations. Let me address each of the issues raised in your letter. Where applicable, citations from our regulations and its preamble (7 CFR Part 205), including page numbers, are included.

Issue: If a producer adheres to all aspects of the National Organic Program (NOP), including never utilizing biotech-derived seeds, but a certifying agent tests and detects the presence of biotech-derived material in the crop, is that crop's status determined to be no longer "certified organic?" And, if so, what in the NOP supports this conclusion?

Reply: It is particularly important to remember that organic standards are process based. Certifying agents attest to the ability of organic operations to follow a set of production standards and practices that meet the requirements of the Act and the regulations. This regulation prohibits the use of excluded methods in organic operations (§205.2—Terms defined, and §205.105—Allowed and prohibited substances, methods, and ingredients in organic production and handling). The presence of a detectable residue of a product of excluded methods alone does not necessarily constitute a violation of this regulation. As long as an organic

       operation has not used excluded methods and takes reasonable steps to avoid contact with the products of excluded methods as detailed in their approved organic system plan, the unintentional presence of the products of excluded methods will not affect the status of the organic operation. As to the status of the commodity, USDA's position is that this is left to the buyer and seller to resolve in the marketplace through their contractual relationship. (See page 80556 of the preamble, "Applicability—Clarifications; (1) "Genetic drift").

Issue: You refer to a section on the NOP website commonly known as FAQs, or frequently asked questions, that address the presence of a detectable residue of a product of excluded methods. You ask if insufficient buffers or barriers that result in unintended contact with a product of genetic modification would threaten the farm's certification or use of the field for the production of organic crops. You also ask if an organic producer or handler is found to have not implemented measures necessary to prevent commingling of organic and non-organic products, would that threaten the certification of the producer or handler?

Reply: In order to become a certified organic operation, a producer must submit an Organic System Plan (plan) to a USDA-accredited certifying agent for approval. That plan must include, among other things, evidence that sufficient buffer zones have been incorporated into the operation to ensure the integrity of the organic crop operation. The certifying agent must not approve a plan that does not provide evidence of sound measures taken to ensure the integrity of the organic crop operation, including buffer zones and other steps to prevent commingling with unapproved non-organic materials or conventional crops. If a producer does not adhere to such preventive measures, the certifying agent is expected to denote such failure as a noncompliance and take appropriate measures toward correction by the producer. Inadequate buffer zones should not be approved in the first place and failure to comply with approved buffer zones constitutes a noncompliance with the approved organic system plan. (See the preamble, page 80558, on Subpart C—General Requirements, which describe what must be contained in an organic system plan, and §205.2 under terms defined – Buffer zone.)

       However, even when all precautions have been taken, and an approved buffer zone fails to provide the protection that both the operator and the certifying agent reasonably expected, certifying agents must not "retroactively" punish the producer by an enforcement action or "de-certify" the organic crop. The appropriate action to take in this case is to re-evaluate the buffer zone and other preventive measures in the plan to ensure improved integrity and performance in the future. As to the status of the commodity, USDA's position is that this is left

to the buyer and seller to resolve in the marketplace through their contractual relationship. (See page 80556 of the preamble, "Applicability—Clarifications; (1) "Genetic drift").

Issue: You ask if a certified organic operation that refrains from intentional use of biotech seeds has ever lost certification for the inadvertent presence of biotech material in its crop, and if so, how many and under what circumstances did the loss of certification occur?

Reply: No accredited certifying agent has reported to us that certification has been lost due to adventitious presence of biotech material. In one instance, a producer admitted to deliberately planting GM-corn seed and representing the crop as organic corn, for which we took enforcement action and revoked the organic certification.

Issue: You ask if food labels stating "GM, GE, or GMO-free" are part of the National Organic Standards?

Reply: They are not. Truthful labeling is embodied in the National Organic Standards, as supported by USDA's Food Safety and Inspection Service (FSIS), the Food and Drug Administration (FDA), and the Federal Trade Commission (FTC) – the agencies with respective jurisdiction over truthful labeling laws. In the preamble of the National Organic final regulations, we stated that organic is not synonymous with "GM-free," when we said: "These phrases may…be used as additional, eco-labels, provided they are truthful statements…[but] they are not permitted as replacements for the term 'organic.'" (See page 80586 of the preamble, under "Labeling—Changes Requested But Not Made: (7) Use of Other Terms as Synonymous for "organic").

Issue: You also state that it would be helpful to confirm "the role of a marketing order of this kind, e.g., that the order is intended to control the activities of those who voluntarily opt in to the program," and whether a marketing order can be used to control the production activities of other growers who do not choose to participate in the program.

Reply: First, the organic program is not a marketing order, in the traditional sense of marketing orders administered by the Agricultural Marketing Service for fruits and vegetables and for dairy producers. The NOP is, as you correctly point out, a voluntary program – that is, producers who wish to become a certified organic operation can do so by adhering to all of the regulatory requirements and successfully achieving certification status by a USDA-accredited certifying agent. But the NOP confers no rights on such producers to control the activities of non-

        organic producers. In fact, "split operations" are permitted under the NOP. That is, a producer may have part of an operation that is certified organic, and the remainder of the operation is a conventional agricultural operation. In that case, the regulations related to commingling of organic and non-organic operations and products discussed above apply to that split operation.

Issue: You ask if there is a working definition of the word "contamination" within the NOP, noting that the word "contamination" is used frequently in the final regulations, and if all products of genetic modification are considered "prohibited substances" as defined in the final regulations? And, what actions are authorized or required when organic crops or products are found to contain unintended or inadvertent genetically modified hybrids or other genetically modified substances?

Reply: There is no definition in the final regulations of the National Organic Standards for the word "contamination," even though, as you point out, it is mentioned frequently. By our count, "contamination" is mentioned nearly 50 times in the regulations. All genetically-modified practices or products are indeed considered prohibited, as cited in 205.105, the paragraph that describes "excluded methods." Please refer back to the above issue when considering the adventitious presence of a genetically-modified or genetically-engineered substance. Such adventitious presence does not affect the status of the certified operation and does *not* necessarily result in loss of organic status for the organic product, provided it was produced in adherence with all of the organic requirements under 7 CFR 205. Again, the action regarding the final product's status in this case is left to the determination by the buyer and seller of the product.

       Contamination by a prohibited substance, when mandated by a government body, however, would result in loss of organic status for the product, even when all other regulations had been followed. In the case of an emergency spray program, for example, if the spray is a prohibited substance but is mandated by a State or Federal program, the crop's organic status is lost and that crop must be diverted for sale in the conventional market. Neither the operation nor the land's organic status is altered by an emergency spray program, however. (See §205.672 Emergency pest or disease treatment.)

I appreciate this opportunity to respond to these issues and to echo the statement of NASDA members – USDA supports and promotes all methods and segments of

agriculture and our goal is to ensure that farmers are successful in meeting market demand, whether they choose to plant biotech, conventional, or organic crops. Thank you again for writing about these important issues.

Sincerely,

Bill Hawks
Under Secretary
Marketing and Regulatory Programs