UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ORGANIC SEED GROWERS AND TRADE ASSOCIATION, et al., Plaintiffs, <br><br> v. <br><br> MONSANTO COMPANY AND MONSANTO TECHNOLOGY LLC, Defendants. | Case No. 1:11-cv-2163-NRB <br><br> Jury Demanded |

## DECLARATION OF JAMES P. TOBIN

I, James P. Tobin, declare as follows:

1. I make this statement based on my personal knowledge of the facts set forth herein or on information that I have learned pursuant to my official duties at Monsanto.

**Background**

2. I am employed by Monsanto Company ("Monsanto") and am based at the company's headquarters in St. Louis, Missouri. Since 2008, I have been Vice President for Industry Affairs at Monsanto.

3. I earned a B.S. degree in agricultural education from Iowa State University in 1978, and served as County Extension Director for the Iowa State Extension Service from 1979 to 1981. After earning an M.B.A. degree from Harvard University in 1983, I joined Monsanto's agricultural unit as a Product Supervisor. I served in various agricultural marketing and commercial development positions before gaining my current position. Past assignments of mine at Monsanto have included responsibilities in Global Product Management, the Global

Seed Group, the Seed Business Team, the U.S. Crop Protection Business, and the Cotton Business.

4.      I am also a member of the board of the US Grains Council, which is a private, non-profit organization dedicated to building export markets for US grains such as corn, sorghum, and barley. I also am a member of the Farm Foundation Round Table, which is an invitational discussion forum comprised of leaders from across various sectors of the North American food chain. I have served on the National 4-H Council and am a past chairman of the American Seed Trade Association, which represents companies involved in seed production, plant breeding, and related industries in North America.

**Monsanto's Business**

5.      Monsanto develops, manufactures, licenses, and sells seed, agricultural biotechnology traits delivered by seed, and agricultural chemicals. Monsanto's seeds, biotechnology trait products, and herbicides provide farmers with solutions that improve productivity and reduce the costs of farming.

6.      Monsanto manages its business in two segments: Seeds and Genomics, and Agricultural Productivity. Through the Seeds and Genomics segment, Monsanto produces leading seed brands (including DEKALB, Asgrow, Deltapine, Seminis, De Ruiter, and others) and develops biotechnology traits that assist farmers in controlling insects and weeds. Monsanto also provides other seed companies with genetic material and biotechnology traits for their seed brands.

7.      Among other products, Monsanto has developed new "transgenic" seed technology involving the carefully controlled transfer of new genes into crop seed, which allows the resulting plants to express beneficial traits. One such trait is resistance to glyphosate, the

active ingredient in Monsanto's Roundup® herbicide, which is highly valued for its environmental friendliness and ease of use. Monsanto's popular line of "Roundup Ready®" seeds permits growers to spray their crops with Roundup® herbicide to control weeds without damaging the crops themselves.

8. Monsanto invests significant amounts of time, money, and expertise in developing new seed hybrids and varieties and biotechnology traits. In fact, Monsanto currently spends over $1 billion annually on all research and development. Monsanto's expenses for research and development were $980 million in 2008, $1.098 billion in 2009, and $1.205 billion in 2010. Approximately 95% of Monsanto's research-and development investment goes to funding seeds-and-traits related research.

**Monsanto's Biotechnology Intellectual Property**

9. To protect its significant investments in its proprietary technologies, Monsanto relies on the federal patent system.

10. Monsanto authorizes growers to use its patented biotechnology under limited-use licenses. Over 275,000 licensed growers in the United States purchase seed containing Monsanto's biotechnology traits each year.

11. Under the limited-use licenses, growers who purchase seed containing Monsanto-patented traits from authorized dealers may use the seed to grow a single commercial crop. The licenses do not allow growers to "save seed," *i.e.*, plant the second-generation seed resulting from the original planting. Monsanto also does not allow access to its patented biotechnology through "brown bag seed," *i.e.*, seed that has been sold outside authorized distribution channels.

12. These protections are essential to Monsanto's business, because Monsanto's patented biotechnologies are self-replicating, meaning that the progeny of the plants grown with

the novel traits will also contain those traits. In some cases, such as soybeans, the plants reproduce at a prolific rate, leaving growers at the end of the growing season with an abundance of seeds that could be saved or sold to others for planting in the following year. Without reasonable license restrictions prohibiting the replanting of second- and subsequent-generation seeds, Monsanto's ability to protect its patented technology would effectively be lost as soon as the first generation of the product was introduced into the market.

13. In addition to its licensing program, Monsanto devotes considerable resources to developing and implementing educational programs that enable licensed growers to engage in responsible trait stewardship practices and to comply with applicable patent laws, conditions of product registration, and license obligations.

14. Monsanto supports and believes firmly in coexistence between agricultural biotechnology and other forms of agriculture, including organic and conventional (non-transgenic) agriculture. Different agricultural systems have coexisted successfully for many years around the world. Standards and best practices for agricultural coexistence were established decades ago and have continually evolved to deliver high-purity seed and grain. For example, despite the possibility of cross-pollination between similar commodities such as field corn, sweet corn, and popcorn, these crops have been produced in close proximity for many years throughout the United States. Another example is the successful coexistence of oilseed rape varieties with low erucic-acid content for food use and high erucic-acid content for industrial uses.

15. Monsanto has explicitly stated its commitment *not* to take legal action against growers whose crops might inadvertently infringe its patents (because, for example, some transgenic seed or pollen blew onto the grower's land). On its website, Monsanto publishes a

page entitled "Monsanto's Commitment: Farmers and Patents," which states: "It has never been, nor will it be, Monsanto policy to exercise its patent rights where trace amounts of our patented seed or traits are present in [a] farmer's fields as a result of inadvertent means." *Monsanto's Commitment: Farmers and Patents*, available at http://www.monsanto.com/newsviews/Pages/commitment-farmers-patents.aspx. This statement is meant to assure growers that Monsanto will not make any patent-infringement claim or demand for settlement where Monsanto's patented traits appear inadvertently (*e.g.*, through cross-pollination by nearby Roundup Ready® fields) and thus are present only in minimal quantities.

16.     Monsanto has never filed a patent-infringement lawsuit against a USDA-certified organic farm or handling operation for the presence of patented traits in its certified organic operations.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on July 12, 2011.

_____
James P. Tobin