UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ORGANIC SEED GROWERS AND TRADE ASSOCIATION, et al., <br>     *Plaintiffs*, <br><br> v. <br><br> MONSANTO COMPANY AND MONSANTO TECHNOLOGY LLC, <br>     *Defendants*. | Case No. 1:11-cv-2163-NRB-RLE <br><br> Jury Demanded <br><br> ECF Case |

### REPLY MEMORANDUM IN SUPPORT OF MONSANTO'S MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

The Federal Circuit's recent decision in *Association for Molecular Pathology v. United States Patent & Trademark Office* ("*AMP*"), 2011 WL 3211513 (Fed. Cir. July 29, 2011), compels dismissal of this case, as Plaintiffs have failed to show either (1) "an affirmative act by the patentee" that was "directed at specific Plaintiffs" or (2) "meaningful preparation [by Plaintiffs] to conduct potentially infringing activity" beyond mere "some day intentions[.]" *Id.* at *9, 11, 14 (internal quotation marks omitted).

This is precisely the framework that Monsanto articulated for determining subject-matter jurisdiction in a declaratory-judgment action, and Plaintiffs agree that the Federal Circuit requires jurisdiction to be determined by this test. *See* Pls.' Mem. of Law in Opp. to Defs.' Mot. To Dismiss for Lack of Subject-Matter Jurisdiction ("Opp.") 16. Plaintiffs also essentially concede that they have not and cannot satisfy either part of this test. Unable to meet the *AMP* standard, Plaintiffs therefore argue that *AMP* is inconsistent with Supreme Court case law and prior Federal Circuit decisions. Opp. 10, 16. Plaintiffs' argument is wrong—*AMP* is entirely consistent with prior precedent—but, in any event, Plaintiffs' argument must be addressed to an

1

appellate court. Because Plaintiffs fail to meet the *AMP* standard, their amended complaint should be dismissed for lack of subject-matter jurisdiction.

**I.   SUBJECT-MATTER JURISDICTION IS LACKING BECAUSE MONSANTO HAS NOT TAKEN ANY AFFIRMATIVE ACT TOWARD ANY PLAINTIFF**

**A.   This Case Is Controlled By *AMP***

The claims made by Plaintiffs in this case are indistinguishable from the claims in *AMP* over which the Federal Circuit held there was no subject-matter jurisdiction. That ruling is binding precedent that requires dismissal of Plaintiffs' claims here.

*AMP* involved a patentee that engaged in "active enforcement of its patent rights." 2011 WL 3211513, at *12. The vast majority of the plaintiffs in *AMP* (represented by counsel for Plaintiffs in this case) made the same argument Plaintiffs make here—that the patentee's *general* practice of enforcing its patent gave the plaintiffs the right to seek a declaratory judgment invalidating that patent:

> [A]ccording to Plaintiffs, the awareness of [patentee's] vigorous assertion of its patent rights … continues to suppress their ability to perform clinical *BRCA* testing, placing Plaintiffs in the very dilemma the Declaratory Judgment Act was intended to address: they must either proceed with *BRCA*-related activities and risk liability for patent infringement, or refrain from such activities despite believing [patentee's] patents are invalid.

*Id.* at *10. *Cf.* Opp. 12 ("These farmers are restrained in their ability to farm as they wish by the risk that doing such would subject them to growing potential liability for patent infringement. This is precisely the harm the Declaratory Judgment Act was meant to ameliorate.").[1]

The Federal Circuit in *AMP*, however, squarely rejected these arguments, and declined even to consider declaratory-judgment jurisdiction for any plaintiffs who had not alleged "affirmative patent enforcement actions *directed at them* by [patentee]." 2011 WL 3211513, at

---

[1]   *Compare* Opp. 9-16, *with* Brief for Appellees, *AMP*, No. 2010-1406 (Fed. Cir. Nov. 30, 2010), at 24-25, 29-36 (Ex. P to Aug. 26, 2011 Declaration of Carolyn Jacobs Chachkin).

