UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
ORGANIC    SEED    GROWERS    AND    TRADE
ASSOCIATION;   ORGANIC   CROP   IMPROVEMENT
ASSOCIATION  INTERNATIONAL,  INC.;  OCIA
RESEARCH   AND   EDUCATION   INC.;   THE
CORNUCOPIA       INSTITUTE;       DEMETER
ASSOCIATION,  INC.;  CENTER  FOR  FOOD
SAFETY;   BEYOND   PESTICIDES;   NAVDANYA
INTERNATIONAL; MAINE ORGANIC FARMERS AND
GARDENERS  ASSOCIATION;  NORTHEAST  ORGANIC
FARMING    ASSOCIATION    OF    NEW    YORK;
NORTHEAST        ORGANIC        FARMING
ASSOCIATION/MASSACHUSETTS  CHAPTER,  INC.;
NORTHEAST  ORGANIC  FARMING  ASSOCIATION  OF
NEW HAMPSHIRE; NORTHEAST ORGANIC FARMING
ASSOCIATION  OF  RHODE  ISLAND;  CT  NOFA;
NORTHEAST  ORGANIC  FARMING  ASSOCIATION  OF
VERMONT;  RURAL  VERMONT;  OHIO  ECOLOGICAL
FOOD   &   FARM   ASSOCIATION;   FLORIDA
CERTIFIED  ORGANIC  GROWERS  AND  CONSUMERS
INC.; SOUTHEAST IOWA ORGANIC ASSOCIATION;
NORTHERN  PLAINS  SUSTAINABLE  AGRICULTURE
SOCIETY;   MENDOCINO   ORGANIC   NETWORK;
NORTHEAST    ORGANIC    DAIRY    PRODUCERS
ALLIANCE; MIDWEST ORGANIC DAIRY PRODUCERS
ALLIANCE; WESTERN ORGANIC DAIRY PRODUCERS
ALLIANCE;   CANADIAN   ORGANIC   GROWERS;
MANITOBA  ORGANIC  ALLIANCE;  PEACE  RIVER
ORGANIC  PRODUCERS  ASSOCIATION;  UNION
PAYSANNE; FAMILY FARMER SEED COOPERATIVE;
SUSTAINABLE    LIVING    SYSTEMS;    GLOBAL
ORGANIC  ALLIANCE;  FOOD  DEMOCRACY  NOW!;
FAMILY  FARM  DEFENDERS  INC.;  FARM-TO-
CONSUMER LEGAL DEFENSE FUND; WESTON A.
PRICE    FOUNDATION;    MICHAEL    FIELDS
AGRICULTURAL INSTITUTE; FEDCO SEEDS INC.;
ADAPTIVE   SEEDS,   LLC;   SOW   TRUE   SEED;
SOUTHERN  EXPOSURE  SEED  EXCHANGE;  MUMM'S
SPROUTING   SEEDS;   BAKER   CREEK   HEIRLOOM
SEED  CO.,  LLC;  COMSTOCK,  FERRE  &  CO.,
LLC;  SEEDKEEPERS,  LLC;  SISKIYOU  SEEDS;
COUNTRYSIDE ORGANICS; WILD GARDEN SEED;
CUATRO  PUERTAS;  SEED  WE  NEED;  INTERLAKE
FORAGE  SEEDS  LTD.;  ALBA  RANCH;  WILD  PLUM
FARM;  GRATITUDE  GARDENS;  RICHARD  EVERETT

**MEMORANDUM AND ORDER**

11 Civ. 2163 (NRB)

FARM, LLC; PHILADELPHIA COMMUNITY FARM,
INC.; GENESIS FARM; CHISPAS FARMS LLC;
KIRSCHENMANN FAMILY FARMS INC.; MIDHEAVEN
FARMS;     KOSKAN    FARMS;    CALIFORNIA
CLOVERLEAF FARMS; NORTH OUTBACK FARM;
TAYLOR FARMS, INC.; JARDIN DEL ALMA; RON
GARGASZ ORGANIC FARMS; ABUNDANT ACRES;
T & D WILLEY FARMS; FULL MOON FARM, INC.;
COMMON GOOD FARM, LLC; AMERICAN BUFFALO
COMPANY; RADIANCE DAIRY; QUINELLA RANCH;
NATURE'S WAY FARM LTD.; LEVKE AND PETER
EGGERS FARM; FREY VINEYARDS, LTD.; BRYCE
STEPHENS; CHUCK NOBLE; LARHEA PEPPER;
PAUL  ROMERO;  BRIAN  WICKERT;  BRUCE
DRINKMAN; MURRAY BAST; and DONALD WRIGHT
PATTERSON, JR.,