2

\*10 (emphasis added); *see also id.* ("Only three plaintiffs … allege an injury traceable to [patentee]").  Moreover, even with respect to those plaintiffs in *AMP* who (unlike the Plaintiffs here) did allege that the defendant had directed patent enforcement action at them, the Federal Circuit sustained jurisdiction with respect to only one, who was going to "immediately begin" testing that would infringe the patent.  *Id.* at \*11.  The Federal Circuit also expressly rejected the district court's analysis, which "failed to limit its jurisdictional holding to affirmative acts by the patentee directed at specific Plaintiffs … [and] erroneously [held] all the Plaintiffs had standing based on the widespread understanding that one may engage in *BRCA 1/2* testing at the risk of being sued for infringement liability by [patentee.]"  *Id.* at \*14 (internal quotation marks omitted).[2]

Despite *AMP*'s clear holding, Plaintiffs argue that "any act by the patentee relating to *either* the patents in suit *or* the plaintiffs can support DJ jurisdiction."  Opp. 16-17 (emphasis added).  But Plaintiffs have not cited a single case where declaratory-judgment jurisdiction was upheld without the patentee taking an affirmative act toward a plaintiff.  In every case finding jurisdiction, the patentee had taken such directed action.  *See, e.g.*, *Arris Group, Inc. v. British Telecomm. PLC*, 639 F.3d 1368, 1378 (Fed. Cir. 2011) ("direct and repetitive" communications by patentee to plaintiff); *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 899, 901 (Fed. Cir. 2008) (patentee sent threatening letters to plaintiff); *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1382 (Fed. Cir. 2007) (patentee made direct communications to plaintiff relaying its infringement analysis and asserting rights to royalties); *Sony Elecs., Inc. v. Guardian*

---

[2]   The court in *AMP* noted that the patentee had taken enforcement actions "against other similarly situated parties"—but it did so only to underscore the imminence and substantiality of the threat faced by one plaintiff that had received a direct demand for royalties from the patentee. *See AMP*, 2011 WL 3211513, at \*11.  The Federal Circuit did not endorse the position advanced by Plaintiffs here—that a patentee's enforcement actions against entirely unrelated parties create standing against a party the patentee has never contacted and has no intention or desire to sue.

3

*Media Techs., Ltd.*, 497 F.3d 1271, 1285 (Fed. Cir. 2007) (patentee directly accused plaintiff of selling infringing products and thus owing royalties); *see also Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 737 (Fed. Cir. 1988) (numerous "threatening" acts by patentee directed toward plaintiff, including communications expressing intent to bring litigation).

Plaintiffs also fail to distinguish the Federal Circuit cases (in addition to *AMP*) where that court found jurisdiction absent. Plaintiffs seek to distinguish *Creative Compounds, LLC v. Starmark Laboratories*, 2011 WL 2519513 (Fed. Cir. June 24, 2011), on the ground that the plaintiff had only an economic interest, not a legal interest, at stake. Opp. 15. But the reason the plaintiff in *Creative Compounds* had no legal interest was precisely because the patentee had contacted only the plaintiff's customers and had *never contacted* the plaintiff. *See* 2011 WL 2519513, at *11. And in *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1382 (Fed. Cir.), *cert. denied*, 131 S. Ct. 424 (2010), the Federal Circuit found jurisdiction lacking because, in Plaintiffs' words, "the patentee had never seen [the plaintiff's product] and … thus had no opinion on infringement." Opp. 15. The situation is the same here: Monsanto has never seen the Plaintiffs' crops and has no opinion as to whether they infringe.[3]

**B.     The Federal Circuit's Case Law Is Consistent With *MedImmune***

As explained above, *AMP* is binding precedent that compels dismissal. Plaintiffs' argument (Opp. 16) that *AMP* is inconsistent with *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), is not properly addressed to this Court, and it is, in any event, wrong. The Federal

---

[3] *See also Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1339-41 (Fed. Cir. 2008) (no jurisdiction where patentee had taken no action directed toward plaintiff). Plaintiffs attempt to distinguish *Prasco* on the basis of a footnote in which the Federal Circuit declined to decide whether the result would have been the same if the plaintiff had conceded infringement and sought only a declaration of invalidity. Opp. 14-15 (citing *Prasco*, 537 F.3d at 1342 n.12). That footnote *declining* to decide an issue is hardly a holding on which Plaintiffs can rely, and even if it were, it is not applicable here: Plaintiffs do not concede infringement and indeed seek a declaration of noninfringement.

Circuit's case law requiring an affirmative act directed at the plaintiff (as well as steps by the plaintiff towards potentially infringing acts) is entirely consistent with Supreme Court precedent.