                    Plaintiffs,

          - against -

MONSANTO COMPANY and MONSANTO TECHNOLOGY
LLC,

                    Defendants.
--------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     Plaintiffs bring this lawsuit against defendants Monsanto

Company and Monsanto Technology LLC (together "defendants" or

"Monsanto"), seeking declaratory judgments that plaintiffs are

not infringing various of defendants' patents, that those

patents are invalid and unenforceable, and that, regardless,

defendants would be entitled to no remedies against plaintiffs.

Presently before us is defendants' motion to dismiss for lack of

subject matter jurisdiction.

For the reasons set forth herein, defendants' motion is granted.

## BACKGROUND[1]

### I.   Pre-Suit Facts

The relevant facts are largely uncontested. Plaintiffs are farmers and seed businesses, both organic and non-organic, as well as related membership organizations. Plaintiffs do not want to use, grow crops raised from, or sell transgenic seed, which is seed that has had genetic code of another species introduced to it. Defendants develop, manufacture, license, and sell chemicals and agricultural biotechnology, including transgenic seed.

Defendants produce, in particular, transgenic seed known as "Roundup Ready," which is resistant to the herbicide glyphosate, the active ingredient in defendants' product "Roundup." This resistance trait and related technologies are covered by a variety of patents held by defendants.[2]

---

[1] These facts are drawn from the First Amended Complaint (the "FAC") and the numerous declarations submitted in connection with the Memorandum of Law in Support of Monsanto Company and Monsanto Technology LLC's Motion to Dismiss for Lack of Subject-Matter Jurisdiction ("Defs.' Mem."), Plaintiffs' Memorandum of Law in Opposition to Defs.' Mem. ("Pls.' Mem."), and the Reply Memorandum in Support of Monsanto's Motion to Dismiss for Lack of Subject-Matter Jurisdiction. In assessing subject matter jurisdiction, we are permitted to look beyond the pleadings. See Hunter v. Colonial Park, 409 F. App'x 411, 412 (2d Cir. 2011).

[2] The patents at issue in this action are U.S. Patent Nos. 5,322,938, 3,532,605, 5,362,865, 5,378,619, 5,424,412, 5,463,175, 5,530,196, 5,554,798, 5,593,874, 5,641,876, 5,659,122, 5,717,084, 5,728,925, 5,750,871, 5,859,347, 6,025,545, 6,040,497, 6,051,753, 6,083,878, 6,753,463, and 6,825,400, and U.S. Reissue Patent Nos. RE38825 and RE39247.

Growers who wish to use defendants' seeds must obtain limited-use licenses to do so. Because subsequent generations of plants grown from these seeds will also contain the glyphosate-tolerance trait, these licenses authorize growers to use the seed only to grow a single crop; growers are not authorized to harvest and plant the second-generation seed produced from the original planting, or to sell seeds containing the patented trait outside authorized channels of distribution.

Despite these restrictions, some unlicensed -- and unintended -- use of transgenic seeds is inevitable. Like any other seeds, transgenic seeds may contaminate non-transgenic crops through a variety of means, including seed drift or scatter, crosspollination, and commingling via tainted equipment during harvest or post-harvest activities, processing, transportation, and storage. Seed businesses and farmers may, at some expense, test their seeds and crops to ensure that no contamination has occurred, and non-transgenic farmers may establish buffer zones between themselves and farmers using transgenic seed in order to reduce the risk of cross-transmission.

No plaintiffs claim that contamination has yet occurred in any crops they have grown or seed they have sold. However, one plaintiff farmer claims that seed he considered purchasing in 2010 was contaminated with genetically engineered seed, (Decl.

of Chuck Noble in Supp. of Pls.' Mem. ¶ 5), and one plaintiff seed distributor claims that it received shipments contaminated with genetically modified seed in each of 2005, 2008, 2009, and 2010, (Decl. of C.R. Lawn in Supp. of Pls.' Mem. ¶ 4). Neither plaintiff asserts that the offending seeds were covered by defendants' patents.