The Federal Circuit's two-part framework recognizes that it takes two to make a case or controversy, and that there can be no real and immediate dispute between two parties if one party is not fighting.  The Supreme Court's *MedImmune* decision does not suggest otherwise. *MedImmune* rejected the Federal Circuit's "reasonable apprehension of suit" test as the standard for analyzing a patentee's conduct under the first part of its two-part analysis.  549 U.S. at 132 n.11; *cf. SanDisk*, 480 F.3d at 1379.  The Court held that the declaratory-judgment plaintiff did not need to establish that the patentee would imminently bring a *lawsuit* against it, because there was no doubt that the patentee was asserting its patent rights directly against the plaintiff.  *See* 549 U.S. at 121 (respondent "delivered petitioner a letter expressing its belief that Synagis was covered by the Cabilly II patent and its expectation that petitioner would pay royalties beginning March 1, 2002"); *see also id.* at 130-32.

Although the Supreme Court in *MedImmune* reaffirmed that declaratory-judgment jurisdiction turns on "all the circumstances" (*id.* at 127), it did not reject the Federal Circuit's two-part framework generally or hold that the Federal Circuit was prohibited from developing guidelines to assist courts in applying the "all the circumstances" test to repeated fact patterns. The Federal Circuit has long recognized that courts must consider all the circumstances to determine if a justiciable controversy is present.  *See AMP*, 2011 WL 3211513, at *9; *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 882-83 (Fed. Cir. 1985).  If the Federal Circuit could not give further content to the "all the circumstances" test as it applies that test to repeated fact patterns, parties and courts would face great unpredictability and inconsistency.  Every declaratory-judgment case would be subject to a broad new balancing of all the facts, regardless

of how similar those facts are to those in prior cases.  Indeed, Plaintiffs concede that bright-line rules may be appropriate within the "all the circumstances" framework when they argue that *MedImmune* established a "*per se* standing" rule for licensees.  *See* Opp. 18.[4]

### C. Monsanto Has Made No "Threat By Omission" Toward Any Plaintiff

Realizing they must show some act by Monsanto directed toward a specific Plaintiff, Plaintiffs attempt to twist Monsanto's public commitment *not* to assert its patent rights against growers in Plaintiffs' situation into a "threat by omission" that Monsanto *will* assert its patent rights against *these specific Plaintiffs*.  Opp. 18.  But simply to state Plaintiffs' far-fetched argument is to refute it, and Plaintiffs cite no case that has upheld jurisdiction on the basis of such a non-threat.

---

[4] On the merits, however, that argument also fails.  *MedImmune* held that the existence of a license did not automatically *preclude* jurisdiction where the patentee was coercing the licensee to make ongoing royalty payments.  549 U.S. at 121-22, 129-31, 135.  *MedImmune* did not hold, as Plaintiffs suggest, that the existence of a license automatically *creates* jurisdiction.  Rather, *MedImmune* turned on the fact that there was an active dispute between plaintiff and patentee about ongoing royalties.

Here, even assuming Plaintiffs were to obtain a license, there would be no similar ongoing dispute to support jurisdiction.  Plaintiffs could not use the license to force a dispute with Monsanto.  A grower would have a payment obligation to Monsanto only if the grower did what Plaintiffs claim *not* to want to do—buy Monsanto transgenic seeds—and, in any event, Monsanto does not require ongoing royalties from its licensees.  Similarly, infringement liability could arise only if Plaintiffs used Monsanto's traits in a way Plaintiffs claim *not* to want to do—by saving and replanting the progeny of the patented transgenic seed.

Moreover, even if *MedImmune* did give licensees *per se* standing, Plaintiffs' argument that they could become licensees remains entirely counterfactual.  First, although Plaintiffs assume they could simply take a license unilaterally (Opp. 18), Monsanto would have to approve any request for a license.  *See* Am. Compl. Ex. 1 (Monsanto Technology/Stewardship Agreement "becomes effective if and when Monsanto issues the Grower a license number").  Second, none of these Plaintiffs has (or even wants) a license to use Monsanto's patented traits.  The fact that *other* growers have taken licenses cannot give *these* Plaintiffs the right to sue.  Plaintiffs suggest that an "offered, but not accepted" license was "precisely the scenario" in "many" Federal Circuit cases upholding jurisdiction.  Opp. 19.  But in each case, the patentee demanded a royalty *from a specific plaintiff*.  *See, e.g.*, *AMP*, 2011 WL 3211513, at *11.  Plaintiffs thus continue to ignore the one obvious fact shared among the cases they rely on:  the patentee directed "affirmative patent enforcement actions at [the declaratory-judgment plaintiff]." *Id.* at *10.