Contamination can theoretically affect non-transgenic farmers by lowering the price for which their crops may be sold and potentially resulting in rejected shipments. While there is no evidence in the record that any farmer has ever been decertified as organic by the U.S. Department of Agriculture National Organic Program (the "NOP") because of seed contamination, we do not foreclose that hypothetical possibility. According to the NOP, however, "[o]rganic certification is process based." (Decl. of Carolyn Jacobs Chachkin in Supp. of Defs.' Mem. ("Chachkin Decl."), Ex. L, Policy Memo 11-13 (Apr. 15, 2011).) As a result, "[i]f all aspects of the organic production or handling process were followed correctly, then the presence of a detectable residue from a genetically modified organism alone does not constitute a violation of this regulation." (Id.)[3]

---

[3] We also note, parenthetically, that organic certification is only of concern to certain plaintiffs; other plaintiffs eschew use of transgenic seed but are not organic farmers or seed businesses.

Additionally, inadvertent growth of crops with patented traits may potentially subject a farmer to liability for patent infringement. While defendants investigate hundreds of possible patent infringers each year, between 1997 and April 2010 they filed just 144 lawsuits to enforce their patent rights against farmers. Defendants, moreover, have never filed a patent-infringement suit against a certified organic farm or handling operation over the presence of patented traits in its operations, and they stated at oral argument that they have never sued a party who did not "want to make use of the traits that are manifested in [defendants'] transgenic products." (Oral Arg. Tr. at 10:2-9; see also id. at 34:23-35:14.) Indeed, defendants have expressly declared that it is not their policy "to exercise [their] patent rights where trace amounts of our seed or traits are present in [a] farmer's fields as a result of inadvertent means." (Chachkin Decl., Ex. O, Monsanto's Commitment: Farmers and Patents.) Nevertheless, plaintiffs allege without specification that defendants have accused certain non-intentional users of Monsanto's seed of patent infringement and threatened them with litigation. No plaintiffs claim to have been so threatened.

## II. Post-Suit Facts

On March 29, 2011, plaintiffs filed a complaint seeking declaratory judgments that twenty-three of defendants' patents

are invalid, unenforceable, and not infringed by plaintiffs, and that, regardless, defendants would be entitled to no remedy against plaintiffs. That same day, defendants republished on their blog their commitment not to exercise their patent rights over inadvertently acquired trace amounts of patented seed or traits. (FAC, Ex. 2, Monsantoco, "PUBPAT Allegations Are False, Misleading and Deceptive" (Mar. 29, 2011).)

Shortly thereafter, plaintiffs wrote to defendants and emphasized a point asserted in their filing: "none of [the plaintiffs] intend[s] to possess, use or sell any transgenic seed, including any transgenic seed potentially covered by Monsanto's patents." (FAC, Ex. 3, Letter from Daniel B. Ravicher, Public Patent Found., to Todd Zubler, Esq., WilmerHale (Apr. 18, 2011).) Nonetheless, the letter professes a fear of being sued by defendants for patent infringement and "request[s] that Monsanto expressly waive any claim for patent infringement it may ever have against [plaintiffs] and memorialize that waiver by providing a written covenant not to sue." (Id.) Plaintiffs asserted that defendants' failure to respond to the letter would make it "reasonable for [plaintiffs] to feel they would be at risk of having Monsanto assert claims of patent infringement against them should they ever become contaminated by transgenic seed potentially covered by Monsanto's patents." (Id.)

In response to plaintiffs' letter, defendants reiterated that it is not their policy to exercise their patent rights against farmers whose fields inadvertently contain trace amounts of patented seeds or traits. In particular, the reply letter referenced plaintiffs' claim that they do not have any intention of using any transgenic seed and noted that, "[t]aking [that] representation as true, any fear of suit or other action is unreasonable, and any decision not to grow certain crops unjustified." (FAC, Ex. 4, Letter from Seth P. Waxman, WilmerHale, to Ravicher (Apr. 28, 2011).)

Plaintiffs filed the FAC on June 1, 2011, seeking the same declaratory judgment relief as in the original complaint while adding a number of new plaintiffs and including a description of the events that transpired after the original complaint was filed. Defendants made this motion the following month, moving to dismiss the FAC for lack of subject matter jurisdiction.

<u>**DISCUSSION**</u>

**I.   Legal Standards**

The Declaratory Judgment Act provides, "In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The jurisdiction of courts to issue judgments is

limited by the justiciability of "cases" or "controversies" under Article III of the Constitution. See Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1335 (Fed. Cir. 2008). Thus a district court has no jurisdiction over a declaratory judgment action if the suit does not meet Article III's case or controversy requirement.