6

As Monsanto explained in its opening brief (at 5), the company has committed not to take legal action against growers whose crops inadvertently contain traces of Monsanto's biotech genes. Monsanto's post-Complaint statements (Opp. 19-20) reiterate Monsanto's policy on this score.[5] Although protection of intellectual property is important to Monsanto, its main concern is with those who intentionally try to benefit from Monsanto's traits without respecting Monsanto's patent rights, not with growers whose crops may inadvertently contain its patented traits.

To be sure, Monsanto has sued other growers for intentionally infringing Monsanto's patents. But Monsanto's lawsuits against other growers do not represent any "threat"—much less a real and immediate threat—to these specific Plaintiffs, who go to great pains to abjure any desire to plant crops containing Monsanto's genes. Although Plaintiffs contend that they fear Monsanto may, some day, sue them even if they do not knowingly plant biotech crops, *AMP* makes clear that jurisdiction cannot be based solely on a plaintiff's subjective fears and "widespread understanding" of a patentee's enforcement actions against others, without any objective basis to believe that the patentee would assert its patent against that particular plaintiff. *See* 2011 WL 3211513, at *14.

Nor do Plaintiffs' asserted subjective fears have substance. Plaintiffs do not dispute that Monsanto has never filed a patent-infringement lawsuit against a USDA-certified organic farm or handling operation for the presence of patented traits in its certified organic operations. Indeed, Plaintiffs allege only 144 lawsuits over the roughly 15 years that Monsanto has sold

---

[5]  In any event, those statements are entirely irrelevant post-filing events that cannot create a case or controversy that did not exist when the original complaint was filed, *see, e.g.*, *Innovative Therapies*, 599 F.3d at 1383-84—a point that Monsanto explained in its opening brief (Mem. at 17 n.15) but that Plaintiffs do not even attempt to rebut.

biotech seed. That amounts to approximately 10 cases filed per year, in a farming industry that encompasses over 2,000,000 farms.[6]

Plaintiffs also assert that Monsanto "could easily make this case disappear by providing Plaintiffs a simple covenant not to sue." Opp. 1. The same could be said in any declaratory-judgment case, yet the Federal Circuit has never required a patentee that has *not* taken any affirmative act toward a declaratory-judgment plaintiff to give a covenant not to sue if it wishes to avoid a lawsuit. *Cf. Prasco*, 537 F.3d at 1341 ("[T]hough a defendant's failure to sign a covenant not to sue is one circumstance to consider … it is not sufficient to create an actual controversy—some affirmative actions by the defendant will also generally be necessary.").

Furthermore, Monsanto could not give Plaintiffs "a simple covenant not to sue" for the same reason there is no subject-matter jurisdiction: beyond what Plaintiffs have alleged in their complaint, Monsanto has no information about Plaintiffs. If Plaintiffs' representations are true, then they face no danger of infringement liability to Monsanto. But a blanket covenant not to sue any individual or entity who chooses to join any Plaintiff organization for any past or future activity would enable anyone to commit intentional infringement. Indeed, at least some of the Plaintiffs appear to be organizations that anyone can join, simply by completing a form and paying a small membership fee, without any requirement that members be organic growers or commit not to purposely use Monsanto's seed.[7] No case suggests Monsanto must give a license

---

[6] *See* Ex. N to Chachkin Decl. in Supp. of Monsanto Mem. of Law (Dkt #21), U.S. Environmental Protection Agency, *Demographics*, *at* http://www.epa.gov/agriculture/ag101/demographics.html (last visited Aug. 26, 2011).

[7] *See, e.g.*, Exhibit Q to Aug. 26, 2011 Chachkin Decl., OSGATA 2011 Membership Form, *available at* http://www.osgata.org/pdf/MEMBERSHIP%20FORM%202011.pdf ($30 to become a member of lead plaintiff OSGATA, whose membership is open to anyone, including all "consumers" and "gardeners").

to infringe in the future in order to avoid a lawsuit by parties who in the present claim no intent to practice its patents and with whom Monsanto has no dispute.