Although "there is no bright-line rule for determining whether an action satisfies the case or controversy requirement," id. at 1336, and "the analysis must be calibrated to the particular facts of each case," Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 879 (Fed. Cir. 2008), the Supreme Court has articulated a basic test that every dispute must satisfy. A declaratory judgment plaintiff must demonstrate that "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office ("AMP"), 653 F.3d 1329, 1342-43 (Fed. Cir. 2011) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)). The Federal Circuit has further refined this test[4] to require "an injury in

---

[4] "Whether an actual case or controversy exists so that a district court may entertain an action for a declaratory judgment of non-infringement and/or invalidity is governed by Federal Circuit law." MedImmune, Inc. v. Centocor, Inc., 409 F.3d 1376, 1378 (Fed. Cir. 2005), overruled on other grounds by MedImmune, 549 U.S. at 130-31.

fact traceable to the patentee," which only exists if plaintiffs have alleged "both (1) an affirmative act by the patentee related to the enforcement of his patent rights, and (2) meaningful preparation to conduct potentially infringing activity."[5]  Id.   at   1343   (citing   SanDisk   Corp.   v. STMicroelectronics, Inc., 480 F.3d 1372, 1380-81 (Fed. Cir. 2007); Cat Tech, 528 F.3d at 880).

The first element is intended to ensure that the parties have adverse legal interests, which may be established "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license." SanDisk, 480 F.3d at 1381. Such circumstances, however, are not "the outer boundaries of declaratory judgment jurisdiction," id., and it is possible that the first prong of the test may be satisfied upon some lesser showing. Nevertheless, there must be "an underlying legal cause

_____

[5] Despite placing heavy emphasis on the Federal Circuit's holding that there can be "no bright-line rule . . . for determining whether a declaratory judgment action satisfies Article III's case-or-controversy requirement," AMP, 653 F.3d at 1342; (Pls.' Mem. 9-11), plaintiffs attempt to circumvent this test first by arguing that MedImmune confers per se standing on any plaintiff who has purchased a license to a patent. (Pls.' Mem. 18.) The argument evinces a lack of understanding of MedImmune's holding, which was that purchasing a patent license does not preclude jurisdiction where the purchase has been coerced. See 549 U.S. at 129-31. Plaintiffs, relying on their misreading of MedImmune, next endeavor to extend the argument and contend that standing should be conferred on all parties who are able to purchase a license, whether or not they have done so. (Pls.' Mem. 19.) Accepting this suggestion would functionally eliminate the case or controversy requirement and should thus be rejected out of hand.

of action that the declaratory defendant could have brought or threatened to bring, if not for the fact that the declaratory plaintiff had preempted it," because otherwise "any adverse economic interest that the declaratory plaintiff may have against the declaratory defendant is not a legally cognizable interest sufficient to confer declaratory judgment jurisdiction." Creative Compounds, LLC v. Starmark Labs., 651 F.3d 1303, 1316 (Fed. Cir. 2011) (internal quotation marks omitted). Indeed, "[t]he mere existence of a potentially adverse patent does not cause an injury [or] create an imminent risk of an injury; absent action by the patentee, a potential [infringer] is legally free to market its product in the face of an adversely-held patent." Prasco, 537 F.3d at 1338 (internal quotation marks and alteration omitted).

With respect to the second element, "[i]f a declaratory judgment plaintiff has not taken significant, concrete steps to conduct infringing activity, the dispute is neither 'immediate' nor 'real' and the requirements for justiciability have not been met." Cat Tech, 528 F.3d at 880. Significantly, "the greater the length of time before potentially infringing activity is expected to occur, the more likely the case lacks the requisite immediacy," id. at 881 (internal quotation marks omitted), and if it is "uncertain when, if ever, the declaratory plaintiff would engage in potentially infringing activity, the dispute

[will] not present a case or controversy of sufficient immediacy to support a declaratory judgment," id.