## II. PLAINTIFFS STILL HAVE NOT DEMONSTRATED A LIKELIHOOD OF IMMINENT POTENTIALLY INFRINGING ACTIVITY

To establish jurisdiction, Plaintiffs also must show a likelihood of imminent "potentially infringing activity"—here, not simply the planting and growing of any crops, but the use or sale of *transgenic* crops. *See, e.g.*, *AMP*, 2011 WL 3211513, at *9-10. Although Plaintiffs' brief is long on expressed fear of cross-pollination, it is short on evidence that any Plaintiff will actually raise such infringing crops in the near future.[8] Plaintiffs continue to deny any actual infringement, and they cannot state any time frame in which the alleged "contamination" will occur. Instead, Plaintiffs continue to resort to only vague allegations of being "at risk" of being "contaminated." Opp. 23. But "[t]hese 'some day intentions' are insufficient to support an 'actual or imminent' injury for standing 'without … any specification of *when* the some day will be.'" *See AMP*, 2011 WL 3211513, at *11 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)).

Plaintiffs' citation (Opp. 25) of *Janssen Pharmaceutical, N.V. v. Apotex, Inc.*, 540 F.3d 1353 (Fed. Cir. 2008), where jurisdiction was found not to exist because any infringement could not occur for eight months, only underscores the deficiency of Plaintiffs' allegation. Even after

---

[8] Amici cite a handful of studies discussing, at a general level, the potential for gene flow in American agriculture. *See* Brief for Amici Curiae at 16-17. But neither amici nor Plaintiffs offer any evidence or allegation as to what these studies (even assuming they are accurate and could withstand careful examination) mean for the crops or seeds of *these particular Plaintiffs*. Moreover, this is a patent case, not an environmental case; the relevant issue here is not whether gene flow might occur somewhere, or even whether it might occur in Plaintiffs' products, but whether there is an "immediate and real" dispute over patent-infringement liability between Monsanto and Plaintiffs. As Monsanto has shown, there is not. *See AMP*, 2011 WL 3211513, at *11 (declaratory-judgment jurisdiction exists only where plaintiff "alleged a concrete and actual injury traceable to [patentee's] *assertion of its patent rights*" (emphasis added)).

15 years of transgenic crops, Plaintiffs cannot state whether "contamination" will occur in the next eight months or the next eight years. This failure further demonstrates the absence of a "substantial controversy … of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (internal quotation marks omitted).[9]

\*   \*   \*

Plaintiffs' contrived case, involving potentially thousands of plaintiff organization members, numerous unspecified crops, and over 600 patent claims from 23 patents that Monsanto has not even suggested that Plaintiffs have infringed, ultimately has little if anything to do with patent law. Plaintiffs have not articulated any real concern about liability for infringing Monsanto's patents. Rather, Plaintiffs are attempting to use this case as a referendum on the appropriateness of transgenic agriculture. *See, e.g.*, Decl. of Chuck Noble in Support of Pls.' Opp. ¶ 3 ("I do everything I can to avoid having any contact with Monsanto's GE alfalfa seed, as I believe it poses a great risk for society."). However, "[s]imply disagreeing with the existence of a patent or even suffering an attenuated, nonproximate, effect from the existence of a patent does not meet the Supreme Court's requirement for an adverse legal controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *AMP*, 2011 WL 3211513, at *14 (citing *MedImmune*, 549 U.S. at 127).

For the foregoing reasons, the motion to dismiss should be granted.

Dated:  August 26, 2011                         Respectfully submitted,

                                                WILMER CUTLER PICKERING
                                                  HALE and DORR LLP

---

[9] Moreover, the patent-law arguments that Plaintiffs seek to advance can be raised—and many already have been—by growers who have actual disputes with Monsanto, in cases with concrete circumstances and specific facts. *See, e.g.*, *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1338-41 (Fed. Cir. 2006); *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1341-43 (Fed. Cir. 2004).

By: /s/ Seth P. Waxman
Seth P. Waxman (admitted *pro hac vice*)
Paul R.Q. Wolfson (admitted *pro hac vice*)
Todd C. Zubler (admitted *pro hac vice*)
Gregory H. Lantier (GL5778)
Carolyn J. Chachkin (admitted *pro hac vice*)
Rachel L. Weiner (RW0414)

1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendants Monsanto Company and Monsanto Technology LLC*