## II.  Declaratory Judgment Jurisdiction

### A.   Defendants' Affirmative Acts

Plaintiffs do not allege that defendants have ever demanded royalty payments from plaintiffs, identified any of plaintiffs' conduct as potentially infringing, or even initiated any contact with plaintiffs whatsoever. Instead, plaintiffs posit the existence of an actual case or controversy based on: (1) defendants' pattern of enforcing their patent rights against non-plaintiff farmers through litigation or threats of litigation; (2) plaintiffs' assertion of the "implicit threat" in defendants' statement that it is not their policy to enforce their patent rights against farmers whose crops inadvertently acquire trace amounts of patented seeds or traits; and (3) defendants' refusal to provide plaintiffs with a blanket covenant not to sue.

### 1.   Defendants' Patent Suits Against Non-Plaintiffs

In the absence of other conduct by the patentee indicative of adverse legal interests, the patentee must have asserted its rights against the declaratory judgment plaintiff. See AMP, 653 F.3d at 1348 ("The district court failed to limit its jurisdictional holding to affirmative acts by the patentee directed at specific Plaintiffs . . . and thus we reverse the

district court's holding that the various plaintiffs other than [one from whom defendant demanded royalty payments] have standing to maintain this declaratory judgment action."); Innovative Therapies, Inc. v. Kinetic Concepts, Inc., 599 F.3d 1377, 1382 (Fed. Cir.) ("[T]he fact that [the declaratory judgment defendant] had filed infringement suits against other parties for other products does not, in the absence of any act directed toward [the declaratory judgment plaintiff], meet the minimum standard discussed in MedImmune."), cert. denied, 131 S. Ct. 424 (2010).

In connection with other activities supporting an inference of adverse legal interests, suits brought by the patentee against parties other than the declaratory judgment plaintiffs may suffice to establish a case or controversy, but only if those suits are sufficiently similar to the one the patentee may potentially bring against the declaratory judgment plaintiffs. See AMP, 653 F.3d at 1345 ("[A]s [plaintiff] was aware, [defendant] was asserting its patent rights against other similarly situated parties, a fact to be considered in assessing the existence of an actual controversy under the totality of circumstances." (emphasis added)); Prasco, 537 F.3d at 1341 ("Prior litigious conduct is one circumstance to be considered in assessing whether the totality of circumstances creates an actual controversy. However, one prior suit concerning different

products covered by unrelated patents is not the type of pattern of prior conduct that makes reasonable an assumption that [the defendant] will also take action against [the plaintiff] regarding its new product."). This is because "a fear of future harm that is only subjective is not an injury or threat of injury caused by the defendant that can be the basis of an Article III case or controversy." Prasco, 537 F.3d at 1338. It is instead "the reality of the threat of injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." Id. at 1338-39 (internal quotation marks and alteration omitted); see also Hewlett-Packard Co. v. Acceleron LLC, 587 F.3d 1358, 1363 (Fed. Cir. 2009) ("[I]t is the objective words and actions of the patentee that are controlling." (internal quotation marks omitted)).

Plaintiffs argue that defendants' 144 patent-infringement lawsuits filed against farmers between 1997 and April 2010 create a reality of the threat of injury. Plaintiffs, however, overstate the magnitude of defendants' patent enforcement. This average of roughly thirteen lawsuits per year is hardly significant when compared to the number of farms in the United States, approximately two million. (Chachkin Decl., Ex. N, U.S. E.P.A., Demographics.)

Moreover, there is no suggestion that these suits were brought against "similarly situated parties." AMP, 653 F.3d at

14

1345. While plaintiffs have alleged that defendants have pursued patent litigation "against other farmers who did not want to be contaminated by transgenic seed," (FAC ¶ 133; see also id. ¶ 132), that claim is belied by the decisions in the suits against the referenced individuals. See Monsanto Co. v. Parr, 545 F. Supp. 2d 836, 842-44 (N.D. Ind. 2008) (defendant intentionally induced others to infringe Monsanto's patents); Monsanto Co. v. Nelson, No. 4:00-CV-1636, 2001 U.S. Dist. LEXIS 25132, at *2 (E.D. Mo. Sept. 10, 2001) (Monsanto alleged that defendants had intentionally saved and replanted second-generation seed with patented traits in violation of their licensing agreement); Monsanto Can. Inc. v. Schmeiser, 2001 FCT 256 [120] (Can.) (finding that the defendant saved and planted seed "he knew or ought to have known was Roundup tolerant"); see also Farmer Fighting Lawsuit Over Seed Planting, Associated Press, July 8, 2001 (describing Monsanto's lawsuit against Troy Roush as one involving saved seeds in violation of licensing agreements).

Thus there is no evidence that defendants have commenced litigation against anyone standing in similar stead to plaintiffs. The suits against dissimilar defendants are insufficient on their own to satisfy the affirmative acts element, and, at best, are only minimal evidence of any objective threat of injury to plaintiffs. Plaintiffs'

alternative allegations that defendants have threatened, though not sued, inadvertent users of patented seed, are equally lame. These unsubstantiated claims do not carry significant weight, given that not one single plaintiff claims to have been so threatened.[6]

### 2.   Defendants' "Implicit Threat"

Plaintiffs contend that the ambiguous language in defendants' statement regarding unintentional use of patented seeds "implicitly threaten[s] all farmers and seed businesses who are not [defendants'] customers." (Pls.' Mem. 19.) In its entirety, the purportedly threatening language reads: "It has never been, nor will it be[,] Monsanto policy to exercise its patent rights where trace amounts of our patented seeds or traits are present in [a] farmer's fields as a result of inadvertent means." (Chachkin Decl., Ex. O.) It is objectively unreasonable for plaintiffs to read this language as a threat.

Plaintiffs expressly allege that they "do not want to use or sell transgenic seeds." (FAC ¶ 2.) They specifically communicated the same to defendants. (Id., Ex. 3, Letter to

---

[6] Plaintiffs have essentially already conceded that their fear of suit was not reasonable at the time the original complaint was filed. Their letter to defendants of April 18, 2011 -- after the original complaint was filed -- notes that, "[i]f we do not receive a response from Monsanto within a reasonable amount of time, . . . then [it would] be reasonable for our clients to feel they would be at risk of having Monsanto assert claims of patent infringement against them should they ever become contaminated by transgenic seed potentially covered by Monsanto's patents." (FAC, Ex. 3, Letter from Ravicher to Zubler (Apr. 18, 2011) (emphasis added).) The letter is an implicit recognition that any anticipated risk of suit was not objectively reasonable when the case was filed.

Zubler from Ravicher ("[N]one of [the plaintiffs] intend[s] to possess, use or sell any transgenic seed, including any transgenic seed potentially covered by Monsanto's patents.").) Assuming the truth of these representations, the presence of patented traits in plaintiffs' seeds could only be inadvertent. And, while we grant that the phrase "trace amounts" is susceptible of differing interpretations, the notion that plaintiffs, who are actively attempting to avoid the use of transgenic seed, may nevertheless find themselves unknowingly utilizing it in significant quantities strains credulity.

Regardless, the negative inference plaintiffs wish to draw from defendants' statement is unwarranted. The statement is an expression of defendants' intention not to pursue their patent rights against certain farmers. Yet plaintiffs want the Court to read the statement not as a limitation on whom defendants will sue, but rather as a positive indication of whom defendants will bring suit against. No such inference is permissible. The plain meaning of defendants' statement is clear, and we cannot adopt plaintiffs' deliberate misreading.

Plaintiffs further contend that defendants' reiteration of their statement in response to the filing of the original complaint and again in their reply letter to plaintiffs is additional cause to worry. Plaintiffs, however, should hardly be surprised and cannot reasonably feel threatened by defendants'

repetition of language Monsanto had previously utilized to respond to individual concerns about accidental contamination.

Indeed, plaintiffs' letter to defendants seems to have been nothing more than an attempt to create a controversy where none exists. This effort to convert a statement that defendants have no intention of bringing suit into grounds for maintaining a case, if accepted, would disincentivize patentees from ever attempting to provide comfort to those whom they do not intend to sue, behavior which should be countenanced and encouraged. In contrast, plaintiffs' argument is baseless and their tactics not to be tolerated.[7]

### 3.  Defendants' Refusal to Sign a Covenant Not to Sue

In their April 18, 2011 letter to defendants, plaintiffs asked defendants to "expressly waive any claim for patent infringement [they] may ever have against [plaintiffs] and memorialize that waiver by providing a written covenant not to sue." (FAC, Ex. 3.) Defendants, rather unsurprisingly, declined

---

[7]  Plaintiffs' allegations with respect to defendants' repetition of their statement pertain only to conduct after the filing of the initial complaint and, as such, do not bear on our decision, which must be an "evaluat[ion] [of] whether a controversy existed at the time the original complaint was filed." Innovative Therapies, 599 F.3d at 1384; see also id. (holding that, "unless there was jurisdiction at the filing of the original complaint, jurisdiction [cannot] be carried back to the date of the original pleading" by allegations in an amended complaint). To hold otherwise "would invite a declaratory judgment plaintiff in a patent case to file suit at the earliest moment it conceives of any potential benefit to doing so" in an attempt to "draw an infringement suit in response (thereby retroactively establishing jurisdiction over their first-filed declaratory judgment suit)." Id. (internal quotation marks omitted). Plaintiffs here have acted similarly, a further reason to discount their argument.

to provide plaintiffs with the requested "blanket" waiver. (Pls.' Mem. 21.) Rather, they represented that they were "unaware of any circumstances that would give rise to any claim for patent infringement or any lawsuit against [plaintiffs]" and that they had "no intention of asserting patent-infringement claims against [plaintiffs]." (Id., Ex. 4.)

This exchange occurred in the same post-filing letters discussed above, and, as before, plaintiffs' argument is groundless and their tactics unacceptable. The fact that defendants declined to provide plaintiffs with a written covenant not to bring any claims they might ever have does not meaningfully add to plaintiffs' case. As the Federal Circuit has noted, "though a defendant's failure to sign a covenant not to sue is one circumstance to consider in evaluating the totality of the circumstances, it is not sufficient to create an actual controversy . . . ." Prasco, 537 F.3d at 1341. This notion is particularly apt in this case. Here, plaintiffs are asking defendants to accept as wholly accurate the complaint's description of plaintiffs' activities and intentions. Moreover, the proffered waiver was so broadly framed as to preclude any realistic chance of defendants' acceptance. In short, plaintiffs' letter was clearly intended to be used as a prop in this litigation, and the failure to sign a covenant not to sue borders on the wholly irrelevant.

B.   Plaintiffs' Preparatory Conduct

Plaintiffs contend that they need not undertake any further actions in order to have "meaningful[ly] prepar[ed] to conduct potentially infringing activity," AMP, 653 F.3d at 1343, because defendants' patented seeds will spread with no action on plaintiffs' part and are self-replicating.

To the extent the test considers plaintiffs' conduct, it is useful because it focuses the analysis on the immediacy and reality of the dispute. See Cat Tech, 528 F.3d at 880; cf. Prasco, 537 F.3d at 1341. Regardless of whether plaintiffs need to demonstrate affirmative action on their part beyond their usual agricultural activities, they must show that potential infringement is a matter of immediate concern. Plaintiffs have not done that.

Plaintiffs have not alleged that any of them have actually grown or sold contaminated seed, and they have in fact professed a desire to specifically avoid any such use. At most they allege that they "could . . . be accused of patent infringement in the near future if and when they become contaminated by Monsanto's transgenic seed." (FAC ¶ 3.) This is the same sort of intangible worry, unanchored in time, that the Federal Circuit has found "insufficient to support an 'actual or imminent' injury for standing without any specification of when the some day will

be."[8] <u>AMP</u>, 653 F.3d at 1346 (internal quotation marks and alteration omitted). The cases are clear that if it is "uncertain when, if ever, the declaratory plaintiff would engage in potentially infringing activity, the dispute [does] not present a case or controversy of sufficient immediacy to support a declaratory judgment." <u>Cat Tech</u>, 528 F.3d at 881. That is precisely the state of affairs in the instant case, creating a significant barrier to plaintiffs obtaining a declaratory judgment.[9]

---

[8] Plaintiffs contend that they are facing immediate injury because some of them have stopped farming certain crops for fear of patent infringement suits brought by defendants. (<u>See, e.g.</u>, Oral Arg. Tr. at 20:10-25; Decl. of Bryce Stephens in Supp. of Pls.' Mem. ¶ 11; Decl. of Frederick Kirschenmann in Supp. of Pls.' Mem. ¶ 13.) That "injury" is of plaintiffs' own making and, as discussed above, is not reasonable based on "the objective words and actions of the patentee." <u>Hewlett-Packard</u>, 587 F.3d at 1363.

   Moreover, as <u>AMP</u> makes clear, the relevant concern is of infringement, not simply altered behavior. <u>See</u> 653 F.3d at 1345-46 (finding that certain plaintiffs, who had ceased their activity out of fear of suit, had not suffered "actual or imminent" injury because they would only "consider" resuming the activity rather than "stat[ing] unequivocally that [they would] immediately" resume). The plaintiffs without standing in <u>AMP</u> were in no danger of invading the space occupied by the defendant's patents because it was not certain that they would resume the infringing activity. Here, even if plaintiffs resumed farming their crops, contamination -- and thus potential infringement -- is not certain. <u>See also Cat Tech</u>, 528 F.3d at 881.

[9] At oral argument, plaintiffs asked the Court to consider a number of cases not dealing with declaratory judgments in the patent context when evaluating whether the controversy at bar is sufficiently immediate to support subject matter jurisdiction. (Oral Arg. Tr. at 3:10-5:1.) Those cases, however, are wholly inapposite because they dealt with plaintiffs seeking pre-enforcement review of criminal statutes, not private parties engaged in civil litigation. <u>See Holder v. Humanitarian Law Project</u>, 130 S. Ct. 2705, 2717 (2010); <u>Virginia v. Am. Booksellers Ass'n</u>, 484 U.S. 383, 392 (1988); <u>Doe v. Bolton</u>, 410 U.S. 179, 188 (1973); <u>Biotech. Indus. Org. v. Dist. of Columbia</u>, 496 F.3d 1362, 1370-71 (Fed. Cir. 2007); <u>see also Arris Grp., Inc. v. British Telecomms. PLC</u>, 639 F.3d 1368, 1374 (Fed. Cir. 2011) (noting that cases challenging government action are treated differently than patent cases seeking declaratory judgment).

   Plaintiffs also drew our attention to <u>Aetna Life Insurance Co. v. Haworth</u>, 300 U.S. 227 (1937). In that case, an insurance company was allowed to seek a declaratory judgment before the insured had provided any indication

C.    "All the Circumstances"

"[U]nder all the circumstances" outlined above, the plaintiffs have not "show[n] that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." AMP, 653 F.3d at 1342-43 (quoting MedImmune, 549 U.S. at 127). Defendants have not accused plaintiffs of infringement or asserted the right to any royalties from plaintiffs, "nor have they taken any actions which imply such claims. Instead, all we have before us is [plaintiffs'] allegation that [their activities do] not infringe the defendants' patents." Prasco, 537 F.3d at 1340.[10]

Defendants' patent-infringement suits against other, dissimilar parties cannot by themselves create subject matter jurisdiction, and the diaphanous allegations that defendants have threatened but not sued unintentional infringers do not add much weight to the substantiality of the dispute. Nor have plaintiffs pointed to any other circumstances that bolster the

that he would bring suit. The insured had stopped paying his premiums because he claimed he was disabled and was therefore entitled to benefits; he had made "a claim of a present, specific right" on the insurance company. Id. at 242. Defendants here have advanced no analogous claim with respect to plaintiffs.

[10] Plaintiffs' attempt to distinguish Prasco on the basis of a footnote that declines "to consider whether similar facts would be sufficient to establish jurisdiction if, instead, [plaintiff] had conceded infringement and was only arguing invalidity," 537 F.3d at 1342 n.12, is unavailing. While plaintiffs here do argue that defendants' patents are invalid, they do not concede that they have infringed those patents, which is what the Prasco court was suggesting may have created an imminent, real dispute.

objective reasonableness of their claims of threat of injury. Defendants' statement regarding the exercise of their patent rights against inadvertent infringers is, if anything, a source of comfort rather than worry. Their actions subsequent to the filing of the complaint cannot reasonably be construed as threatening and, regardless, are simply the product of plaintiffs' transparent effort to create a controversy where none exists. Even were there credible threats of suit from defendants, there is no evidence that plaintiffs are infringing defendants' patents, nor have plaintiffs suggested when, if ever, such infringement will occur.

Taken together, it is clear that these circumstances do not amount to a substantial controversy and that there has been no injury traceable to defendants. We therefore do not have subject matter jurisdiction over this action, and it is, accordingly, dismissed.

## CONCLUSION

For the foregoing reasons, the motion (docket no. 19) is granted.


Dated:    New York, New York
          February 24, 2012

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE



Copies of the foregoing Order have been mailed on this date to the following:

**Attorneys for Plaintiffs**
Daniel B. Ravicher, Esq.
Sabrina Y. Hassan, Esq.
Public Patent Foundation
Benjamin N. Cardozo School of Law
55 Fifth Ave, Suite 928,
New York, NY 10003

**Attorneys for Defendants**
Seth P. Waxman, Esq.
Gregory H. Lantier, Esq.
Rachel L. Weiner, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006